UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------
LORRAINE WETZEL,

              Plaintiff,

    -against-

THE TOWN BOARD OF ORANGETOWN,
THE TOWN OF ORANGETOWN,
THOM KLEINER, MARIE MANNING AND
DENIS TROY,

              Defendants
------------------------------------------------------------------

**COMPLAINT**
("*Wetzel 6*")

08 Civ.  0196    "*ECF Case*"

### Complaint's Preliminary Statement

    *This complaint ("Wetzel 6") challenges, on due process and equal protection grounds, the action of the Defendant Town Board in adjudging Plaintiff Lorraine Wetzel guilty of disciplinary infractions, and imposing a 10 day suspension, based upon an unauthorized trial conducted in a constitutionally abusive manner before an uncredentialed and completely partisan "hearing officer" apparently selected by the municipal prosecutor (the Town's outside labor counsel) for the purpose of convicting Lt. Wetzel, regardless of the actual evidence, because of her opposition to the Town's unlawful discrimination.*

    *The challenged action is the most recent in a series of abusive actions taken by the Town and its agents in retaliation for Plaintiff's opposition to unlawful and unconstitutional discrimination, including the* Wetzel 1, Wetzel 2, Wetzel 3, *and* Wetzel 4 *federal lawsuits referenced below, and* Wetzel 5, *Plaintiff's freedom of information lawsuit uncovering the Town labor counsel's $1 million+ billings for "police personnel matters."*

    *A public employee, including a female police lieutenant, has a property interest in her public employment and the reasonable expectation that she will not be deprived of such without good cause.  She also has a reasonable expectation that her municipal employer will act in good faith and fairly, and not abusively with reprisal, in her public employment.*

    *As described below, and in the annexed Exhibit "4" entitled "Manual for Municipal Reprisal," the Defendant Town and its agents (its outside counsel, its Police Chief and its henchman hearing officer) have prosecuted an administrative  disciplinary case in a manner which violates Plaintiff's federal rights to the equal protection of the law and to due process of law.  Plaintiff requests that the disciplinary proceeding be declared void and a nullity, and remanded to the Town Board.  She also seeks damages for her unlawful suspension from work and as otherwise appropriate and authorized by law.*

### THE COMPLAINT

    Plaintiff Lorraine Wetzel, through her attorney Michael D. Diederich, Jr., alleges as her complaint as follows:

    1.    Plaintiff LORRAINE WETZEL, is and was at all times relevant herein a citizen of the United States and a resident of the Town of Orangetown, County of Rockland, State of New York.

2.     Defendant TOWN OF ORANGETOWN (hereinafter "defendant Town"), upon information and belief, is and at all times relevant herein, was a municipal corporation organized and existing under the laws of the State of New York, and located within Rockland County.

3.     Defendant TOWN BOARD OF ORANGETOWN (hereinafter "defendant Town Board" or "Town Board"), upon information and belief, is and at all times relevant herein, was the governing and policymaking body for the Town of Orangetown.

4.     Defendant THOM KLEINER (hereinafter "defendant Supervisor" or "Town Supervisor"), upon information and belief, is and at all times relevant herein, was a resident of the Town of Orangetown, County of Rockland, State of New York, and is sued as Town Supervisor.

5.     Defendant MARIE MANNING (hereinafter "Defendant Councilwoman" or "Defendant Manning"), upon information and belief, is and at all times relevant herein, was a resident of the Town of Orangetown, County of Rockland, State of New York, and is sued in her official capacity as a Town Councilmember.

6.     Defendant DENIS TROY (hereinafter "Defendant Councilman" or "Defendant Troy"), upon information and belief, is and at all times relevant herein, was a resident of the Town of Orangetown, County of Rockland, State of New York, and is sued in his official capacity as a Town Councilmember.

## JURISDICTION AND VENUE ALLEGATIONS

7.     This court has jurisdiction over this action under 42 U.S.C. § 1983, the First, Fifth and Fourteenth Amendments to the Constitution of the United States, as authorized under 28 U.S.C. § 1331 and § 1343(4).

8.        Supplemental jurisdiction exists by virtue of  28 U.S.C. § 1367 regarding New York remedies under the N.Y.S. Bill of Rights,  N.Y.S. statute, including the Police Act and N.Y.S. Civil Service Law § 75-b, and the common law.

## FACTS

*PART I –ESSENTIAL FACTS DIRECTLY RELATED TO THE TOWN BOARD'S DECEMBER 10, 2007 ADJUDICATION OF SEPTEMBER 7, 2004 DISCIPLINARY CHARGES*

1.        Plaintiff is a veteran of the Defendant Town of Orangetown's police department, serving in her 28th year of service, and holding the rank of lieutenant.

2.        Plaintiff's has for several years been involved in opposing unlawful discrimination engaged in by the Town, its Police Chief and its agents.  For her efforts, she has experienced reprisal by Defendants' police chief and agents.   *See*, Part II below and Exhibit "4".

3.        The September 7, 2004 disciplinary charges at issue here, as well as another set of disciplinary charges dated September 3, 2004 (as yet untried), were placed against Plaintiff  by Chief Nulty.  These charges were made shortly after Plaintiff filed an amended complaint in her still-pending federal discrimination lawsuit *Wetzel v. Town of Orangetown*, 03 Civ. 9896 ("*Wetzel 1")*, and within days of two local newspaper pieces discussing Plaintiff's opposition to the "glass ceiling" facing female police officers seeking promotion in the Defendants' Police Department.

4.        Both sets of disciplinary charges essentially allege deficiency in supervising subordinates.

5.        Both sets of disciplinary charges notify Plaintiff that she had the "<u>right to trial before the town board</u>," pursuant to the governing special state statute, the Rockland County Police Act ("Police Act"), Chapter 526 of the N.Y.S. laws of 1936, as amended. *(emphasis added)*

6.     Upon information and belief, Plaintiff's trial was, and is, the first and only trial to have taken place under the Police Act in recent history, including at least the last 28 years.

7.     Moreover, up until late March 2006, plaintiff and her PBA union believed that police discipline was governed by, and a subject of negotiation under, her union's collective bargaining agreement ("CBA") with the Town of Orangetown.

8.     In March 2006, certain CBA provisions regarding police discipline were held invalid by New York's highest court in *Matter of Orangetown PBA*, 6 N.Y.3d 563 (2006).

9.     Upon information and belief, after the *Matter of Orangetown PBA* decision, there was an absence of rules or regulations governing the imposition of police discipline in the Town.

10.     Specifically, the Defendant Town has not yet promulgated any rules or regulations under the Police Act relating to the adjudication of disciplinary cases involving police officers supervisors (sergeants or above).

11.     After disciplinary charges were placed against her, and while *Matter of Orangetown PBA* was being litigated, Plaintiff's PBA attorneys consented to a delay in the trial of the disciplinary charges pending Appellate Division (intermediate appellate court) disposition of the *Matter of Orangetown PBA* appeal.

12.     Plaintiff and her attorneys gave no further consent for the extension of time.

13.     In January, 2006, the Town Board promoted Plaintiff to the rank of lieutenant in the Defendants' police department.

14.     By letter dated February 1, 2006, the Town's outside counsel Lance Klein (of the law firm Keane & Beane PC) expressed the following to Plaintiff's attorney:

> "I also held the mistaken belief that you and your client realized the consequences of the two (2) disciplinary charges [sic] pending against her. I can assure you that those cases will be prosecuted as soon as the Court of Appeals [in *Matter of Orangetown PBA* ] makes its determination as to who will hear the

4

charges.  <u>It would be a shame for your client, as the first female Lieutenant in the department, to be the first Lieutenant disciplined</u>. (*emphasis added*)

15.    On  June 30, 2006, which was over one year after the Appellate Division's decision in the *Matter of Orangetown PBA* case, Plaintiff and her attorneys received notice from an individual purporting to be a hearing officer, namely, Joseph E. Wooley, that a disciplinary trial was scheduled to begin five (5) business days thereafter, on July 11, 2006.

16.    Joseph E. Wooley had been appointed to "act as a hearing officer" regarding Plaintiff's disciplinary case by the Defendant Town Board on May 22, 2006.  *See*, Resolution 441.

17.    Plaintiff was not notified of his appointment by the Town.

18.    The Town Board did not specify any duties, or timely delegate[1] any authority, in its resolution appointing Mr. Wooley.

19.    Upon information and belief, at the time of its appointment, the Town Board had no résumé, no written proposal, nor any other written information describing Mr. Wooley's credentials, including whether he had ever presided over any police disciplinary case before.

20.    Upon information and belief, Mr. Wooley was appointed because of the recommendation or suggestion of Keane & Beane attorney Lance Klein or one of its other attorneys.

21.    Upon information and belief, Mr. Wooley was hired to convict Plaintiff on disciplinary charges, regardless of guilt or innocence.

---

[1] The Town Board did attempt to correct this fatal defect in August 2006, after the prosecution case had rested, by retroactively tasking Defendant Wooley with making "findings of fact and issue a recommendation…."  *See*, Town Board Resolution 600 of August 14,  2006, purporting to "amend" Resolution 441 appointing Mr. Wooley.

22.     Prior to June 30, 2006, Plaintiff had no notice that any person had been appointed to "act as a hearing officer" regarding her disciplinary case, nor the identity of any such person, nor any notice that the Town Board was contemplating appointing a hearing officer (as formal notice to her stated that trial would be before the Town Board itself), nor provided with any information about any process or procedure for the selection of an impartial hearing officer.

23.     After receiving the June 30, 2006 notice, Plaintiff, through her attorney, immediately requested a reasonable adjournment.

24.     The Town's outside counsel (Keane & Beane PC) indicated that it would consent to an adjournment of the disciplinary trial only if Plaintiff waived various discovery requests which he made in her pending *Wetzel 1* federal lawsuit against the Town and its police chief. Plaintiff refused.

25.     Mr. Wooley denied Plaintiff requests for an adjournment of the disciplinary trial.

26.     Upon information and belief, denial of a request for an adjournment under such circumstances was not in accordance with standard practice under Civil Service Law § 75 procedures, which procedures, according to Town Attorney Kenny, would provide guidance for this disciplinary proceeding.  *See*, N.Y.S. Guide to Section 75 procedures (website).

27.     Upon information and belief, the denial of Plaintiff's request for an adjournment was done in bad faith, and solely to unfairly benefit Chief Nulty and his prosecutor, Mr. Klein.

28.     The disciplinary trial commenced on July 11, 2006.

29.     Plaintiff made jurisdictional challenge to the purported tribunal, including objection to the absence of any legal authority for Mr. Wooley to preside over a fact-finding hearing.

30.     The disciplinary trial continued for eight additional nonconsecutive days, and concluded on November 1, 2006.

31.     The disciplinary trial was conducted by Mr. Wooley in a highly unfair and abusive manner which demonstrated an utter lack of impartiality on his part, and which suggested that his sole function was to convict plaintiff on disciplinary charges, regardless of the facts.

32.     Upon information and belief, the annexed "Manual for a Municipal Reprisal" accurately and fairly describes, in narrative form with commentary, some of the abusive and retaliatory nature of the disciplinary proceedings against Plaintiff.  *See*, Exhibit "4".

33.     In connection with the disciplinary trial, by letter dated September 21, 2006 from her attorney, Plaintiff sought relief from the Town Board regarding the hearing officer's lack of legal authority to preside over a disciplinary trial, the ostensible tribunal's lack of jurisdiction, the non-impartiality and unfairness of the hearing officer, and Plaintiff's right to trial before the Town Board itself, among other things.  *See*, Exhibit "2".

34.     By prior letter sent on or about September 7, 2006, the Town's outside counsel (Lance Klein) had directed the Town Board not to consider any application to it from Plaintiff (including any letter from her attorney) in connection with the disciplinary matter.

35.     Upon information and belief, the Town Board did not consider the September 21, 2006, letter from plaintiff's counsel.

36.     Upon information and belief, Plaintiff has the First Amendment right to petition her local government for the redress of grievances, but was continually and repeatedly denied such right by the Defendants' refusal to entertain Plaintiff's requests (through her attorney) to the Town Board.

7

37.     Upon information and belief, the Constitution of the State of New York guarantees its citizens the right to freedom of speech, and to petition government.  See, N.Y.S. Constit., art. I, §§ 8 & 9.

38.     In this regard, Plaintiff commenced an action in this Court requesting a declaration of her First Amendment right to petition local government (06 Civ. 5144), which action is currently on appeal (07-5114-cv).

39.     During the disciplinary trial, Mr. Wooley explained his practice for receiving post-trial briefs, which was essentially that briefs would be required to be simultaneously submitted two weeks after Plaintiff received a copy of the transcript of the disciplinary trial. *See*, Disciplinary Transcript at pages 921-923.

40.     Upon information and belief, the Town's outside counsel had in its possession all disciplinary transcripts shortly after the trial was concluded on November 1, 2006.

41.     For reasons unexplained by the Town's outside counsel, and unjustified, the Town did not make any transcripts available to Plaintiff's counsel until the end of January or early February 2007.

42.     Plaintiff's attorney requested Mr. Wooley to provide him with a date for simultaneous submission of Plaintiff's post-trial brief.

43.     In particular, Plaintiff's attorney wrote to Mr. Wooley, with copy to Prosecutor Klein:

> Via fax: 914-681-5131
>
> February 9, 2007
>
> Joseph E. Wooley, Esq.
> PO Box 6
> Hawthorne, NY 10532

Re: Chief of Police v Wetzel disciplinary case-submission post-hearing briefings

Dear Mr. Wooley:

Please advise whether you will be accepting post-trial briefs regarding the disciplinary charges dated September 7, 2004 against my client, Lt. Wetzel, and if so, the date for such submission from the parties (I suggest one month from today).

Secondly, as to your eventual report and recommendation, I request that you furnish this in a manner whereby I can review and comment upon your report and recommendation prior to its submission to the Town Board.

Thank you.

                              Sincerely yours
                              /s/
                              Michael D. Diederich, Jr. /'

cc: Lance H. Klein, Esq.
via fax 914-946-6868

44.     Mr. Klein responded by suggesting, in a letter dated February 12, 2007, that the one sentence statement Plaintiff's attorney made at the conclusion of the disciplinary trial constituted all the input that Plaintiff was entitled to give.

45.     Plaintiff's counsel further wrote Mr. Wooley another letter on May 2, 2007:

*Via mail and fax:*
   914-681-5131
                          May 2, 2007

Joseph E. Wooley, Esq.
PO Box 6
Hawthorne, NY 10532

Re:  Chief of Police v Wetzel disciplinary case—post-hearing matters

Dear Mr. Wooley:

I never received a response from you regarding my February 9, 2007 letter to you, attached.  Please advise.

Secondly, on behalf of my client, I would like to know whether you have any information as to why it took almost three months (from November until late January 2007) for the disciplinary transcripts to be made available to you and me in this Nulty v. Wetzel disciplinary matter.

Thirdly, can you please give the parties some indication of when you expect to complete your report and recommendation to the Town Board in this matter?

Lastly, you directed the Town to provide transcripts to my client, Lt. Wetzel.  Opposing counsel has a "Minu-script" (4 pages per page) version of such transcript.  I request that

9

you direct opposing counsel to provide me with one copy of such Minu-script version, for the following reasons: because the format is easier to read, with less waste of paper, because the 2200+ page transcript is large, because opposing counsel is now using such Minu-script pages of this Nulty v Wetzel hearing in connection with their work, and because providing my client with such is necessary for fair and equal treatment as between the parties in this disciplinary matter.

Your consideration of these requests, and prompt response, will be much appreciated. Thank you.

> Sincerely yours,
> /s/
> Michael D. Diederich, Jr.

cc:  Lance H. Klein, Esq.

46.     For reasons not stated, and certainly unjustified, Mr. Wooley again failed and refused to respond to Plaintiff's correspondence.  Thus, Mr. Wooley did not provide a date allowing Plaintiff to submit a post-trial brief.

47.     Approximately two weeks later, and over <u>six months after</u> the disciplinary trial had ended, the Town's outside counsel (disciplinary prosecutor Lance Klein) unilaterally submitted a 46 page "Closing Statement" on behalf of Chief Nulty wherein, among other things, Mr. Klein proposed a total of 62 days forfeiture of pay as a disciplinary punishment.  *See*, Mr. Klein's transmittal letter dated May 11, 2007.

48.     A month later, without any post-trial input from Plaintiff's counsel, Mr. Wooley provided Plaintiff's attorney with a 59 page single-spaced Report and Recommendations ("Wooley Report").

50.     Mr. Wooley provided no information, in this letter as to how this Wooley Report would be submitted to the Town Board or the members thereof, nor whether trial exhibits (the evidence) would be provided to the Town Board.

51.    Thereafter, Plaintiff's attorney requested information about whether, when and

how the Town Board would review the disciplinary record and Closing Statement of prosecutor

Klein.

52.    In particular, on August 9, 2007, Plaintiff's attorney wrote the Town Clerk (clerk

to the Town Board) as follows:

> *VIA FACSIMILE (359-5126) & MAIL*
>
> August 9, 2007
>
> Charlotte Madigan, Town Clerk
> Orangetown Town Clerk's Office
> 26 Orangeburg Road
> Orangeburg, NY 10962
>
> *Re:  Joseph Wooley's disciplinary submission regarding Lt. Wetzel*
>
> Dear Ms. Madigan:
>
> As Lt. Lorraine Wetzel's attorney, I request reasonable advance notice as to whether, and when, the report and recommendation of Joseph Wooley will be submitted to the Town Board.
>
> Please be advised that I wish to provide input to the Town Board, including but not limited to articulating to the Town Board what it likely already knows, namely, that Mr. Wooley was and is <u>not</u> an impartial or unbiased adjudicator of the facts concerning Lt. Wetzel, and that he presided over a disciplinary trial not authorized by the Rockland County Police Act.
>
> I would also like to personally explain to the Town Board why Mr. Wooley's "findings of fact" are unsupported by the evidence, and why Mr. Wooley's recommendation regarding punishment is absurd, patently unjust, and manifestly the product of reprisal.  For these reasons, Mr. Wooley's report and recommendation must be rejected in its entirely.
>
> There was and is no grounds for a disciplinary proceeding based upon September 2004 charges against Lt. Wetzel, and the prosecution of such charges, after her 2006 promotion, was a naked attempt to extort Lt. Wetzel into dropping her federal civil rights case against the Town and its Police Chief.   If the Town Board condones such illegality, my client will seek further remedies provided by law.
>
> Thank you for your attention to this matter.
>
> Sincerely yours,
> /s/
> Michael D. Diederich, Jr.

53.    Plaintiff was never provided with any notice from either Mr. Wooley, prosecutor

Klein, Town Attorney Theresa Kenny, or the Town Clerk that the disciplinary record and trial

exhibits (with or without Mr. Klein's Closing Statement) had been furnished to the Town Board or its members.

54.     Thus, as to Plaintiff's requests for information about the status of the case and for an opportunity to provide his client's side of the story to the Town Board, no response was provided.

55.     It was not until reading Mr. Klein's papers in connection with defendants' motion to dismiss Plaintiff's retaliation case,[2] *Wetzel 3,* that Plaintiff's counsel learned that the disciplinary record had been already been provided to the Town Board, apparently in August.

56.     Plaintiff's counsel once again requested that the Town Board provide him with an opportunity to present his client's defense.   He wrote:

> ***VIA FACSIMILE (359-5126) & MAIL***
>                                                          November 20, 2007
>
> Charlotte Madigan, Town Clerk
> Orangetown Town Clerk's Office
> 26 Orangeburg Road
> Orangeburg, NY 10962
>
> *Re:  Joseph Wooley's disciplinary submission regarding Lt. Wetzel*
>
> Dear Ms. Madigan:
>
> Upon reviewing for the first time today the legal papers of the Town's outside counsel, regarding a motion to dismiss returnable in 10 days or so, I see that the Town's outside counsel Lance Klein indicates that "[i]n or about August 2007, the record of the Disciplinary Hearing" relating to July 7, 2004 charges against my client, Lt. Lorraine Wetzel, "was provided to the Town Attorney … for the Town Board's consideration."
>
> By my letter to you dated August 9, 2007, attached, I previously requested:
> > "reasonable advance notice as to whether, and when, the report and recommendation of Joseph Wooley will be submitted to the Town Board."
> I also informed you that I wished to provide input to the Town Board, including but not limited to presenting the facts which show that Mr. Wooley was and is <u>not</u> an impartial or unbiased adjudicator of the facts concerning Lt. Wetzel; that the disciplinary trial was not authorized by the Rockland County Police Act; why Mr. Wooley's "findings of fact" are

---

[2]  Plaintiff's 2006 retaliation lawsuit, *Wetzel v. Orangetown*, 06 Civ.6117, which includes the claim that the disciplinary charges brought against her, and forcing her to undergo a disciplinary trial, was the product of reprisal.

12

unsupported by the evidence; and why Mr. Wooley's recommendation regarding punishment is absurd, patently unjust, and manifestly the product of reprisal.

Please advise me immediately as to what, if anything, has actually been shown to the Town Board regarding Lt. Wetzel, and whether I will be given the opportunity to present my client's side of the case.    Thank you.

Sincerely yours,

/s/

Michael D. Diederich, Jr.

cc:  Town Attorney  *via fax*

57.    Town Attorney Kenny eventually responded, by informing Plaintiff's counsel by letter faxed late in the day on December 3, 2007, that he and Prosecutor Klein would both be "allowed to speak for five minutes" during the public portion of the Town Board's regularly scheduled December 10, 2007 meeting.

58.    Promptly responding by letter dated December 7, 2007, Prosecutor Klein stated:

"Please note that on behalf of the Chief of Police Kevin Nulty, I hereby accept the Town Board's offer to comment upon the Wetzel disciplinary matter at the public portion of the December 10, 2007 Town Board meeting.  Of course, I will adhere to the rules promulgated by the Town Board.

59.    Upon information and belief, there were no "rules promulgated by the Town Board," only *ad hoc* rules likely formulated by its attorneys.

60.    Significantly, neither Town Attorney Kenny nor any other representative of the town expressly informed plaintiff's counsel that the disciplinary case was on the Town Board agenda or action planned for that evening.  Thus, Plaintiff was not even informed that decision-making regarding her career would take place that evening, until she heard this as her attorney was speaking.

61.    Significantly, it appeared from Ms. Kenny's December 3, 2007 letter that the Town Board may have only considered the Wooley Report, the hearing transcript and one tape

13

recording, as there is no indication that any of the other physical (electronic) evidence introduced as trial exhibits was available for review, or was reviewed, by the Town Board.

62.     Upon information and belief, the physical (electronic) trial exhibit evidence was not examined by the Town Board, even though this evidence was critical to undercutting the misleading, if not perjurious, testimony of prosecution witness Robert Zimmerman and Chief Nulty.

63.     For example, although both Zimmerman and Nulty testified that a major failing of Plaintiff was allowing a detainee to wander about the booking room for extended periods of time, the videotapes establish that this testimony (and the charges which the testimony supported) was not supported by the actual evidence.

64.     As shown below, Plaintiff's belief that the Town Board did not review the physical evidence, including, for example, the videotapes, is corroborated by the Town Board's December 10, 2007 resolution in this matter, which resolution states, in its fifth paragraph, that "Whereas the Town Board has had an opportunity to review the record in this matter, as well as the report and recommendation of the Hearing Officer, and…." *(emphasis added)*

65.     Thus, in its formal resolution, there is no indication that any the trial exhibits were reviewed by the Town Board.  And because the prosecution testimony was based upon the electronic evidence (audiotapes and videotapes), essentially the exhibits are the evidence of the case.  The Town Board apparently only reviewed the prosecution witnesses' interpretations of the evidence, without looking at the actual evidence.  And by denying Plaintiff the ability to present a defense to it, and comment on the evidence, the Town Board remained oblivious to the vital need for it to itself examine critical portions of the physical electronic evidence.

66.     On the day before the December 10, 2007 Town Board meeting, the Town Attorney informed Plaintiff's counsel that the Town Board would <u>not</u> permit a closing statement or "argument on the evidence."   Thus, Plaintiff did not even receive a meaningful five minutes of time.

67.     Rather, when Plaintiff's counsel addressed the Town Board, he was forced to limit his presentation to reading from a letter he had prepared, which, in the short 5 minutes allowed, focused on history of his client's opposition to unlawful discrimination and the reprisals she experienced as a consequence.  At precisely 5 minutes, he was directed to stop speaking by the Town Supervisor, without even being allowed to finish the sentence.

68.     All indications are that Plaintiff's guilt, by this date, had already been predetermined by the Town Board.  This is logical, as it had had the prosecutions side of the case (the Wooley Report) for months, and refused input from the defense.

69.     When Plaintiff's attorney got up to speak at the public portion of the December 10, 2007 meeting, the Town Supervisor advised him that the Town Board would be deciding the disciplinary matter later in the evening (but that further input would not be permitted on behalf of Plaintiff) and that there was no further need for plaintiff or her counsel to remain at the meeting.

70.     The maximum punishment permitted by the Police Act, short of termination, is a 20 day forfeiture of pay.  Mr. Wooley recommended that maximum punishment short of termination.

71.     On December 13, 2007, plaintiff's attorney received correspondence from Town Attorney Kenny indicating that the Town Board had issued a finding of "guilty" as recommended by Mr. Wooley, and a penalty of a 10 day suspension without pay.

15

72.    By the time Town Attorney Kenny sent her correspondence, Plaintiff's attorney had already read about its verdict of guilt in the local Our Town newspaper, as apparently the Town Board saw fit to publicize its finding of guilt and penalty assessment at the Town Board meeting -- an unprecedented and unnecessary action, as personnel matters are virtually always discussed privately, in executive session.

73.    This action by the Town Board was, we believe, designed to publicly humiliate and disparage the Plaintiff.

74.    The Town Board resolution of December 10, 2007, annexed as Exhibit "1", and available on the Town's website,[3] reads as follows (with emphasis added):

**RESOLUTION NO. 795 POLICE/DISCIPLINARY CHARGES EMPLOYEE NO. 1422**

Councilman Troy offered the following resolution, which was seconded by Councilman O'Donnell and on a roll call was adopted:

Whereas a proceeding was commenced against Employee Number 1422 based upon disciplinary charges dated September 7, 2004, that were issued by the Chief of Police pursuant to the Rockland County Police Act; and

Whereas the Town Board designated Joseph P. [sic] Wooley, Esq., as the Hearing Officer for such charges; and

Whereas a hearing was held at which Employee Number 1422 was represented by counsel; and

Whereas, the Hearing Officer rendered findings of fact and recommendations based upon the record presented at the aforementioned hearing; and

**Whereas the Town Board has had an opportunity to review the record in this matter, as well as the report and recommendations of the Hearing Officer; and**

**Whereas, on December 10, 2007, at its regularly scheduled public meeting, the Town Board provided the Employee and Chief Nulty with an additional opportunity to address the Town Board with respect to the pending disciplinary charges;**

**Now, therefore, be it resolved that the Town Board hereby accepts the Hearing Officer's findings of fact, as more fully set forth in the decision of the Hearing Officer dated June 11, 2007; and**

Be it Further resolved that, based upon the recommendations contained in the decision of the Hearing Officer, the Town Board hereby finds Employee Number 1422 guilty of Charge 1(a), (b) and (c); Charge II, Charge III(a) and (b); Charge IV; Charge V; Charge VI (a) and (b); Charge VII(a); Charge VIII; Charge IX, and Charge X, and

Be it Further resolved that, based upon the recommendations contained in the decision of the Hearing Officer, the Town Board hereby finds Employee Number 1422 not guilty of Charge VII(b) and Charge XI, and

Be if Further resolved that the Town Board rejects the Hearing Officer's recommendation that a penalty of

---

[3] See, http://www.orangetown.com/departments/clerk/2005051714410.11/townBoardMinutes/20070111115321.156/folder_view

twenty (20) days forfeiture of salary or compensation be imposed; and

**Be it Further resolved that, based upon the entire record in this matter, and in recognition of the employees prior length of service without any prior disciplinary problems, the Town Board imposes a ten (10) days suspension without pay**, which is less than the penalty recommended by the Hearing Officer.

Ayes: Councilpersons Troy, O'Donnell, Manning
Supervisor Kleiner
Noes: None
Abstained: Councilperson Morr

75.    Thereafter, Chief Nulty (the disciplinary charges' accuser) was permitted to implement the punishment. The Town permitted this notwithstanding the request of Plaintiff's attorney that the new Town Board be permitted to reconsider the matter.[4]

76.    Even before Plaintiff's 30 days to appeal had expired, the police chief implemented the punishment as follows:

- the 10 day suspension would be served during two separate periods of time separated by Plaintiff's two regular days off.  This transformed the 10 day suspension into two six day suspension over a period of 12 calendar days suspension.  Thus, a 10 day suspension was transformed by Chief Nulty into a 12 day suspension.  As expected, Plaintiff was offered, and given, no work during her regular two days off.
- Chief Nulty also decided that the suspension would begin on January 4, 2008, in the New Year which, because a new PBA contract is anticipated, will be a more expensive penalty, including affecting retirement pay, than if the penalty had been served promptly after its Town Board issuance, in 2007.
- Upon information and belief, these were gratuitous acts of reprisal, for the Police Chief and his prosecutor to get in their last pokes.
- Forcing Plaintiff to undergo the humiliation of being required to turn in her shield, her weapon and her ID card to her own subordinate sergeant.

### *Untried September 3, 2004 charges unaddressed still*

77.    No mention was made by the Town on an important outstanding item.  There remains the pending yet untried September 3, 2004 disciplinary charges against Plaintiff, relating to the events of July 4, 2004.

_____

[4] Two of the five Town Board members had not been reelected, in part because of the public interest advocacy of Plaintiff's attorney in an unrelated litigation-- additional cause for bias, and request for reconsideration.

78.     Prosecutor Klein has refused to divulge Chief Nulty's intentions regarding these untried charges.

79.     Upon information and belief, it was unprecedented, and abusive, for those charges not to be tried with the September 7, 2004 disciplinary charges.   The Town has permitted those charges to loom over Plaintiff's head for almost four (4) years, presumably with the malicious motive of again using a henchman—a "for hire" adjudicator like Mr. Wooley—to convict Plaintiff again a second time around, making her a "repeat offender and subject to dismissal from the force after 28 years of loyal service.  That is, if she does not submit to the Town's unlawful demands that she cease opposing unlawful discrimination, reprisal and illegality.

80.     If those now-ancient July 4, 2004 charges are tried before a truly fair and impartial adjudicator, Plaintiff is confident that should would be found innocent and her good name vindicated.   If tried before another Wooley, even irrefutable proof of innocence would not spare a conviction, in our view, as that is not how Stalinist justice works.

81.     In Plaintiff's view, notwithstanding the damage to her and her reputation resulting from the Town Board's December 10, 2007 action, the much greater injury caused by the wrongful Town action is to the civil service, to the police officers who enforce the Law, and to the public which depends upon faithful adherence to the Law by government.

82.     Plaintiff intends to continue her struggle against the Town government's lawlessness, in the public interest, as well as to vindicate her good name and her professional reputation.

83.     Upon information and belief, if Plaintiff as a police lieutenant and 27 year police veteran cannot successfully oppose such blatantly unlawful practices, then no one effectively can, and illegality will replace the Rule of Law in Orangetown.

PART II – FURTHER DESCRIPTION OF PLAINTIFF'S OPPOSITION TO UNLAWFUL DISCRIMINATION & ILLEGALITIES

A. **Background to Wetzel "6"—the Wetzel "1" through Wetzel "4" federal actions, all still active**

84.    Plaintiff was hired as a police officer in 1980 (the Town's second female police officer), and was subsequently promoted to the rank of sergeant in 1990 (becoming the Town's first female sergeant) and, since 2001 fought for the right to be treated equally with men regarding promotion.[5]

85.    In January 2001, Plaintiff was passed over for promotion in favor of a man who had approximately one third of her seniority and meritorious service and a comparable civil service examination score—the criteria upon which promotion should have been based under applicable law, namely, the Police Act.[6]

86.    In 2001, Plaintiff filed a New York State article 78 petition alleging that she was wrongfully denied promotion in January 2001.

87.    In December 2003, Plaintiff filed a federal complaint alleging, *inter alia*, gender discrimination by the defendant Town and Police Chief Nulty, including discrimination resulting in Plaintiff's non-promotion to the rank of lieutenant in January 2001.

88.    In January 2004, Plaintiff was again passed over for promotion in favor of a man who, again, had much inferior seniority and meritorious service, and an identical civil service examination score.

---

[5]  Plaintiff finally was promoted to the rank of lieutenant in January 2006, but not without being subjected to further threats, abuse and retaliation alleged herein and in *Wetzel 3* (06 Civ. 6117, pending in this Court).

[6] Section 7 of the Police Act sets forth criteria for promotion. See, Rockland County Police Act, Chapter 526 of the N.Y.S. Laws of 1936, *as amended*.

89.     On or about July 12, 2004, Plaintiff filed an amended/supplemental complaint (hereinafter "**2004 Federal Complaint**"), adding the new 2004 claims, including the discriminatory refusal to promote her in January 2004.

90.     The 2004 Federal Complaint alleged, *inter alia*, that as to the objective criteria for promotion set forth in the Police Act,  Plaintiff, a woman, possessed an equivalent civil service examination score and approximately two to three times more seniority and meritorious service than the men chosen for promotion in 2001 and 2004.

91.     Chief Nulty did not take lightly Plaintiff's continued opposition to his unlawfully biased administration of the police department.

92.     For example, shortly after Plaintiff's 2004 Federal Complaint, Police Chief Nulty made comments to a local newspaper, OUR TOWN, which comments were published in an article in that newspaper in early August 2004, and which publicly disparaged Plaintiff, belittled her, and publicly denied that his or his department's action against Plaintiff were biased or discriminatory.

93.     Upon information and belief,  Chief Nulty's making statements to the OUR TOWN reporters regarding one of his own subordinates, a Town employee, was unprecedented, unprofessional and evidenced discriminatory and retaliatory animus toward Plaintiff Wetzel.

94.     Thereafter, Plaintiff's attorney wrote a response which was published on or about August 23, 2004  in the same local Orangetown newspaper, OUR TOWN.  The letter to the editor from Plaintiff's attorney expressed the view that Police Chief Nulty's police department had created a "glass ceiling" preventing the promotion of female police officers.

95.     In addition, during this same time period (July-August 2004), Police Chief Nulty and his administration began (illegally) examining audiotaped telephone conversations between

two citizens (detainee Frank Dowd and Nicole Colandrea), and as a result saw this as an opportunity for bringing baseless disciplinary charges against Plaintiff Wetzel.

96.    On September 3 and September 7, 2004, action was taken regarding the dismissal of Plaintiff's state court Article 78 proceeding relating to her Police Act challenge to her non-promotion.  These are also the precise dates of disciplinary charges placed against Plaintiff Wetzel, regarding alleged events of July 4 and 7, 2004.

### i. Chief Nulty signs retaliatory disciplinary charges in September 2004

97.    Upon information and belief, based upon the 2004 Federal Complaint, the above mentioned August 2004 OUR TOWN letter to the editor, and the article 78 dismissals, Chief Nulty decided to undertake  reprisal, which reprisal was also designed to sabotage Plaintiff's upcoming January 2005 promotional opportunity.

98.    On September 3, 2004 and September 7, 2004, Police Chief Nulty signed departmental disciplinary charges against Plaintiff.

99.    The disciplinary charges in sum and substance alleged "failure to supervise" police subordinates properly on, respectively, July 4 and July 7, 2004.

### ii. Disciplinary charges made & prepared in bad faith by the Law Firm Actors and Municipal Officials

100.    Upon information and belief, Keane & Beane PC and its attorney, Lance Klein (together the  "**Law Firm Actors**") prepared and/or assisted in the preparation of such disciplinary charges, and gave advice thereon to Chief Nulty, Lieutenant (now Captain) Zimmerman, Supervisor Kleiner (together the "**Municipal Officials**") and the Defendant Town.

101.    One indication of the Law Firm Actors' input into the disciplinary charges is the Law Firm's document identifier "18681961264594 VI 9/7/04"  written on the charges.

102.     Upon information and belief, these disciplinary charges were not prepared in good faith by the Law Firm Actors or the Municipal Actors.

103.     Rather, it appears that the Law Firm Actors have profited greatly, at taxpayer expense, by orchestrating much of the Town's reprisal against the Plaintiff.     When Plaintiff's attorney, on her behalf, sought information about what has been paid to Keane & Beane PC, he was provided with unintelligible documents, and as a consequence was required to commence a state court proceeding under the N.Y.S. Freedom of Information Law ("*Wetzel 5*") in order to obtain the public documents.  Plaintiff learned, through FOIL disclosure, that Keane & Beane PC and actually invoiced the Town over $3,000 for preparing an ethics grievance against Plaintiff's attorney, which grievance was a malicious litigation tactic and ultimately dismissed by the governing judicial authority.

104.     Upon information and belief, the reason disciplinary charges were not prepared by a deputy town attorney (several of whom are employed by the Town), rather than by the Town's outside counsel, was the fact of Plaintiff's federal lawsuit, and the Town's desire to use disciplinary charges to obtain an advantage in the federal lawsuit.  *See also*, Mr. Klein's February 1, 2006 extortionate letter.

105.     Specifically, upon information and belief, these disciplinary charges were prepared in retaliation for Plaintiff's opposition to unlawful discrimination and to coerce her into settling or abandoning her *Wetzel 1* opposition to unlawful discrimination.

106.     These September 2004 disciplinary charges were the <u>first and only</u> disciplinary charges made against Plaintiff in her entire 27 year police career with the Orangetown Police Department (Plaintiff is now in her 28th year of service).

107.     Prior to these charges, Plaintiff had an unblemished police record.

22

108.    The disciplinary charges do not allege that Plaintiff committed affirmative misconduct herself, but essentially allege failure to supervise, on a shift where she was the lone headquarters supervisor (Lt. Zimmerman was away) working the same shift with a patrol sergeant of greater seniority.

109.    Upon information and belief, the municipal Defendants did not even attempt to inquire of Plaintiff about the alleged events at the time, to gather factual information or otherwise to consider her knowledge of the facts.

110.    Plaintiff's immediate supervisor, Lt. Zimmerman, made no effort to ascertain facts from Plaintiff regarding the alleged events of July 7, 2004, nor did he ascertain whether Plaintiff was in need of education or training regarding her alleged incompetence or dereliction, nor did he require any additional education or training regarding her alleged incompetence or dereliction, nor did he reflect her alleged incompetence or dereliction on a performance evaluation of Plaintiff, notwithstanding that these actions were, upon information and belief, required of him under the General Orders of the police department, including the job description for Lt. Zimmerman's rank (lieutenant).

111.    Lt. Zimmerman received two promotion in the department after helping formulate the disciplinary charges against his subordinate, Plaintiff Wetzel.  He later became the sole prosecution witnesses against the Plaintiff.

112.    Upon information and belief, it is impossible to discern from the face of the charges precisely what Plaintiff is alleged to have done wrong.

113.    As to the allegations against Plaintiff, no corrective action or progressive discipline was sought nor applied.  It is apparent to Plaintiff that these disciplinary charges were

wrongfully motivated, and not designed for any corrective or remedial purpose or *bona fide* discipline.

**B. *Statutory Background – Plaintiff becomes the first officer tried under the Rockland County Police Act***

114.    Upon information and belief, throughout the Defendant Town's modern history it cooperatively agreed upon rules and procedures for the discipline of police officers, such as through a collective bargaining agreement ("CBA").

115.    For reasons unknown to plaintiff, the Town decided in or around 2004 to challenge the procedures which it itself had previously agreed to in its CBA with the police officers union, the PBA.  It did so in the *Matter of Orangetown PBA* (hereinafter "CBA challenge").

116.    Upon information and belief, the town was influenced in its decision by the advice of the Law Firm Actors (its outside counsel, Keane & Beane) which law firm was then paid handsomely by the town to challenge the CBA provisions relating to police officer discipline.

117.    Specifically, the town challenged the CBA provisions requiring binding arbitration on police disciplinary matters.

118.    Upon information and belief, the September 2004 disciplinary charges against Plaintiff were made while the CBA challenge was pending.  For this reason, Plaintiff's PBA attorneys consented to the disciplinary charges being held in abeyance pending determination by the Appellate Division of the N.Y.S. Supreme Court as to whether the charges would be tried before the defendant town's town board, or tried before an arbitrator.

119.    Upon information and belief, there was <u>never</u> any suggestion by the Town that trial would be other than noticed in Plaintiff's disciplinary charges,  namely, "trial before the Town Board."

120.    Upon information and belief, Plaintiff's PBA attorneys would not have consented to any extension of time, and plaintiff certainly would not have consented, to trial for a non-a partially chosen hearing officer.  Plaintiff had the right to expect trial before the Town Board itself.

121.    Upon information and belief, neither Plaintiff nor her attorneys gave any further consent to the extension of time to try disciplinary charges against her other than consent to abeyance pending Appellate Division decision.

122.    The Appellate Division determined the appeal in or around May 2005.

123.    Upon information and belief, the Defendant Town did not obtain consent from Plaintiff for further delay of the disciplinary case against her.

124.    Nevertheless, as further described below, over one year later, on July 30, 2006, Plaintiff and her attorneys were informed that a disciplinary trial would commence a few days later, on July 11, 2006.

125.    Furthermore, on July 30, 2006, Plaintiff was informed for the first time that trial was to be conducted by an ostensible hearing officer, a "Joseph Wooley," rather than by the town board itself.

126.    Upon information and belief, there is no authority under the Police Act for the delegation of fact-finding to a hearing officer.

127.    The Defendant Town as promulgated no rules or regulations under the Police Act authorizing the delegation of fact-finding from the Town Board to a hearing officer.

25

128.    The Defendant Town as promulgated no rules or regulations under the Police Act authorizing the delegation of fact-finding from the Town Board to a hearing officer.

**C. Untried September 3, 2004 charges (relating to July 4, 2004 events)**

129.    In addition to the September 7, 2004 disciplinary charges at issue here, as mentioned above there was another set of disciplinary charges against Plaintiff related to events of July 4, 2007.

130.    Other police officers charged with infractions that day, though not necessarily related matters, were  five individuals, whose initials are CS (a woman), JA, FY, DF, KD and Plaintiff.

131.    Upon information and belief, of the above-mentioned individuals, <u>only the female officer was actually punished</u> with loss of pay.

132.    Upon information and belief, female Officer CS's alleged misdeeds did not warrant a financial punishment, or any punishment at all.

133.    Specifically, upon information and belief she was charged with making a joke to another police officer about Orangetown's detectives not working on the July 4 holiday, 2004.

134.    Upon information and belief, she eventually voluntarily left the police department, to work as a police officer elsewhere.

135.    <u>Not</u> charged regarding July 4, 2004 events was male officer, Officer S, who appears to have been most directly involved with the events alleged against Plaintiff, but who was, it appears, a "favorite" of the administration and Captain Zimmerman.  This officer has apparently also had repeated instances of serious misconduct, yet he has faced no substantial disciplinary consequences or corrective measures.

136.    Upon information and belief, as to the male officers, disciplinary charges were recently (in 2007) withdrawn as to JM. Charges never brought as to FY (who retired in 2004). No resolution was ever reached with Sergeant DF. Officer KD received only a "for the record" suspension (meaning no financial punishment was actually exacted).

137.    As to Sergeant DF, it appears that his public pension was unjustifiably threatened by the Law Firm Actors and/or the Municipal Officials in a manner which dissuaded him from providing testimony at Plaintiff's 2006 disciplinary trial.  Upon information and belief, Sgt. DF asserts his innocence of disciplinary infraction to this day.

138.    The town's outside counsel, Keane & Beane, represented to the federal court judge that regarding the above charges, as well as the charges described below relating to July 7, 2004, there were "10 persons charged, 9 settled, and one, the plaintiff, did not" or words to that effect.

139.    It appears, in actuality, it only three individuals actually settle charges, and as to two of those (the men), the settlements included expunging the disciplinary record from their files after a short period of time.

140.    This was a material misrepresentation to the federal court, designed to hinder the federal court from properly ascertaining the facts when Plaintiff sought a TRO to prevent the start of the disciplinary trial at issue here.

141.    Upon information and belief, Keane & Beane did so to obstruct the federal district court judge from understanding and recognizing the reprisal and abuse being perpetrated against Plaintiff.

142.    As mentioned above, these September 3, 2004 charges remain an ongoing threat, hanging over the head of Plaintiff and her policing career.

**D.  September 7,  2004 charges do not require re-trial here**

143.    The September 7, 2004 charges against plaintiff Wetzel of the subject of this lawsuit.

144.    Plaintiff is cognizant of the reality that this federal court will be disinclined to second-guess fact-finding undertaken in a legitimate administrative proceeding.

145.    Therefore, for the purposes of this complaint, Plaintiff will not here set forth the 11 separate charges and accompanying specifications contained in the September 7, 2004 disciplinary charges.

146.    Rather, the details of the charges, and the evidence supporting the charges, will be necessarily examined only if the Court does not invalidate the Town Board action on the constitutional and state law jurisdictional grounds alleged herein.

147.    For example, if the Court determines, as plaintiff believes it must, that there was no legal authority for fact-finding to be placed into the hands of Mr. Wooley (because there were no rules and regulations allowing for such delegation, and because even if there were rules and regulations, there was nevertheless no written delegation), the case can be disposed of on that basis, through nullification of the Town Board action and remand to the Town Board.

148.    Similarly, if the court determines that the non-impartial nature and circumstances surrounding of Mr. Wooley appointment by the Town Board nullify his fact-finding determinations, and the Town Board's adoption of the Wooley report, there again is no need to further explore the disciplinary trial.  Again, nullification of the Town Board action with remand will suffice.

149.    Of course, plaintiff nevertheless requests this Court to provide her with appropriate declaratory relief prohibiting unconstitutional action if the Town continues prosecuting the September 2004 disciplinary cases against plaintiff.

### i.    *Bogus nature of the disciplinary charges at issue*

150.    A brief discussion of the insufficient nature of the September 7, 2004 disciplinary charges against Plaintiff is set forth next, to provide the Court with a perspective as to the bad faith nature of the disciplinary charges.

151.    The September 7, 2004 disciplinary charges, consisting of ten separate "charges," and numerous specifications, essentially allege failure to supervise in that police officers with whom Plaintiff worked (one subordinate and one senior, Sgt. Flannery) supposedly failed in their duties.

152.    However, nothing untoward occurred as a result of the alleged mistakes by the other police officer and sergeant.

153.    Upon information and belief, no citizen was injured nor written complaint made by any citizen.

154.    Upon information and belief, nor did any citizen make any complaint about Plaintiff's conduct or Plaintiff's supervision of others.

155.    On or about September 7, 2004, Police Chief Nulty filed disciplinary charges against Officer Holihan regarding the events of July 7, 2004.

156.    Upon information and belief, Officer Holihan was the only police officer facing disciplinary charges who had direct supervision of detainee Mr. Dowd on July 7, 2004.

157.    The law firm Defendants and Defendants Chief Nulty and Cpt. Zimmerman accused Sgt. Wetzel of indirectly permitting Mr. Dowd to make threatening and/or harassing

telephone calls to Ms. Colandrea, through purported lack of supervision, even though Plaintiff Wetzel was never in Mr. Dowd's presence at any time when he was using the telephone in the downstairs booking room.

158.    For example, Charge IV of the September 7, 2004 disciplinary charges against Sgt. Wetzel state at specifications 8 through 12 as follows:

> Specification 8:  On or about July 7,2004, at approximately 9 p.m., Officer Holihan returned to Orangetown Police Headquarters from the hospital with Mr. Dowd for processing.
>
> Specification 9:  On or about July 7, 2004, at approximately 9:00 p.m., Officer Holihan proceeded to process the arrest of Mr. Dowd.
>
> Specification 10:  On or about July 7, 2004, between 9:00 p.m., and 10:45 p.m., Officer Holihan failed to properly process Mr. Dowd in that he allowed Mr. Dowd to make several telephone calls to the complainant from the booking room.
>
> Specification 11:  The telephone calls made by Mr. Dowd included harassment and inappropriate language.
>
> Specification 12:  On July 7, 2004, you failed to supervise Officer Holihan thereby allowing Mr. Dowd to make the inappropriate telephone calls to the complainant.
> *(emphasis added)*

159.    Upon information and belief, Plaintiff was handling headquarters alone that evening, as Lt. (now Captain) Zimmerman, the Squad Commander, was on leave or otherwise absent.

160.    During Plaintiff's shifts of duty on both July 4 and July 7, 2004, the municipal Defendants required Plaintiff to single-handedly supervise headquarters, by not providing a substitute for the absent Lt. Zimmerman.

161.    Upon information and belief, the municipal Defendants knew full well that the headquarters supervisor, if handling that duty as the sole supervisor,  would need to handle at least some of the regular duties of the other supervisor.

162.    Upon information and belief, on September 7, 2004, Plaintiff had to perform her own duties as headquarters sergeant, plus at least some of Lt. Zimmerman's duties (in his absence), at a headquarters where her subordinates included a probationary officer (Officer Drane) and an officer with less than stellar performance nearing retirement (Officer Youngman).

163.    Plaintiff was given no notice whatsoever that there were accusations against her regarding the events of July 7, 2004 until two months or so after the alleged events, when she was served with formal charges, at which time her Memo Book, used for noting events, was taken from her.

164.    Upon information and belief, her Memo Book was taken from her for the purpose of depriving her of the ability to recollect events for which she stood accused.

165.    Notwithstanding the purported seriousness of the disciplinary charges, the municipal and law firm Defendants were willing to "settle" these for what amounted to no financial punishment at all (a two day, for the record only suspension), on the condition that the settlement and/or charges could be used against Plaintiff in her federal discrimination case, *Wetzel 1*.

166.    Upon information and belief, this was an attempt to exact an unconstitutional condition, in further violation of Plaintiff's equal protection and Title VII rights, and, like Mr. Klein's February 1, 2006 letter, was extortionate in nature.

167.    As described elsewhere in this complaint and in Exhibit 1, the testimony of the prosecutions only witness, Captain Zimmerman, as well as that of Chief Nulty was that plaintiff allowed a detainee to wander around the booking room unsupervised for significant periods of time, where the videotapes disapprove this testimony completely (and suggests intentional misrepresentation is not perjury).

168.    In addition, as mentioned above, the town deprived plaintiff of a central witness to her defense, namely, Sergeant (retired) Flannery, as it threatened him with prosecution of disciplinary charges even in his retirement.

169.    Mr. Wooley made no reference to the exculpatory evidence which the defense uncovered as the trial proceeded.  Upon information and belief, as to some of the exculpatory evidence showing misleading if not perjurious statements by pro-prosecution witnesses, a truly impartial hearing officer might have recommended disciplinary charges against the witnesses providing the false testimony (including Captain Zimmerman and Chief Nulty).

170.    Plaintiff remains willing to set forth in great detail the many reasons why any impartial and fair-minded adjudicator would have found her innocent of all 11 charges alleged in the September 7, 2004 set of charges.

171.    For the reasons stated above, Plaintiff requests equitable relief and damages, for the Defendants' unlawful actions and reprisal.

## FIRST CLAIM FOR RELIEF
## DENIAL OF EQUAL PROTECTION OF THE LAW

172.    Plaintiff repeats and reiterates the allegations above as if fully set forth again here at length.

173.    Defendants have denied Plaintiff the equal protection of the law, because she is a woman who has opposed unlawful discrimination, and is the target of unlawful reprisal.

174.    In particular as relevant here, Plaintiff has been denied of the Equal Protection of the Law because the disciplinary proceedings against her were motivated by unlawful retaliation, and a desire to coerce Plaintiff into abandoning her opposition to unlawful discrimination including gender discrimination and political cronyism, as alleged in *Wetzel 1*.

175.    Upon information and belief, for the first time ever in the town of Orangetown, a police officer respondent, the Plaintiff', was denied trial before a fair and impartial trier of the facts.  Upon information and belief, she was singled out for such given by her government for no legitimate and proper governmental reason.

176.    The Town's disciplinary prosecutor, in his letter to Mr. Wooley dated September 12, 2007, states that a hearing officer is not required to "treat the parties equally or fairly" as a matter of constitutional due process.  Upon information and belief, this was a direction by the Town's labor counsel to the Town's representative (Mr. Wooley, acting as hearing officer) that he need not act with impartiality and fairness towards the disciplinary respondent.

177.    Upon information and belief, other municipalities in Rockland County endeavor in their police disciplinary trials to use fair and impartial adjudicators.

178.    Upon information and belief, the Police Act , either expressly or impliedly, requires the use of a fair and impartial adjudicator of the facts.

179.    Upon information and belief, a fair and impartial adjudicator would have found Plaintiff not guilty of all charges against her, and would have dismissed, were recommended dismissal of, all charges.

180.    Upon information and belief, favored men (especially politically favored men) have never been subjected to the sort of disciplinary proceeding abuse and maltreatment as plaintiff has experienced.

181.    Upon information and belief, Plaintiff has been maliciously made a "guinea pig" as the first police officer tried in Orangetown under the Police Act.

182.    Upon information and belief, besides unequal protection based upon her gender and her opposition to unlawful discrimination, Plaintiff has also been denied equal protection as a "class of one" through the town's arbitrary treatment and this treatment of her.

183.    Upon information and belief, Plaintiff has been singled out for prosecution even though there was no probable cause, nor good faith grounds, nor good faith impartial investigation for the initiation of disciplinary charges, nor sworn charges, and even though the charges were a result of an improper fishing expedition improperly looking into private citizens Federal Wiretap Act-protected conversations.

184.    Upon information and belief, Plaintiff's disciplinary punishment was far in excess of that received by male police officers for infraction much more serious than those alleged against Plaintiff

185.    It is patently arbitrary, and also retaliatory, for the Police Chief to offer a "two day 'for the record only'" penalty,[7] based upon what he testified at trial were egregious facts, but then to recommend a forfeiture of pay totaling 62 days after the those egregious facts were shown to be false at trial.  This demonstrates bad faith and unlawful animus.

186.    Moreover, the Police Chief's insistence that he be able to use the disciplinary settlement as an admission of Plaintiff's guilt on the September 3 and 7, 2004 disciplinary charges in Plaintiff's *Wetzel 1* federal lawsuit reveals the Defendant Town's intent to exact an unconstitutional condition from Plaintiff, and to coerce her into giving up legitimate federal rights.

---

[7] *See*, August 9, 2006 letter of Lance Klein, indicating to plaintiff's counsel that the Town had previously offered settlement of the disciplinary charges with settlement including a "two (2) day suspension."

187.    Plaintiff Wetzel has been damaged thereby, for which she seeks the remedies available the 5th and 14th Amendments to the United States Constitution, as enforceable under 42 U.S.C. § 1983.

## SECOND CLAIM FOR RELIEF——
## VIOLATION OF PLAINTIFF'S RIGHTS TO SUBSTANTIVE AND PROCEDURAL DUE PROCESS

188.    Plaintiff repeats and reiterates the allegations above as if fully set forth again.

189.    In using sham and rigged disciplinary process, the Defendant Town has violated procedural and substantive due process rights of its civil servant, the Plaintiff.

### *Official town action*

190.    Upon information and belief, the municipal conduct at issue is not "random and unauthorized" action by individual agents of Town government, but rather the considered an authorized (though illegal) action of the Town's legislative body.

191.    Involved here is the official action of the Town of Orangetown, not "random and unauthorized act" of its employees.

192.    Moreover, the fact that Plaintiff has sought to petition the Defendant Town government  for the redress of grievances further evidences its municipal policy of intentionally depriving its citizens and its employees of federally guaranteed rights.  *See, Wetzel 2.*

### *Hearing officer henchmen for hire*

193.    Upon information and belief, the use of a "for hire" "hearing officer,"  acting essentially as a henchman,[8] violates Plaintiff's basic Due Process right to a fair and impartial factfinder.

194.    Upon information and belief, Keane & Beane (including Mr. Klein) and Mr. Wooley have had a familiar working relationship in the past.  See, Higham v. Temple, 2006 WL 2714712 (S.D.N.Y., Sep 22, 2006).

195.    Upon information and belief, Mr. Wooley has a reputation for always adjudicating cases in favor of his municipal employer.  Id.

196.    however, the pontiff mention them believe the relationship between Keane & Beane and Mr. Wooley is not merely that of two professionals coincidentally working together on the same case, but rather that of a patron-benefactor.

197.    Upon information and belief, Keane & Beane recommends Mr. Wooley's appointment, and Mr. Wooley reciprocates my adjudicating cases in favor of Keane & Beane's client.

198.    Upon information and belief, it is human nature to reward those who grant you favor.  However, it is antithetical to justice in the context of the judge favoring one party in a disputed case.

199.     Thus, upon information and belief, defendant Wooley is a henchman, and administrative "hanging judge," whose services are "for hire" to any municipality or its counsel desiring a favorable outcome against an employee, regardless of the evidence.

---

[8] WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY definition of "henchman" includes: " 2 a: trusted follower; a right-hand man  b: a political follower whose support is chiefly for personal advantage  c: an unscrupulous often violent member of a gang."

200.    Upon information and belief, Mr. Wooley's conduct and presiding over the disciplinary case at issue provides ample proof of partisan behavior.

201.    The refusal of Mr. Wooley to allow *voir dire* at the beginning of the disciplinary trial on the subject of his impartiality or lack thereof further suggests a lack of impartiality, and that his was a "for hire" appointment.

### *Denial of, and intentional infringement upon, the right to defend at trial*

202.    Upon information and belief, the Defendants in the town representatives including the police chief and his prosecutor/counsel)  engaged in attempting to deny plaintiff her basic due process rights, such as adequate notice of charges before trial, adequate ability to prepare and present a defense, and adequate access to and production of relevant evidence needed for the defense.

203.    Upon information and belief, the Defendants' representatives actively sought to deprive the disciplinary respondent, Plaintiff,  of necessary evidence within the Town's control, including physical evidence in the possession of the Town, and testimonial evidence in the form of necessary witness testimony.  Upon information and belief, the prosecution engaged in the intentional intimidation of witnesses, and was also involved in the intentional non-preservation of evidence (if not the actual destruction of evidence, for example, FOB data), at the disciplinary trial.

### *No input to ultimate decision maker, the Town Board*

204.    Plaintiff was denied any reasonable opportunity to be heard by the decision-maker on the disciplinary charges against her, namely, the Defendant Town Board.

205.    The Wetzel disciplinary process was, upon information and belief, intentionally designed by the Town's representatives to be conducted in an abusive and  fundamentally unfair manner as feasible.

206.    Upon information and belief, the proceedings abusive tactics were intentionally designed to burden and oppress the respondent public employee, Plaintiff herein.

207.    Upon information and belief, this action violates procedural and substantive due process, and is shocking to the conscience.  Some aspects of this governmental abuse are as follows:

i.    The possibility that the public employee might need to expend perhaps a year's worth of salary or more in order to adequately defend her career against retaliatory accusations is abusive and shocking;

ii.    The assertion by the Town's outside counsel (and the hearing officer in his Wooley report) that a disciplinary respondent (Plaintiff) might be subjected to personal liability under the Federal Wiretap Act for exercising her right to a public hearing  (The assertion is also shocking to the conscience because it was the Town's police chief and his counsel which caused both the unlawful recordings, and the public dissemination of such recordings at the disciplinary trial.)

iii.    The disciplinary trial was designed to be a sham and a charade, with the purpose being a disciplinary convicting regardless of the guilt or innocence.

iv.    A 2 year delay in trial violates basic Due Process, as does the four year span concerning the as yet untried September 3, 2004 charges;

v.    The unconstitutional condition demanded by the town and its 2004 proposed settlement;

vi.    The Town Attorney's presenting a proposal to Plaintiff's PBA representative immediately prior to the disciplinary trial, but without informing Plaintiff's attorneys;

vii.    The outrageously excessive punishment requested by the police chief.

*No notice of the penalty sought*

208.    Upon information and belief, an important aspect of due process is notice of the punishment sought by the government.

38

209.    In this case, Plaintiff was provided with absolutely no notice of what punishment was sought by Chief Nulty.

210.    As described above, she was offered a settlement which amounted to only a "paper penalty" of a two-day suspension without any financial exaction (but I condition that her admission of guilt be available to the Town to use against her and her federal litigation).

211.    As described above, because Plaintiff exercised her right to a trial, and even though the evidence which developed a trial exonerated Plaintiff regarding the factual assumptions relied on by Chief Nulty, is requested punishment and became the maximum short of termination.

212.    However, at this stage of the proceeding where Chief Nulty sought maximum punishment, Plaintiff was not permitted to provide any further input, as she was denied the opportunity to submit a post-trial brief, and denied any meaningful input to the Town Board.

213.    Upon information and belief, it violates fundamental due process not to inform the respondent of the penalty sought.

### *Disciplinary punishment was unconscionably excessive*

214.    Even if Plaintiff  had committed the infractions (which we believe any impartial person would agree she did not), the punishment imposed is excessive and unconscionable.

215.    Upon information and belief, in the context of police officers disciplined, imposing one half the maximum punishment short of termination would be analogous to imposing one half of a sentence of life imprisonment for the offense of jaywalking.

216.    This becomes apparent when one considers that, upon information and belief, police officers committing far more serious alleged infraction have suffered penalties only a fraction as severe as that imposed upon Plaintiff.

217.    Essentially the prosecution has accused Plaintiff of committing a mistake in judgment.  Respectfully, the mistake in judgment was theirs, not hers, but nevertheless the alleged faults were mistakes in judgment and as such, should not be the subject of quasi-criminal punitive action, namely, suspension without pay.

218.    Of much greater risk, impose punishment provides a predicate for future adverse action, such as termination.

219.    Finally, it is clear that this punishment is designed to terrorize not only plaintiff, but all other police officers who might, someday, need to decide whether to "demand a trial" regarding accusations of wedge their answer.  The answer is clear, absent a federal remedy in this case-- no reasonable police officer would dare subject himself or herself to the administrative system of injustice administered by the town

220.    It is a system which violates procedural and substantive due process, is shocking to the conscience, and detrimental to the public interest.

### *Disparate punishment*

221.    Upon information and belief, in Orangetown, under the Chief Nulty's administration, and condoned by the Town Board, Caucasian male officers under 40 have received very minor disciplinary punishment for quite severe errors in judgment or misconduct.

222.    Females, on the other hand, are treated harshly for actions which may not be infractions at all.  Plaintiff situation is the most egregious, but other female officers experiencing unreasonable or unjustified disciplinary action at the hands of Chief Nulty include Sergeant (retired) Barbara Noyes and Police Officer Cathleen Sampath.

223.    On the other hand, upon information and belief, examples of minor punishment men for men perpetrating serious misconduct or negligence include:

40

    a.  a male Police Officer (now in another department) for his negligent discharge of an AR 15 (M16-like) semiautomatic assault rifle in the police officer lineup room, thereby endangering the lives of any police officers in attendance. He is reported to have received a punishment of 3 days pay or less.

    b.  a male Police Officer (now detective) for negligent discharge of a pistol, shooting another police officer in the ankle. The Officer is reported to have received a punishment of 3 days pay or less

    c.  a male Police Officer for negligent discharge of a pistol, shattering a mirror in the officers' locker room and traveling into the supervisors' section of the locker room. He is reported to have received a punishment of perhaps one day pay (but in no event more than 3 days pay).

    d.  Officer R.S. received minimal discipline for his involvement in permitting an improper and outrageous strip search of one or more emotionally disturbed high school (BOCES) student(s), yet is reported to have received punishment of merely three days loss of pay.

224.    Upon information and belief, the official written policy of the Defendant Town's police department is progressive discipline, meaning ordinarily a progression from less severe punishment to correct disciplinary problems, to more severe disciplinary punishment if a problem continues.

225.    Thus, if an officer is in need of correction or discipline, supervisors should first use counseling, and if such counseling does not correct the deficiency, then extra training, admonition, informal reprimand, formal reprimand, with formal disciplinary charges used only as a last result (or where the misconduct is so egregious that only formal discipline is appropriate).

226.    Progressive discipline was not provided to Plaintiff. Rather, Plaintiff has been punished in an intentionally humiliating and public manner serving no proper purpose, but rather, detrimental to the department, detrimental to the town, detrimental to morale and discipline, and detrimental to expectation of police officers that they will be treated fairly.

*Officially-sanctioned due process violations require a federal remedy*

227.    Upon information and belief, Defendants' officially sanctioned disciplinary process is so arbitrary, capricious, and abhorrent to basic principles of due process as to violate substantive due process of law.

228.    As noted in part above in connection with Plaintiff's first claim regarding deprivation of equal protection, Defendants disciplinary process intentionally, and by design, denied Plaintiff due process of law by:

    a.    denying Plaintiff the right to trial before the town board itself, where she was both notified of this in the notice of charges, and where this such appears a requirement of the Police Act;

    b.    providing Plaintiff with only five work days notice in advance of trial, at the same time Plaintiff was informed of the identity of the hearing officer, namely, June 30, 2006;

    c.    denying Plaintiff's reasonable request for an adjournment regarding the trial scheduled, on five work days notice, for July 11, 2006.

    d.    bifurcating the September 2004 charges into two sets of charges, thereby requiring Plaintiff to prepare separate defenses for, and undergo, two separate disciplinary trials, one scheduled for July 11th, and the other yet unscheduled one year later.

    e.    providing no procedural guidance regarding the conduct of the hearing, with the Town having promulgated no rules or regulations under the Police Act to guide Plaintiff as a disciplinary respondent;

    f.    providing no effective opportunity for Plaintiff to subpoena witnesses or evidence prior to the first day of trial, and arguably no power to subpoena witnesses or evidence at all (because the hearing officer tribunal is unauthorized here);

42

g.  Police Chief Nulty's attorney, Mr. Klein, forbade Plaintiff's counsel from contacting <u>any</u> town employees in connection with the disciplinary case, and threatened recourse to the federal magistrate judge handling discovery in *Wetzel I* if Plaintiff's counsel attempted to prepare a defense by contacting potential witnesses.[9]

h.  providing no discovery (even of written material confiscated from Plaintiff in September 2004) as to material vital to Plaintiff's defense, such as activity logs, FOB access card records, video camera recordings, Plaintiff's own Memo Book, and many other items requested of the Town, in writing, but refused;

i.  providing no bill of particulars, or adequate opportunity to prepare and request same, so that Plaintiff was not reasonably apprised of the disciplinary charges against her;

j.  providing no specific trial location (e.g., a specific room to convene the proceedings) in its notification to her, so that Plaintiff could so inform the interested public, and have a public trial, as was and is her Police Act right;

k.  as mentioned above, the appearance and actuality of bias and non-impartiality by the hearing officer, including that:

>   A.  there is no indication that defendant Wooley was selected in an impartial manner, but rather appears that he was selected by the defendant Town and Police Chief Nulty (who has a personal stake in the litigation as a § 1983 defendant), and their counsel, Keane & Beane PC is acting as both an advocate in *Wetzel 1*, as the "prosecutor" in the disciplinary matter, and apparently also as counsel to the Town Board, which in a disciplinary matter is obligated to be an impartial as "judge";

>   B.  thus, it appears the Charging Party (Police Chief Nulty) is vicariously sitting as judge and jury, in violation of the express provisions of § 7 of the Police Act, and fundamental principles of due process;

---

[9] <u>See</u>, Keane & Beane (L. Klein ) letter dated June 5, 2006, letter #1.

C. it appears that defendants attorneys engaged in *ex parte* communication with the hearing officer to establish a trial date on an expedited basis, to prejudice Plaintiff's rights in *Wetzel 1*.

D. Plaintiff served discovery demands in *Wetzel 1 (*inquiring into the retaliatory aspects of defendants actions) on June 28, 2006, and two days later Plaintiff was informed that the disciplinary trial was schedule for 5 work days later;

E. The disciplinary trial was set to begin two days before the defendants' deposition of Plaintiff in *Wetzel 1*, and thus apparently designed to interfere with Plaintiff's preparation for her deposition in the federal lawsuit, *Wetzel 1*.

F. There is no evidence that Defendant Wooley had <u>any</u> substantial prior experience in police disciplinary hearings or arbitrations;

G. There is no evidence that this hearing officer was regularly selected through any regular and competitive system, such as a published request for proposals, or other process designed to avoid the favoritism disfavored by public policy, as described, for example, in N.Y.S. General Municipal Law § 104-b;

l. Plaintiff was has never been notified of what the Town regards as the maximum punishment which could be imposed, if all charges were proven. She was not informed, for example, whether the Town considers termination, or demotion in rank, a possible punishment.

m. The hearing officer's letter indicated that the procedures of Civil Service Law Section 75 will be applied, yet in the Town's challenge to arbitration in police disciplinary matters, New York's highest court expressly held that the longstanding arbitration procedures were impermissible, and that Civil Service Law Section 75 did <u>not</u> apply.  See, *Matter of Patrolmen's Benevolent Ass'n of City of New York v. New York State Pub. Empl. Relations Bd.*, 6 N.Y.3d 563,(2006), decided March 28, 2006 ("*Orangetown v. PBA*")("…where Civil Service Law §§ 75 and 76 apply, police discipline may be the subject of collective bargaining.").

n. Notwithstanding *Orangetown v. PBA*, the Town has <u>not</u> promulgated rules and regulations in accordance with Orangetown v PBA, even though that decision pre-dated the disciplinary trial.

44

o.  There is no "neutral" or "detached" governmental official responsible for supervising this disciplinary procedure, even though the procedure could significantly affect Plaintiff's property or liberty interests, 27 year career, and 2006 achievement of becoming the second female lieutenant in Rockland County history, with an unblemished disciplinary past, significant career achievements and excellent reputation among police officers and supervisors.

p.  There is no procedure in place for a disciplinary respondent to directly input the actual decision-maker, the Town Board, and thus no effective "opportunity to be heard."

q.  Plaintiff has been denied any meaningful opportunity to provide input to the ultimate decision maker, the Town Board;

r.  plaintiff was denied the ability to submit a post-trial brief to the hearing officer;

s.  the remains the threat of a repetition of most or all of the above abuses if the municipal and law firm Defendants choose to prosecute the still pending September 3, 2004 disciplinary charges.

229.    Upon information and belief, disciplinary proceedings of civil servants are "quasi-criminal" and punitive in nature, and warrant full due process protections.

230.    In sum, this Court must provide a federal venue to remedy the carefully calculated official action intentionally devised to deprive police officers (such as Plaintiff ) of their federal right to due process of law.

231.    Plaintiff Wetzel has been damaged thereby, for which she seeks the remedies available under the 5th and 14th Amendments to the United States Constitution, as enforceable under 42 U.S.C. § 1983.

## THIRD CLAIM FOR RELIEF—
## CERTIORARI (ARTICLE 78) REVIEW OF THE FINDING OF GUILT
## AND PENALTY ASSESSMENT OF THE DEFENDANT'S TOWN BOARD,

## WITH A DECLARATION NULLIFYING THE TOWN BOARD'S DECEMBER 10, 2007 ACTION

232.     Plaintiff repeats and reiterates the allegations above as if fully set forth again.

233.     Upon information and belief, under the Police Act, Plaintiff is entitled to *certiorari* review from a court of competent jurisdiction.

### *Federal Court's supplemental jurisdiction*

234.     *Certiorari* review is a common law judicial remedy to provide legal review of governmental action, and is specifically allowed by the Police Act.

235.     Such review is within, and can properly be undertaken under, this Court's supplemental jurisdiction.  See, e.g., City of Chicago v. International College of Surgeons, 522 US 156 (1997).

236.     This Court's supplemental jurisdiction is found at 28 U.S.C. § 1367, which provides in relevant part:

> (a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. *** *(emphasis added)*

237.     There can be no doubt that this case involves state claims that are inextricably intertwined with Plaintiff's Federal claims, and that the state claims are certainly part of the federal case in controversy.

238.     Plaintiff is entitled by federal statute to elect the federal forum, where predominantly federal rights have been violated.   The Court should note that an article 78 proceeding does not provide for a jury trial, nor does it provide a damages remedy.

239.    If *certiorari* review is not provided by this federal court, Plaintiff may be forced to forego such remedy and proceed only on her federal claims.  This will, of course, defeat both the spirit and intent of the supplemental jurisdiction provisions of Title 28.

### *Straightforward certiorari relief is sought*

240.    As to Plaintiff's request for certiorari review under the Police Act, Plaintiff respectfully submits that Town Board's action is unlawful under New York law in that:

- Disciplinary trial should have been undertaken exclusively by the Town Board, as there were no rules or regulations promulgated by the Town permitted otherwise, even assuming *arguendo* that the Police Act would permit the Town to delegate such authority;[10]

- Even if *arguendo* that promulgated rules or regulations existed authorizing a delegation of authority to a hearing officer, there was no timely written delegation here by the Town Board to Mr. Wooley to conduct fact-finding. The Town resolution which purported to do so here (Resolution 600 of August 2006)  was issued after the prosecution had already rested.

- The unilateral selection of a partisan to preside over a full adjudicatory hearing, where the individual is selected by the prosecution with the intention that he act as a henchman, and convict the respondent regardless of the evidence and fairness, violates not only federal constitutional law, but also of New York law.

241.    As to the above, the federal court is not faced with a difficult task.  I need only declare the Town Board action a nullity, and remand for the matter to the Town Board, to conduct a trial itself, if it chooses to do so, with certain guidance so that the Town can do so in the future in a constitutionally sufficient manner.

---

[10]  Under the Westchester County Police Act, factfinding cannot be delegated by a town or village.  For the State to provide police officers with substantively different rights, merely because they work on different sides of the Hudson River, may violate equal protection, the privileges and immunities clause, and due process under the federal Constitution, as the Police Act is applied.

242.    The Court should consider that the State law issues are few compared to the many important federal law issues involved herein.  Moreover, the the State law issues are easily redressible, without undue burden to the federal court.

243.    On the other hand, if not addressed by the federal court in this case, the State courts would be unduly burdened, especially if it is required to examine the *Wetzel* 1 through *Wetzel* 4 lawsuits already pending in this federal court.

## FOURTH CLAIM FOR RELIEF—
## FIRST AMENDMENT RIGHT TO PETITION GOVERNMENT
## FOR REDRESS

244.    Plaintiff repeats and reiterates the allegations above as if fully set forth again.

245.    Plaintiff repeatedly attempted to seek redress from the Town Board in connection with her disciplinary case, and the trial thereof.

246.    The Town Board refused to allow such petition, including but not limited to considering the September 21, 2006 letter-motion from Plaintiff's attorney challenging the authority of Mr. Wooley to preside over a disciplinary trial, and challenging his non-impartiality and unfairness.

247.    The Town Board continues to refuse Plaintiff the right to petition for redress.

248.    In Plaintiff's opinion, being afforded "5 minutes" to for her attorney to talk, while prohibited from making "argument on the evidence" or making a "closing statement," is not permitting a petition.  It is a sham offer of an opportunity, after decision-making was all but concluded.

249.    Upon information and belief, for constitutional purposes it makes absolutely no difference whether the First Amendment petition is furnished by the petitioner herself (the

plaintiff therein), an attorney in fact (such as a lay spokesperson) or an attorney at law

(Plaintiff's attorney).

250.    By continuing to deprive Plaintiff of the ability to object to the unfair disciplinary

process, and to deprive her of the ability to present "her side of the story" to the Defendant Town

Board, where it was being presented only with the Police Chief version of the facts (via the

closing statement of the Town's outside counsel and the Report and Recommendation of its

henchman hearing officer), Plaintiff was deprived of her right to petition her government for the

redress of wrongs.

251.    Plaintiff has been damaged thereby.

## FIFTH CLAIM FOR RELIEF—
## REQUEST FOR DECLARATION THAT THE POLICE ACT,  AS
## APPLIED TO PLAINTIFF,  IS UNCONSTITUTIONAL.

252.    Plaintiff repeats and reiterates the allegations above as if fully set forth again.

253.    The Police Act is a special statute of state government and as such, upon

information and belief, must not violate citizens federal constitutional either facially or as

applied.

254.    Upon information and belief, as applied by the defendant town, the Police Act

violates Plaintiff's federal constitutional rights, and also the federal constitutional rights of all

police officers which may be subject to its similar unlawful application.

255.    As applied, Police Act deprives police officers, including the Plaintiff, to equal

protection of law, to due process of law, to freedoms of speech, association and petition under

the First Amendment, and the privileges and immunities of American citizens.

256.    As applied, the defendant town's application of the Police Act deprives public employees of their property right to security in their public employment, and to the merit service protections of the civil service.

257.    As applied, the provisions of the Police Act are also unconstitutionally vague, allowing for an interpretation which essentially deprives the saucers of basic due process and equal protection.

## SIXTH CLAIM FOR RELIEF—
## RETALIATION FOR EXERCISING FEDERAL RIGHTS
## UNDER 42 U.S.C. § 1983 AND TITLE VII

258.    Plaintiff repeats and reiterates the allegations above as if fully set forth again.

259.    Defendants retaliated against Plaintiff because Plaintiff opposed gender discrimination, opposing political patronage, cronyism and political discrimination in police promotions, opposed unlawful retaliation, and opposed the violation of Plaintiff's federal statutory and constitutional rights.

260.    Defendants retaliated because plaintiff would not be coerced into abandoning her federal lawsuit.

261.    Defendants retaliation includes allowing, and condoning, the abusive and pretextual disciplinary proceedings which have been prosecuted against her,  and the Town Board adjudication thereof, including its refusal to permit any meaningful input from the Plaintiff or her attorney, and the police chief abusive implementation of the punishment adjudged.

262.    Plaintiff has previously sought relief regarding these retaliatory disciplinary charges including filing a timely charge of discrimination with the United States Equal Employment Opportunity Commission, which charge remains pending.

50

## SEVENTH CLAIM—RETALIATION PROHIBITED BY
## N.Y.S. CIVIL SERVICE LAW § 75-b

263.    Plaintiff repeats and reiterates the allegations above as if fully set forth again.

264.    The Defendants and their representatives (including Mr. Wooley) denied Plaintiff her right to put on a defense of retaliation, unequal treatment or selective prosecution at the disciplinary trial.

265.    Defendant Wooley refused to permit Plaintiff to introduce evidence of retaliation. He refused to consider or allow into evidence Defendant Klein's February 1, 2006 letter.

266.    Upon information and belief, this refusal to consider retaliation in connection with the disciplinary proceeding against Plaintiff, a civil servant, violated N.Y.S. Civil Service Law § 75-b, by denying Plaintiff the right under § 75-b(3)(a) to assert the defense of retaliation.

267.    Upon information and belief, § 75-b(4) permits this federal court to adjudicate this matter here, as the retaliation defense was not permitted by Defendant Wooley in the disciplinary trial.

## EIGHTH CLAIM FOR RELIEF—
## DECLARATION OF INVALIDITY UNDER THE STATE
## CONSTITUTION, INCLUDING STATE BILL OF RIGHTS AND CIVIL
## SERVICE PROVISION

268.    Plaintiff repeats and reiterates the allegations above as if fully set forth again.

269.    Defendants' actions have also violated the provisions of New York's constitution, including but not limited to N.Y.S. Constitution Article I, § 6, guaranteeing due process of law, and Article I, § 11, guaranteeing the equal protection of law, as well as state statutory provisions protecting civil service in their public employment, and prohibiting retaliation for disclosing unlawful and discriminatory governmental activities, including but not limited to the N.Y.S. Human Rights Law contained in Executive Law article 15.

WHEREFORE, Plaintiff prays that this Court grant the following relief:

a)  declaring that the December 10, 2007 action of the Defendant Town Board
    adjudicating Plaintiff's guilt and assessing a penalty is a legal nullity;

b)  issuing an injunction retroactively restating Plaintiff regarding her 10-day suspension;

c)  remanding the disciplinary case to the Town Board, for its further consideration and
    action consistent with the requirements of law;

d)  awarding Plaintiff back pay equivalent to 12 days (the actual period of her suspension
    as a fermented by the police chief)

e)  declaring that the procedures employed by the defendants, ostensibly under the Police
    Act, are unconstitutional as applied,

f)  granting Plaintiff  a permanent injunction against continued retaliation in the form of
    baseless disciplinary charges adjudicated before a non-impartial agent of the town

g)   declaring Plaintiff's rights as a public employee, including but not limited to the
    rights to equal protection of law and due process of law set forth above;

h)  if the Court deems it appropriate, consolidating the damages aspects of this case with
    Plaintiff's federal retaliation case, *Wetzel 3;*

i)  granting an award of reasonable attorneys' fees and the costs of this action; and

j)  awarding Plaintiff such other and further relief as the Court deems just and equitable
    in the circumstances.

**Jury Demand**

*Plaintiff demands trial by jury in this action.*

Dated: Stony Point, New York
      January 9, 2008

                        Respectfully submitted,

                        _____/S/_____

                        MICHAEL D. DIEDERICH, JR.
                        *Attorney for Plaintiff     (MD 2097)*
                        361 Route 210
                        Stony Point, N.Y. 10980
                        845-942-0795
                        Mike@DiederichLaw.com

Attachments:
Exhibit "1" (Town Board Resolution 795 of December 10, 2007)
Exhibit "2" (Wetzel Chronology outline)
Exhibit "3" (Itemization of disciplinary trial due process deprivations
Exhibit "4" (Manual for Municipal Reprisal against Police Officers--draft)

*EXHIBIT "1"* ( Town Board Resolution 795 of December 10, 2007)

### RESOLUTION NO. 795 POLICE/DISCIPLINARY CHARGES EMPLOYEE NO. 1422

Councilman Troy offered the following resolution, which was seconded by Councilman O'Donnell and on a roll call was adopted:

Whereas a proceeding was commenced against Employee Number 1422 based upon disciplinary charges dated September 7, 2004, that were issued by the Chief of Police pursuant to the Rockland County Police Act; and

Whereas the Town Board designated Joseph P. [sic] Wooley, Esq., as the Hearing Officer for such charges; and

Whereas a hearing was held at which Employee Number 1422 was represented by counsel; and

Whereas, the Hearing Officer rendered findings of fact and recommendations based upon the record presented at the aforementioned hearing; and

Whereas the Town Board has had an opportunity to review the record in this matter, as well as the report and recommendations of the Hearing Officer; and

Whereas, on December 10, 2007, at its regularly scheduled public meeting, the Town Board provided the Employee and Chief Nulty with an additional opportunity to address the Town Board with respect to the pending disciplinary charges;

Now, therefore, be it resolved that the Town Board hereby accepts the Hearing Officer's findings of fact, as more fully set forth in the decision of the Hearing Officer dated June 11, 2007; and

Be it Further resolved that, based upon the recommendations contained in the decision of the Hearing Officer, the Town Board hereby finds Employee Number 1422 guilty of Charge 1(a), (b) and (c); Charge II, Charge III(a) and (b); Charge IV; Charge V; Charge VI (a) and (b); Charge VII(a); Charge VIII; Charge IX, and Charge X, and

Be it Further resolved that, based upon the recommendations contained in the decision of the Hearing Officer, the Town Board hereby finds Employee Number 1422 not guilty of Charge VII(b) and Charge XI, and

Be if Further resolved that the Town Board rejects the Hearing Officer's recommendation that a penalty of twenty (20) days forfeiture of salary or compensation be imposed; and

Be it Further resolved that, based upon the entire record in this matter, and in recognition of the employees prior length of service without any prior disciplinary problems, the Town Board imposes a ten (10) days suspension without pay, which is less than the penalty recommended by the Hearing Officer.

Ayes: Councilpersons Troy, O'Donnell, Manning
Supervisor Kleiner
Noes: None
Abstained: Councilperson Morr

EXHIBIT "2"

## CHRONOLOGY[1] --Wetzel v Orangetown

| | |
|---|---|
| 1977 | Plaintiff Wetzel, as a civilian, awarded PBA award for bravery for assistance to a police officer in trouble (Patrolman Kevin Nulty-- the Defendant Chief)) |
| 1978 | Barbara Noyes hired as first female police officer in Town of Orangetown (and second in history of Rockland County) |
| 1980 | June 28   Plaintiff appointed to the Orangetown Police Department, following a family tradition of police service. |
| 1990 | October 22   Plaintiff was appointed to the rank of Sergeant (under Chief Crable). |
| 1997 Feb. | Captain Kevin Nulty promoted to chief of police |
| 1997 June | Two Lieutenant promotional opportunities -- first ever where a female was an eligible candidate (Barbara Noyes) |
| 1999 | Plaintiff takes Lieutenant examination |
| 2000 June | Plaintiff learns of upcoming Lieutenant promotional opportunity |
| 2000 Sept.13 | Chief Nulty letter to 4 sergeants (Brown, Butterworth, Mercurio & Wetzel) notifying of promotional opportunity |
| 2000 Dec | Interview for promotion |
| 2001 Jan. 16 | Sgt. Mercurio promoted over Plaintiff (notwithstanding Plaintiff's much greater seniority and service).   Mercurio is male, and his aunt is a prominent county politician (in the same political party as the majority of the Town Board).   He has Honor Guard ceremony. |
| 2001 May | Another apparently "politically connected" officer is selected over another officer with apparently far better credentials for promotion under Police Act criteria. |
| 2001 May | Plaintiff files N.Y.S. article 78 petition (Kopf [a/k/a Wetzel] v Orangetown/Lt. Mercurio ("Mercurio Art. 78") |
| 2001 Jan | Lt. Mercurio takes over midnight squad |
| 2001 Autumn | Mercurio Art. 78 litigation activity & motion to dismiss |
| 2002 Jan | Mercurio moved to Plaintiff's squad, becoming her immediate supervisor |
| 2001-2002 | Mercurio Art. 78 petition decision  (May 29, 2002) & subsequent appeal. |
| 2003 Autumn | Schedule Mercurio Article 78 for trial |
| 2003 Dec. | Federal action 03 Civ 9896 ("Wetzel 1") commenced |
| 2004 Jan. | Promotion of Sgt. Donald Butterworth to Lieutenant; Plaintiff again denied promotion (notwithstanding, again, Plaintiff's much greater seniority and service and identical civil service exam scores).   He has Honor Guard ceremony. |

---

[1] This document was prepared by Plaintiff's counsel, and is intended as demonstrative evidence as an aid to the Court.

2004 March      Mercurio Article 78 trial commences

2004 April      Plaintiff files EEOC charge of gender discrimination regarding January 2004 non-promotion

2004 April      Plaintiff files article 78 petition (Butterworth's January 2004 promotion)

2004 May 28     EEOC "Right to Sue" letter

2004 Summer-Autumn  Chief Nulty anticipates and/or plans for new lieutenant vacancy for January 2005.

2004 July 4 & 7  Events of these days serve as pretext for September 3 & 7, 2004 disciplinary charges

2004 July 14 (approx)   Plaintiff finalizes & files *Wetzel 1* supplemental/amended federal complaint.

2004 July-August       Chief Nulty's HQs officers (including Lt. Zimmerman) illegally review secretly eavesdropped telephone conversations between detainee Frank Dowd and his domestic companion Nicole Colandrea.  The audiotapes serve as a basis for September 7, 2004 disciplinary charges.

2004 August 4  Judge William Nelson (Rockland Co. Supr. Ct.) dismisses Plaintiff's article 78 petitions, finding that the Town Board promotions of the two men had a "rational basis"

2004 Aug. 18   Chief Nulty's OUR TOWN comments of Aug 18, 2004 critical of Plaintiff, his subordinate police officer

2004 Aug 23    Diederich's responsive letter to editor to OUR TOWN

2004 August   Keane & Beane PC (and its principal Lance Klein Esq.) assist and advise Chief Nulty in investigating and developing disciplinary charges against Plaintiff Wetzel, at the same time Keane & Beane represents the Chief and Town Board in defending against *Wetzel 1*. Keane & Beane learns of (and may have provided advice to the municipal defendants regarding) unlawfully recorded telephone conversations.   Keane & Beane appear to be actively participating in and designing the deprivation, obstruction and interference with Plaintiff's federal rights (and those of others too—Ms. Colandrea, Mr. Dowd and Sgt. Flannery).

2004 Sept 3    Entry of Judgment – Plaintiff's article 78 (re: Sgt. Donald Butterworth promotion)

2004 Sept. 3 or 4  Plaintiff handed a sealed manila envelope containing disciplinary charges-- 1st set  re: events of July 4, 2004.

2004 Sept. 8   Plaintiff was served second set of disciplinary charges regarding alleged events of July 7, 2004.

2004 Sept. 8  Lt. Mercurio finalizes a compilation of data which Keane & Beane subsequently asserts was "prepared in contemplation of litigation" and therefore privileged from disclosure (e.g., at the Wetzel disciplinary trial).

2004 Sept and ongoing  Keane & Beane represents the Town in arguing in Matter of Orangetown PBA that police discipline is not a proper subject of collective bargaining and impartial arbitration.   Keane & Beane presumably earns significant fees in litigating this issue, yet there appears to be no demonstrated need to change an arbitration procedures in effect for years.

2004 Oct. 5  Article 78 Notice of Appeal filed

2004 December   Plaintiff develops serious medical problem (ultimately requiring partial hysterectomy)

2004 December Plaintiff learns about upcoming promotional opportunity

2005 Jan.        Sgt. James Brown promoted to Lieutenant    He has Honor Guard ceremony.

2005             Chief Nulty directs Plaintiff to be gynecologically examined by a gynecologist unknown to her

2005             After undergoing major surgery, Plaintiff subjected to "bed check" telephone calls from the Police Department

2005 June 9      EEOC complaint

2005 Sept. 5     Decision of U.S. District Court (Judge Robinson) re: Town/Nulty's motion to dismiss federal complaint

2005 Nov. 3      Plaintiff's attorney is released from active duty with U.S. Army, after serving one year in central Iraq.

2006 Jan.        Plaintiff is promoted to the rank of lieutenant.   She has <u>no</u> Honor Guard ceremony (unlike prior 3 promotions of men to rank of lieutenant).

2006 Jan.        Defendants' attorney Lance Klein suggests to Plaintiff's attorney that he makes a demand.   Plaintiff's attorney proposes settlement.

2006 Feb. 1      Defendants' attorney Lance Klein indicates that if Plaintiff does not abandon her federal lawsuit (or settle on Defendants' terms), that he will ensure that the 2 disciplinary cases (of September 3 & 7, 2004) pending against Plaintiff will be prosecuted

2006 Spring/Summer  Plaintiff begins successfully working in her new position of squad lieutenant. Performance is acknowledged as satisfactory.

2006 June 30     Plaintiff is unexpectedly informed that a disciplinary trial will be prosecuted against her, and that it will commence against her in 5 business days, beginning July 11

2006 July 7      Plaintiff commences *Wetzel 2*, to enjoin the retaliatory disciplinary proceeding.   TRO is denied.

2006 July 11- Nov 1     The Wetzel disciplinary trial (9 days)

2006  Nov 1 – June 12   For over 6 months, Defendant Wooley does not issue a findings and recommendations.

2006  Nov 1 – June 12, 2007    For over 6 months, Defendant Wooley does not issue a findings and recommendations.

2007 February & thereafter   Lt. Wetzel's attorney repeatedly asks Hearing Officer for opportunity to submit a post-trial brief.  No response is forthcoming.

2007 May         Keane & Beane submits a "Closing Statement" (49 page written brief) and Hearing Officer Wooley refuses to inform Lt. Wetzel's counsel whether a brief submitted on Lt. Wetzel's behalf would be considered

2007 June        Hearing Officer Wooley mails a copy of his 59 page, single spaced, report/recommendation to Lt. Wetzel's counsel.   This recommends the maximum penalty authorized by the Police Act, short of termination.

2007 August     Town provides no information to Plaintiff's attorney regarding status of case; whether case will or has been presented to the Town Board; and whether he will be given an opportunity to provide Plaintiff's side of the case—her defense—to the Town Board

2007 Nov.      Plaintiff learns that the Town Board is reviewing the record and Wooley Report, and again requests an opportunity to provide a defense

2007 Dec. 3   The Town Attorney advises that he will be afforded "5 minutes" to provide a statement at the public portion of the December 10, 2007 Town Board meeting. The Town Attorney later clarifies that plaintiff's attorney will not be permitted to make "argument on the evidence" or provide a "closing statement."

2007 Dec. 10  Plaintiff's attorney reads from a letter, and is allowed exactly 5 minutes. Later, the Town Board adjudicates guilt and punishment.

2007 Dec      Plaintiff request Town Board reconsideration; Town Attorney responds no.

2008 Jan 4    Plaintiff begins her "10 day suspension," in two segments extending over 12 days.

2008 Jan 9    Wetzel "6" is commenced, seeking, *inter alia*, invalidation of Town Board's December 10, 2007 guilt finding and penalty assessment, and challenging the unconstitutional disciplinary proceedings under the Police Act, as applied

EXHIBIT "3"

## ITEMIZATION OF VARIOUS DUE PROCESS
## DEPRIVATIONS ENCOUNTERED DURING THE DISCIPLINARY TRIAL

The Town's ad hoc and unprecedented disciplinary process is arbitrary and capricious, and designed to deprive Lt. Wetzel of due process of law.  It is essentially a sham, and a hoax as far as due process of law is concerned.  In particular, defendants intended disciplinary process denies Lt. Wetzel due process of law for a number of reasons including, but not limited to, the following:

a.  denying Lt. Wetzel the right to trial before the town board itself, where she was notified in the notice of charges that trial would be before the Town Board, and where this such appears the requirement of the Police Act;

b.  providing Lt. Wetzel with only four regular work days notice in advance of trial, at the same time Lt. Wetzel was informed of the identity of the hearing officer, namely, June 30, 2006;

c.  denying Lt. Wetzel's reasonable request for an adjournment regarding the trial scheduled, on four work days notice, for July 11, 2006;

d.  bifurcating the September 2004 charges into two sets of charges, thereby requiring Lt. Wetzel to prepare separate defenses for, and undergo, two separate disciplinary trials, one scheduled for July 11th, and the other yet unscheduled;

e.  providing no procedural guidance regarding the conduct of the hearing, with the Town having promulgated no rules or regulations under the Police Act to guide Lt. Wetzel as a disciplinary respondent;

f.  providing deficient notice of her rights, including deficient opportunity to subpoena witnesses and evidence,

g.  purporting to rights similar to those under Civil Service Law § 75, as summarized in the Civil Service Commission "Manual" referred to by the hearing officer in his notice of hearing letter dated June 29, 2006, yet denying such rights;

h.  allowing Police Chief Nulty's attorney, Mr. Klein, to forbid Lt. Wetzel's counsel from contacting any town employees in connection with the disciplinary case, and threatened recourse to the federal magistrate judge handling discovery in *Wetzel I* if Lt. Wetzel's counsel attempts to prepare a defense by contacting potential witnesses;

i.  refusing to provide evidence relevant to Lt. Wetzel's defense;

j.  providing no bill of particulars, or adequate opportunity to prepare and request same, so that Lt. Wetzel is not reasonably apprised of the charges against her;

k.  providing no specific trial location (e.g., a specific room to convene the proceedings) in its notification to her, so that Lt. Wetzel can be confident that her trial will be public, if she elects such option, as is her Police Act right;

l.  the appearance of likely bias and non-impartiality of the hearing officer, and his refusal to state whether he has a prior relationship with Keane & Beane, P.C. or its lead attorney, Lance Klein.

m.  Lt. Wetzel was has never been notified of what the Town regards as the maximum punishment which could be imposed, if all charges were proven. She is not informed, for example, whether the Town considers termination, or demotion in rank, a possible punishment.

n.  The hearing officer's letter indicates that the procedures of Civil Service Law Section 75 will be applied, yet in the Town's challenge to arbitration in police disciplinary matters, New York's highest court expressly held that arbitration was impermissible, because Civil Service Law Section 75 and 76 did <u>not</u> apply.  <u>See</u>, <u>Matter of Town of  Orangetown v. Orangetown Policemen's Benevolent Association</u>, No. 34, decided March 28, 2006 ("*Orangetown v. PBA*")("…where Civil Service Law §§ 75 and 76 apply, police discipline may be the subject of collective bargaining.").

o.  Notwithstanding *Orangetown v. PBA*, the Town has not promulgated rules and regulations in accordance with that N.Y. Court of Appeals decision.

***[This list does not include post-trial deprivations described in the body of the Wetzel 6 complaint herein.*** ]

Exhibit "4"

# Manual for Municipal Reprisal against Police Officers
## (draft #1 Jan 9, 2008)

## I.  Introduction

This is a "how to" guide for retaliating against police officers and other municipal civil servants for any nefarious motive.  While subtlety is useful, it may not be necessary.  Blatant reprisal may find no immediate remedy, or no remedy at all, if the Manual's user—the Reprising Official—can expend sufficient effort, using taxpayer dollars, to implement the Reprisal Plan.

A Reprisal Plan can be usefully employed to achieve various goals.  Reprisal can be effectively used to discourage civil servants from "whistle-blowing" or otherwise challenging activities such as unlawful discrimination or political cronyism.  Successful reprisal will "educate" the workforce—they will be able to see that municipal leaders are all-powerful.  If ruthlessly employed, civil servants will realize that they must not oppose in any manner the "powers that be."  For corrupt public officials, the use of a Reprisal Plan is very important, as an essential tool for insulating them from public exposure.  Crafty use of a Reprisal Plan can defeat union protections, and the protection of State statutes designed to protect the integrity of the civil service, by eviscerating "merit protection" and other statutory safeguards designed to protect the public interest.

An effective Reprisal Plan must carefully disguise itself, and its retaliation and abuse.   The Reprisal Plan must not be expressly labeled as such.  And it is crucial that the municipal actors co-opt or neutralize potential opposition forces.  It is best if, for example, the Reprising Official obtain the sympathy, if not the active cooperation, of other officials, such as elected officials and perhaps the judiciary.  If such officials have any potential for believing that civil servants must be treated fairly, then the best strategy is to withhold or misrepresent information to such officials.   Litigation facilitates this.  If the reprisal provokes a lawsuit, the Reprising Official can accomplish much by convincing the elected officials and news media that  the civil servant at issue is undesirable.  "Advocacy" can be used to distort or misrepresent facts, to place the employee in the least favorable light, perhaps even vilifying her and even, if possible, creating public scorn.  Outside counsel, retained by the municipality to defend against the employee's lawsuit can be effectively used for these tactics, while also being responsible for achieving these results in their role as the "attorneys" for the municipality, and at the same time insulating the municipality responsibility for the Reprising Official's actions.  "It's in the hands of our attorney" will be the convenient public response.

The municipality can further insulate itself from responsibility for the reprisal if it prevents the civil servant or her attorney from publicly addressing the abuse to the municipality's elected officials.  *See, e.g., "Wetzel 2" (06 Civ 5144),* now on appeal.  Finally, if the litigation is assigned to a pro-government, anti-individual rights judge (increasingly common, for many reasons), the civil servant may find herself with no timely remedy for multiple acts of *in seriatim* reprisal.  Without the prospect for a federal judicial remedy (and a realistic award of attorney's fees, which the civil servant could not otherwise afford), the civil servant will be coerced into submission, or fired.  The Reprisal Plan's "mission" will be accomplished.

## II.    *The Lorraine Wetzel case –a study in condoned municipal reprisal*

The above is not merely hypothetical.   A Reprisal Plan appears to have been developed in one suburban New York community, the Town of Orangetown, New York. Most of the tactics and strategies  described herein have been vigorously opposed by the author, who views the Town's various and cumulative actions as lawless.  To date, neither the courts nor the EEOC have done anything whatsoever to stop the reprisals. The Rule of Law does not appear to apply to the Town of Orangetown.  The Town's ability to engage in reprisal is at the cutting edge of the law (or more precisely, the cutting edge of lawlessness).

With Orangetown in mind, municipal officials, and the lawyers who represent them, can use the various techniques described herein as a useful "how to" guide for abusing civil servants.  Ultimately, with the help of the courts, these officials might success in destroying civil service merit protection without any action by the State Legislature or Governor—a truly remarkable non-democratic and lawless achievement. However, because the author may be successful opposing such lawlessness, this Reprisal Manual should not be adopted until the courts either condone, or meaningfully deter and prohibit, the retaliatory tactics described herein.

### A.  *Background—police department gender bias*

Lorraine Wetzel is a 28 year career police officer, now a lieutenant, employed by the Town of Orangetown Police Department.  Before becoming a police officer, she received a commendation for heroism for rescuing Patrolman Kevin Nulty from a dangerous situation.  Patrolman Nulty eventually rose to become the Town's present Chief of Police, and as chief, is responsible for personnel actions regarding his subordinate police officers.  As such, as to select subordinates, he has become the lead Reprising Official.

Police Officer Wetzel was the second female police officer in the Town's history, and ten years later she was promoted to sergeant, becoming the first female sergeant in the Town's history.  Ten years after that Sgt. Wetzel hoped for promotion to the rank of lieutenant.  A special New York State statute, the Rockland County Police Act,[1] provides specific criteria for promotion:  seniority, meritorious service, and civil service exam score.  Patrol officer Wetzel was best qualified under these criteria when she was promoted to sergeant.  However, under the new administration of Chief Nulty, she was not selected for promotion in 2001, even though clearly best qualified.  Under Chief Nulty's new reign, no women were hired into the department, none were promoted, and the Town's first female police Officer, Barbara Noyes, was sufficiently frustrated to retire and move to a different department.

Sgt. Wetzel's prior attorney commenced a State law "article 78" proceeding challenging her non-promotion.  The State court judge (a male) dismissed the case, which was restored on appeal (with female judges on the panel) and remanded for trial before the original judge.  Sgt. Wetzel's new attorney commenced a federal action asserting federal discrimination claims regarding Sgt. Wetzel's non-promotion and unlawful

---

[1] Chapter 526 of N.Y.S. Laws of 1936, *as amended*.

discrimination.  For this reason, at the trial of the article 78 case after remand, Sgt. Wetzel limited her case to violation of the Police Act, not discrimination.  On this, the judge found that the Town had a "rational basis" for promoting the male, but without making any determination as to who was best qualified.   Sgt. Wetzel has not yet sought to appeal this determination to the State courts. She may still appeal.

### B.  Start of Reprisal – some subtle yet useful tactics

After commencing her article 78 proceeding in 2001, Sgt Wetzel experienced reprisal designed to obstruct her chances for promotion in the future.  This included, for example, making her subordinate to the person who was promoted over her, which created the intentionally awkward (and humiliating) situation of a far less experienced and far less qualified individual being elevated to become Sgt. Wetzel's supervisor, for reasons unrelated to merit.  At least one subordinate male police officer commented, in writing, that the new male lieutenant acted in an abusive manner.

Additional reprisal included refusing to offer Sgt. Wetzel the types of  extra duties, assignments as well as self-promoting "fluff," which would make any future candidacy for promotion more attractive/sellable by the Chief (who recommends promotions) to the Town Board under the ever-shifting and *ad hoc* procedures used for selecting only men for promotion.

> REPRISAL TIP:  *For effective reprisal, it is important to keep the employee "in her place", to minimize the opportunity for the employee to prove her worth or to demonstrate a potential for advancement.  It is important to avoid even-handed business or governmental practices, such as providing developmental counseling and regular performance evaluations whereby job performance can be objectively evaluated and good performance acknowledged and rewarded.*

In this regard, an important technique for engaging in effective reprisal is to ensure that the employee's job performance is not routinely and objectively documented.  Accurate documentation of competent or excellent job performance will undermine various Reprisal Plan options, such as falsely accusing the employee of dereliction or incompetence.  Worse, documenting good performance from a woman, a member of a minority or member of an employee in some other protected class may provide the employee with evidence of unlawful discrimination.

> REPRISAL TIP:   *Do not permit the creation of routine documentation objectively showing good job performance.  If routine performance evaluations are in place, make sure the object of reprisal receives none.*

In the case of Sgt. Wetzel,  all her performance evaluations were very good and competitive with her peers, until she challenged her 2001 non-promotion.  Thereafter, she received a poor evaluation from the same individual whose promotion over her she challenged, and at the same time that the legal challenge was pending against him.  After Sgt. Wetzel's 2001 non-promotion, Chief Nulty also imposed a moratorium on regular (semi-annual) performance evaluations (without any authority from the Town Board to do so).

The Police Act is special legislation which has, as an obviously intent, the meritorious selection of police officers for promotion.  Whatever the motivation (bias, reprisal, self-interest or an ill-advised disregard of the Police Act criteria), it is clear that the Chief Nulty selected a preferred male (and also politically-connected) candidate for promotion.

>    *REPRISAL TIP:   People in power relish the ability to control outcomes. The power to pre-determine results manifests itself often in the actions of Chief Nulty, and the reprisal against Lt. Wetzel.  It is a recurrent theme.  It is the power which facilitates and enables unlawful reprisal.*

### C.  Non-promotion again:  2004

Whether an act of reprisal or "mere" discrimination, Sgt. Wetzel was again passed over for promotion in 2004, with the individual selected for promotion again a male possessing credentials far inferior to hers under the applicable Police Act criteria.

Several techniques appear to have been used by the Town to achieve its pre-determined result of promoting another male sergeant.  These can be emulated in any Reprisal Plan.

First, the Reprisal Plan or plan for unlawful discrimination should develop a strategy for achieving its ultimate goals.  Whether the goal is reprisal alone (keeping Sgt. Wetzel from being promoted) or unlawful discrimination (selecting individuals in the favored class or classes for promotion), it is logical and smart to plan a course of action to achieve such goal.   Accordingly, it would not be a smart course of action to promote by faithful application of Police Act criteria, yet bypassing Sgt. Wetzel for promotion.   This would have resulted in sequential non-promotion of the most qualified candidate (Sgt. Wetzel) in favor of the second best candidates (male Sgts. Brown, Butterworth and Mecurio) and thus give a clear appearance of discrimination.  The better approach would be to employ non-Police Act factors for promotion, and then select the same male sergeants but in a reverse order (Sgts. Mecurio, Butterworth and Brown), thereby making the discrimination less obvious.   With this strategy, the Chief can seek to avoid a claim of discrimination by asserting, upon Sgt. Mecurio's promotion, that "we did not promote Sgt. Brown either, and his credentials were similar to Sgt. Wetzel's,"  and similarly assert this again as non-discrimination with Sgt. Butterworth's promotion ("Sgt. Brown was not promoted").[2]

>    *REPRISAL/DISCRIMINATION TIp:   If you wish to exclude a "disfavored" individual (e.g., a woman) from promotion, be sure to adopt promotional criteria by which you can minimize the qualities of the woman.   If possible, do not immediately promote a male (e.g., Sgt. Brown) with qualifications similar to the woman's, because you can then point to that male as you proof of lack of bias in favor of men.   And when you eventually promote the male (Sgt Brown) over the female*

---

[2]  Some of these issues are currently under review in the pending "*Wetzel 1" case, 03 Civ. 9896,* summary judgment motion pending.

*(Sgt. Wetzel), you can assert that their credentials were similar and thus no bias reasonably shown.*

Second, reprisal (or mere discrimination) is facilitated by changing employment decision-making processes in order to obtain immediate goals. Thus, in the context of promotions, the process and criteria for promotion should be altered to facilitate the goal of selecting the desired (pre-determined) candidate for promotion. In Sgt. Wetzel's case, this included:

 ➢ Altering and eliminating and the prior use of a "Lieutenant's Board";

 ➢ Not considering regular performance evaluations

 ➢ Eliminating (without Town Board authority) the creation of performance evaluations to document job performance.

Third, deny information or developmental counseling to the candidate for promotion, so that she will be unable to know what criteria will be used, and what, if any, special assignments and duties are needed, to be "competitive" for the next promotion.

Fourth, decline to select or place a potential candidate (Sgt. Wetzel) into jobs which would make her "competitive."

> REPRISAL/DISCRIMINATION TIp:  *It is best to keep the disfavored employee "in the dark" as to how to demonstrate his or her worth.  If such employee is denied insight into expectations or criteria for promotion, the employee will undoubtedly be unable to meet unexpressed/unarticulated expectations.*

> FURTHER TIP:  *And if the employee is a superior candidate under an established set of expectations (such as the Police Act criteria and/or criteria historically applied for promotion prior to Chief Nulty's administration), you should secretly establish, without announcement, new criteria and then "groom" you favored individuals so that only they will meet the new criteria.*

As to Sgt. Wetzel, she met all settled expectations regarding promotion in 2001 and 2004—where seniority (time in rank) and meritorious service were obviously most determinative, because examination scores were always close (as only the candidates with the top three scores on the civil service list were put forward as candidates).

### D.  Bogus disciplinary charges in 2004 and non-promotion in 2005

After Sgt. Wetzel's non-promotion in January 2004, she again challenged the non-promotion on Police Act grounds, and also as being discriminatory and the result of a gender "glass ceiling."

Sgt. Wetzel's amended federal complaint, adding claims relating to the January 2004 non-promotion, was filed in mid-July 2004. It does not appear to be "coincidental" that beginning around this time and thereafter, Chief Nulty and his senior staff "discovered" tape recorded conversations, including conversations of a very personal nature between two Orangetown residents, which Chief Nulty and his outside attorneys

then used as a basis for developing bogus disciplinary charges against Sgt. Wetzel—the first charges in her 28 year police career.

> NOTE:  Another supervisor (a 43 year police veteran whom Chief Nulty wanted gone) was also charged, as was a patrol officer.  The supervisor retired in December 2004, and his charges apparently remain pending to this day (for no apparent purpose, as his retirement benefits are entitlements which cannot be affected).  The other police officer arguably deserved disciplinary charged, which he settled for a trivial punishment, if it was punishment at all (which 2004 charges were "settled" as the witness took the witness stand during Lt. Wetzel's 2006 disciplinary trial).

Actually, two sets of charges were drafted.  Both sets appear to have been drafted by Chief Nulty's attorneys—the Town's outside counsel.  The retaliatory disciplinary charges, and ensuing abusive prosecution thereof, are described below at "The Tactic of Reprisal thru Administrative Disciplinary Charges" discussed in at Part 3 below.

The two sets of disciplinary charges served one immediate goal—that of sabotaging Sgt. Wetzel's chances for promotion in January 2005.  Chief Nulty certainly would not recommend the promotion of a candidate who was, at the time, the subject of two sets of charges, totaling  21 separate charges of misconduct, dereliction and incompetence.   Promotion of someone potentially so misfeasant would appear out of the question.

### E.  2006 promotion

Sgt. Wetzel was not promoted in January 2005.  However one year later, in January 2006, the Town Board promoted her to the rank of lieutenant, notwithstanding that the disciplinary charges remained pending.  The Town Board may have viewed her as most qualified for promotion. More likely, however, the Town Board saw it as in its self-interest to promote Sgt. Wetzel, in light of the federal court's refusal to dismiss her discrimination lawsuit.

> REPRISAL TIP:  If a federal court refused to dismiss claims of discrimination,  and if an the civil servant (police officer) deserves promotion, consider abandoning the Reprisal Plan.

### F.  Immediately after 2006 promotion, attempt to extort a lawsuit settlement

Shortly after she was promoted to lieutenant, the Town's outside counsel solicited a settlement proposal from Lt. Wetzel's attorney.  Her attorney submitted a settlement proposal.  The Town made no counter-proposal.  Instead, the Town's outside counsel the law firm of Keane & Beane PC, and its principal Lance Klein, wrote what appeared to be an extortionate threat, designed to coerce Lt. Wetzel into abandoning her federal claims.  Mr. Klein wrote in his letter dated February 1, 2006:

> "I also held the mistaken belief that you and your client realized the consequences of the two (2) disciplinary charges pending against her.  I can assure you that those cases will be prosecuted as soon as the Court of Appeals makes its determination as to who will hear  the charges.  It would be a shame for your

client, as the first female Lieutenant in the department, to be the first Lieutenant disciplined. (*emphasis added*)

> *REPRISAL STRATEGY & TIPS*:  *It is not recommended that the Reprising Official's attorney place extortionate threats in writing, especially if such threat might meet all elements of crimes such as coercion or extortion. See, e.g.,  N.Y.S. Penal Law § 155.05.  However, if the attorneys are confident that they will not suffer any consequences for their threats, then extortion becomes a powerful coercive tool of reprisal.*

Ultimately, it appears that the Town's refusal to negotiate has, as further described below, generated a huge amount of "billable hours," perhaps $500,000 or more, paid for by the Town's taxpayers to defend against Chief Nulty's and his attorneys' discrimination and follow-on Reprisal Plan.  Undoubtedly, Lt. Wetzel would have settled her case for a tiny fraction of what the Town has paid to its outside counsel to facilitate lawlessness.   However, a reasonable settlement may have been viewed as embarrassing to Chief Nulty, and would have deprived his (and the Town's) outside counsel, Keane & Beane PC of considerable taxpayer-paid attorney fees.

> *REPRISAL STRATEGY & TIPS*:  *If the municipality's taxpayers are keep uninformed, or do not care, that their taxpayer dollars are used for the purposes of discrimination and reprisal, then hiring outside counsel to aggressively "litigate" the employee's claims, including the use of abusive tactics to "wear out" the employee, financially and otherwise, will succeed if the courts decline to provide an efficacious and timely remedy.*

The Town's outside counsel refused to present any federal litigation settlement counterproposal in 2006.  Instead, Chief Nulty and/or his and the Town's outside counsel decided to play what they considered to be the trump card which they had concocted in 2004, namely, the two sets of disciplinary charges which Chief Nulty preferred against then-Sgt. Wetzel.   The apparent goal was to coerce a favorable disposition of the *Wetzel 1* federal lawsuit by threatening Lt. Wetzel's police career.  This is discussed next.

## III.    *The Tactic of Reprisal via Administrative Disciplinary Charges*

The use of administrative disciplinary charges is the ultimate weapon available for use against a career civil servant, including police officers, because a disciplinary prosecution has the potential for not only terminate the civil servant's employment, but also destroying his or her career.   For example, a police officer fired from municipal employment in Rockland County will have virtually no chance of re-employment as a police officer in the county, or with the State, or with the federal government.   Being fired for cause as a police officer is akin to being accused of serious crime, which we believe is the most common grounds for termination of police officer employment in New York State.

As presently postured, Lt. Wetzel is facing an obvious risk of potential termination of employment, and destruction of an exemplary 28 year police career, even though, as further described below, the Town has <u>no</u> proof that she violated any rules or regulations or engaged in any wrongdoing whatsoever.  She was prosecuted, and found

guilty, of disciplinary charges solely because of her opposition to unlawful discrimination by the Town and its police chief.

Lt. Wetzel is courageous, because she is unwilling to be bullied into silence or coerced into condoning unlawful discrimination.  Hers is a fight between right and wrong.  Moreover, if the Town can fire her, it will demonstrate that it has the power to fire any police officer without justification.  Police officers will, as a consequence, realize that they owe personal loyalty to the police chief, not to the public they serve.  This is an underline invitation to corruption, and an invitation for cronyism.  It is contrary to the principles of merit which are fundamental to the civil service system.

Seeing the abuse that the Town can direct toward Lt. Wetzel, no reasonable police officer in the Town would ever challenge disciplinary charges.  As discussed below, challenging disciplinary charges would be suicidal, because the Town has ensured that the outcome of any trial is predetermined—the Town hires and pays its "hearing officer" to convict, through a sham proceeding, rather than to impartially conduct a fair hearing.

The tactics are un-American, and we believe illegal,[3] yet it is a perfect weapon to accompany a Reprisal Plan.  A sham trial means that there is no risk that retaliatory disciplinary charges will ever be revealed as such, because the henchman hearing officer will ensure findings of guilt.   While "un-American" in concept, the evolution of employment law has allowed for numerous arguments which may permit sham administrative proceedings unless the courts are cognizant of the abusive reprisal.  For example, the Town has repeatedly argued that *Younger v. Harris* prevents federal court intervention in a "pending state proceeding."

Perhaps most contrary to Americans' notions of justice is the intentional denial of an impartial adjudicator.  Here, the "judge" (hearing officer)  was selected essentially to be a hanging judge or henchman.  Such behavior is sometimes likened to that of a whore.  And with what amounts to a "paid for"  judge, the respondent can be assured that no defense will prevent conviction, accompanied by the harshest recommendation of punishment which the henchman hearing officer muster within the limits of credibility.

> *REPRISAL TIP*:  *It is important to disguise a henchman hearing officer as a legitimate quasi-judicial official.  Referring to him as a "hearing officer", just as referring to a person as a "judge," suggests proper authority, legitimacy and an entitlement to judicial respect.  Similarly, it is important to create a sham proceeding and to disguise it with the trappings of a legitimate proceeding, such as by appointing the henchman hearing officer as the presiding officer, hiring a stenographer, using the Town's outside counsel as the "prosecutor," creating a "record" of the proceedings (whether or not all evidence is actually included) and permitting the henchman hearing officer to make "findings of fact" with "recommendations" as to punishment.*

Using a henchman hearing officer[4] and making the process as abusive as possible will result in a cumulative effect of exhausting the financial and personal resources of the

---

[3]  *See*, Lt. Wetzel's lawsuit against the retaliation, "*Wetzel 3*", 06 Civ. 6117.

[4]  A non-impartial hearing officer will be referred to in this Manual as a "Henchman Hearing

8

employee, and unreasonably burdening her attorney, while at the same time demonstrating to the employee, and all other employees observing or learning of the proceedings, that defending against retaliatory charges will be a futility. Merit protection in civil service will become meaningless, and the careers of public employees unjustifiably subject to destruction.

Described below are some of the many abusive tactics which can be used in connection with a bad faith disciplinary proceeding. Because ostensibly it is an "administrative" proceeding of the municipal government, redress is properly sought from the Town. However, as was done in regarding Lt. Wetzel's attempt to petition the Town to redress and stop the retaliatory abuse, the Town's elected officials may refuse to entertain and consider any such petition for redress, notwithstanding that petitioning one's government for the redress of wrongs is a fundamental First Amendment right. See, *Wetzel 2* appeal.

### A. Fishing expedition for pretextual charges

To threaten the civil servant with the ultimate threat of disciplinary charges, the Reprising Official or his underlings must identify actions or inactions of the subject civil servant which can be turned into disciplinary charges. This is not difficult in a police department setting, as there are numerous rules and regulations which can be used to create retaliatory disciplinary charges against any employee. All that is needed is to closely watch the police officer, and then look for the slightest deviation from the rules, regulations, or the Chief's interpretation of "proper judgment" with regard to such.

> REPRISAL TIP: *It is best to look for action which can be portrayed as a mistake or omission, so that the charges can be portrayed with credibility. It is best to charge more than one person, as this will help defuse the accusation of reprisal against one individual. The non-target officers charged with disciplinary infractions can then be rewarded in the future (such as by receiving a promotion) for becoming unfortunate but necessary tools of the Reprisal Plan. (For example, Patrolman Thomas Holihan is now Sgt. Holihan.) Or charges can simply be dropped after sufficient time has elapsed (Det. Lt. John McAndrew), or never brought to trial (Sgt. Flannery and PO Youngman, both now retired).*

For example, the Town wished charges drafted against Chief of Police Nulty, such would be an especially easy undertaking, with charges upheld by even a non-henchman hearing officer.

Briefly, Chief Nulty preferred two sets of disciplinary charges against Sgt. Wetzel regarding events of July 4 and July 7, 2004, which charges were signed on September 3 and 8, 2004, respectively. These are briefly described below.

---

Officer" or "HHO"

### i.   July 7, 2004 disciplinary charges

As to the July 7, 2004 charges, then-Lieutenant (now twice promoted to Captain) Robert Zimmerman was Sgt. Wetzel's squad lieutenant at that time.  For reasons unknown, he became involved in investigating the alleged supervisory misfeasance of his own two squad sergeants (Sgt. Dennis Flannery and Sgt. Wetzel)  after Mr. Frank Dowd telephoned the NYPD to complain of excessive force used in connection with his arrest for disorderly conduct a few days earlier.

In particular, although Mr. Dowd complained that excessive force in connection with his arrest caused a laceration at Sunset Road in Blauvelt, Lt. Zimmerman's investigation evolved into a fishing expedition into telephone conversations made between Mr. Dowd and his girlfriend Nicole Colandrea.   Ms. Colandrea became unfairly mischaracterized by Chief Nulty's administration as a "victim" of "domestic violence" and also portrayed as a "complainant" when she was not.  In fact, Chief Nulty and his administration did not even inquire of Ms. Colandrea regarding the events of July 7, 2004.  Yet Chief Nulty and his administration have characterized Mr. Dowd as having committed "aggravated harassment" despite the complete absence of proof regarding any such charge.  Essentially, in their enthusiasm and haste for developing disciplinary charges against Sgt. Wetzel in pursuit of their Reprisal Plan, Chief Nulty and his administration (and the Town's outside counsel and henchman hearing officer) have made victims of Mr. Dowd and Ms. Colandrea as well, by using their personal relationship, and Mr. Dowd's mistake of becoming an obnoxious drunk on that date, to portray Sgt. Wetzel as a police sergeant unconcerned with issues of domestic violence (notwithstanding that no such issue was present).

> REPRISAL TIP:  It is permissible to violate the rights of innocent citizens, such as Ms. Colandrea, in connection with prosecuting disciplinary charges against a police officer, because the Reprising Official can assert that exposure of citizens' lives was the fault of the civil servant who demanded a hearing on disciplinary charges, and, in any case, the employee will not have "standing" to assert the violation of the individuals' rights.

The prosecution's chief witness was Captain Zimmerman, who at the time of the July 2004 events, was Lt. Zimmerman and Sgt. Wetzel's immediate supervisor.  Strangely, he never discussed Sgt. Wetzel's alleged failings with her, nor took any corrective action.  In fact, Sgt. Wetzel and Sgt. Flannery were, a few months later, again working a shift alone, unsupervised by Lt. Zimmerman, without having even been counseled as to what they did wrong on July 7, 2004, and what was needed to avoid such alleged omissions and incompetence in the future.

### ii.   July 4, 2004 disciplinary charges – even more bogus

As to the July 4, 2004 charges, Sergeant Wetzel and several others were charged with various acts or omissions, all loosely related to a communication which suggested that a child might be "missing."  Sergeant Wetzel was never reasonably made aware of this situation, yet is being faulted for it.

10

It appears, for example, that another female police officer, Police Officer Cathleen Sampath, was presented with formal disciplinary charges for making what was intended as a humorous comment to another police department.  She "settled" her charges, and not long thereafter, it appears, retired from the Department out of frustration with its gender hostility and promotional glass ceilings.

It also appears that the person most responsible for failing to explore the issue of a potentially missing child was a police officer who is both a favorite of Chief Nulty's administration, and who also has committed rather egregious acts of misconduct and/or incompetence, including but not limited to being involved with the strip searching of a school child.  He was not charged with anything regarding events of July 4, 2004.

> *REPRISAL TIP:  It stands a splendid message to all civil servants that if you are a "favored" employee, you will be spared disciplinary charges, whereas if you are a troublemaker (e.g., by being a diligent, honest civil service who objects to unlawful practices)  you will face disciplinary charges even  if you did nothing wrong.*

## B.  Service of disciplinary charges & notice "right to trial before Town Board"; abuse of separate trials

The disciplinary charges made against Sergeant Wetzel included notice that she was entitled to a trial on the charges to be conducted before the Town Board.   It was not until five business days before the trial that she learned that the charges were instead to be tried before a person of unknown credentials appointed to "act as a hearing officer."

> *REPRISAL TIP:  It is a useful tactic to misrepresent intentions to the subject of reprisal.*

As to the July 4, 2004 charges against Sergeant Wetzel, Chief Nulty's prosecutor did not present these during the 2006 trial.  His attorney has asserted the right to try these separately, in the future.   It must be pointed out that it is unheard of to conduct two separate disciplinary trials against an employee under circumstances such as those present here.   The police chief easily could have presented all charges pending against Sergeant Wetzel at one proceeding, before the same hearing officer.

> *REPRISAL TIP:  By "holding back" one set of charges, the Reprising Official keeps further reprisal leverage over the employee.   After conducting trial on the first set of charges in an abusive fashion, the Reprising Official can dare the employee not to submit to his will.  This is a splendidly coercive tactic.   It can even be used to seek the termination of a resistant civil servant's employment, by arguing that conviction on the second set of charges show her to be a "repeat offender."*

## C.  PBA litigation – Orangetown argues for politically responsible  officials to be final adjudicator, not neutral arbitrators

The Town, using its outside counsel, litigated <u>Matter of Orangetown PBA</u>.[5]  Its reasons for pursuing this litigation are unknown to Lt. Wetzel, as it appears to have

---

[5] Orangetown Policemen's Benevolent Ass'n v. Town of Orangetown, 18 A.D.3d 841 (2d Dept

involved a large expenditure of taxpayer funds to "fix what was not broken," namely, the collectively agreed manner of fairly handling police discipline. For many years, if not decades, the police department used neutral arbitrators to adjudicate police disciplinary cases. We believe that the disciplinary issue involved in Matter of Orangetown PBA was trivial, and ultimately resulted in small penalty against a police sergeant sill serving in the department.

Cynically, in Matter of Orangetown PBA it appears that the Town (or its outside counsel) affirmatively kept Sgt. Wetzel, her counsel, and her PBA union misinformed as to its actual intention, namely, to try disciplinary charges before a henchman hearing officer in the abusive manner described in this Manual. There is no logical reason why a neutral arbitrator, retired judge or JHO could not preside over disciplinary cases, unless the Town's intent was not to conduct a fair proceeding.

> *REPRISAL TIP: If litigating appeals which may relate to your ability to perpetrate reprisal, do not "tip your hand" by disclosing the abusive tactics you intend, because if you do, the courts may then recognize the potential for abuse. Thus, make your adversary (here, the PBA) believe (through its clients' notice of charges) that trial is to be "before the Town Board," and then, only after you receive a favorable, broadly worded appellate decision, disclose your intent to conduct a sham trial before a hired hatchet man.*

> *BEWARE: One day, the PBA (or perhaps Sgt. Wetzel, a member) may make a federal challenge to the Matter of Orangetown PBA, The Town misinformed the PBA & members (or the present PBA did not represent its members), thereby overbroadly voiding Article 15 of the PBA contract. However, the holding of the case is limited to final decision-making, and therefore procedures allowing fair rules and a fair fact-finder are needed.*

### D. Town's appointment of a henchman

At around the same time that the Town's attorneys were hoping for a favorable N.Y.S. Court of Appeals ruling on their argument that police discipline decision-making should be by the Town Board, not an impartial arbitrator, they apparently were arranging for the appointment of a partisan "hearing officer" hired, it became obvious, for the purpose of convicting the charged police officer regardless of the evidence.

Noteworthy, the Town had longstanding agreement over the years through its many collective bargaining agreements ("CBAs")  with the police union, the PBA, that the selection of hearing officers would be of mutually agreed and impartial adjudicators of the police disciplinary matters. Now, suddenly, the Town was unilaterally selecting its ostensible "hearing officer" with absolutely no input from any representative of the civil servant charged.

Much worse, it appears the Town was selecting the prosecutor's choice. It appears obvious that the "hearing officer" was chosen by Chief Nulty's principal lawyer, Lance Klein, the disciplinary prosecutor (and Town's labor counsel).

---

2004);  *aff'd* 6 N.Y.3d 563 (2006).

The answer seems clear from the response to the question which counsel directed to the hearing officer, answered at the disciplinary hearing on July 11, 2006, at transcript pages 57-58:

```
21              MR. DIEDERICH:  -- that this
22        proceeding is a charade, an absolute
23        charade.  And I'd like to know, for example,
24        who recommended you to the Town Board?  Did
25        Keane & Beane recommend you to the Town
2        Board?
3              HEARING OFFICER WOOLEY:
4        Mr. Klein.
```

Mr. Klein is a Keane & Beane attorney.  Thus, Chief Nulty essentially assured himself that Sergeant Wetzel would be convicted, because his prosecutor "hired the judge."

> REPRISAL TIP:  If you can select an attorney to prostitute himself into always finding in favor of the attorneys (your attorneys) who recommends and causes his selection as a "hearing officer," you will be assured of a conviction against the subject of reprisal.  Your outside counsel will be happy too.  They will always win, thereby justifying their retention and the payment of their large fees.

In his extortionate  letter of February 1, 2006 (see above), Mr. Klein misrepresents that it would not be until the "Court of Appeals makes its determination as to who will hear  the charges" that the disciplinary case would go forward.  However, the Court of Appeals was never asked by Mr. Klein (or any other attorney from the town) to authorize use of the hearing officer, and the ruling does not authorize the use of a hearing officer.  If this were the issue, and if fair adjudication were desired, the Town could just as well of have used an arbitrator to make findings of fact and recommendations.

> REPRISAL TIP:  If an impartial adjudicator is used (such as a mutually chosen arbitrator or Judicial Hearing Officer (JHO)), reprisal will become difficult and sometimes impossible.  Therefore, it is vital to make sure that a partisan, or better yet, a "paid for" henchman, is placed into the role of "adjudicator."

### E.  Sgt. Wetzel's non-consent for post-Appellate Division appeal; undue delay to trial and conclusion

It is abusive to the employee, the Town and the public to have a two year delay in bringing disciplinary charges (July 2004 events ) to trial (July 2006) then to conclusion (January 2008 punishment).  It is especially abusive when the whole process is intended as reprisal.

The Town received consent for an adjournment pending decision of New York's intermediate appellate court (the Appellate Division, Second Department).  The Town has produced no evidence of any consent for further adjournment, and specifically, no consent to await an appeal before New York's highest court, the resolution of which

would have been expected to extend about a year.  It took 10 months. Tr. 77.  Without such consent, the disciplinary charges should have been tried, and tried as noticed— "before the Town Board."

Moreover, even if Sgt. Wetzel had provided further consent for adjournment, no consent for adjournment would have been an informed consent, because she consented to adjournment of "trial before the Town Board" (as noticed in her charges), not an abusive trial devoid of any pre-established rules of procedure, conducted before a lawyer apparently selected by Chief Nulty's attorneys and paid as a henchman to convict Sgt. Wetzel regardless of the evidence or lack thereof.

> *REPRISAL TIP: Obtain consent based upon one set of assumption (mislead your opponent, if necessary) and then implement the abusive actions after the consent is given.  Because your henchman hearing officer will rule on motions, you will be assured that a subsequent motion to dismiss for lack of consent to adjournment will be denied.*

### F.   Town Board relies entirely upon Keane & Beane's Mr. Klein in appointing Henchman Wooley

When the Town's and Police Chief's attorney, Mr. Lance Klein, wrote his threatening February 1, 2006 attempted extortion letter, he appears that he already knew that his firm's "friend," Henchman hearing officer Joseph Wooley, whom Mr. Klein appears to have recommended to the Town, had already been appointed by the Town.  It does not appear that Mr. Wooley was ever interviewed by the Town Board, nor were his credentials evaluated, nor did he even furnish a resume or a written proposal.

> *REPRISAL TIP:  Refuse to negotiate if you can assure yourself a win, by rigging the disciplinary trial to assure victory.  Hire your friend to assure victory—a lawyer with whom you have similarly orchestrated convictions in the past, and who is beholden to you for arranging for the new work as an ostensible "hearing officer."*

### G.   "Kick-back" a portion of fees (taxpayer money) to the Reprising Official's supervisor, to keep his favor

Chief Nulty's boss is the Town Supervisor, the chief fiscal officer of the town.  Chief Nulty has a been approving Keane & Beane  invoices.  Town Supervisor Kleiner is ultimately responsible for Town disbursements.  Over the past few years, Keane & Beane has been paid over $1 million as outside counsel for police "personnel matters."  Keane & Beane has also made financial contributions to the political campaign of Supervisor Kleiner.  The appearance is that public funds paid to the law firm are being returned to the elected official who approves the expenditure.  Presumably, the more fees paid to Keane & Beane, the more incentive they have to reciprocate with political contributions to the town's chief financial officer, it's supervisor.   (It might be interesting to explore

whether this arrangement may involve professionally unethical "champerty," "maintenance" and/or fee-splitting,[6] especially as public funds are involved.)

> REPRISAL TIP:   In New York, vendor kick-backs of taxpayer funds received for municipal work is referred to as "pay to play."  In order to play (receive government work), the vendor must pay (the officials—or their political campaigns—who approve or are influential in approving the vendor's continued work as a governmental contractor).  Thus, the Reprising Official should make sure that any vendors (e.g. outside counsel) assisting with the reprisal should make political contributions to influential elected officials, such as a Town Supervisor, in order to remain in his or her favor.

### H. Inadequate notice of hearing, and non-notice regarding the selection process or the identity of the "hearing officer"

Though disciplinary charges were pending against Sergeant Wetzel for almost a year, she was provided with no reasonable notice, after her promotion to lieutenant, that the Town would actually be pursuing a disciplinary trial against her.  Her only notice was Mr. Klein's extortionate February 1, 2006 letter, and that letter also implied that both sets of disciplinary charges would be tried, presumably together.

Sgt. Wetzel was not provided with any notice that it had become the intention of the Town to use a hearing officer, nor was she informed of any legal authority for such. The disciplinary charges expressly stated:

> "By reason of these formal disciplinary charges, you are entitled to a hearing before the Town Board of the Town of Orangetown."

Nor was Sgt. Wetzel provided with any information regarding the manner for selecting the purported hearing officer, nor provided with any assurance that he was impartial, nor provided with his identity, nor provided with his professional credentials.

If the municipality desires to act in good faith and reasonably toward its employee, it would advise the employee of its intentions regarding a disciplinary proceeding, and discuss with the employee or her attorney procedural matters, evidentiary issues, and the possibility of arranging a mutually convenient date for the parties and all necessary witnesses.

> REPRISAL TIP:  It is not desirable to act in good faith and reasonably towards the subject of reprisal.  Reprisal is designed to abuse and punish the employee, not to be fair or reasonable.   If other civil servants believe that the municipality will be fair and reasonable, they may assert civil service rights to merit protection.

---

[6] See, Code of Professional Responsibility, Ethical Consideration 2-3; N.Y. Jur.2d, <u>Champerty & Maintenance</u> § 2.

### I. *No notice of Hearing Officer identity, nor of any delegation of Town Board authority;*

After advising Sgt. Wetzel of her right to trial before the Town Board, she learned 5 business days before trial that trial would now be before a "hearing officer"—a person unidentified to her with no disclosed credentials nor a transparent selection process.

The Town Board held a workshop which including  discussing the appointment of Mr. Wooley on May 15, 2006, which was almost 2 months prior to the trial date. Apparently it did not discuss Sgt. Wetzel's right to trial before the Town Board itself, nor how a date for trial would be established, nor the procedures to be used nor rights the respondent would be afforded.   We do not know whether the Town Board gave specific direction that the proceeding should be as abusive toward Sgt. Wetzel as possible,, and that she, as the disciplinary respondent, should be given the bare minimum 5 business days notice of hearing, and that should minimal notice would be given immediately before the July 4th holiday weekend.

Significantly, while "appointing" Mr. Wooley, the Town Board failed to provide a written delegation of authority to him.  Thus, although it appointed him to "act as a hearing officer," it did not authorize him to make factual findings or recommendations regarding punishment.  From Resolution 441 of May 22, 2006, Sgt. Wetzel could reasonably have presumed by that he was merely to preside over a trial "before the Town Board," where the Town Board would act as the jury and, like a military court-martial, adjudicate both guilt and punishment.

Resolution 441 of May 22, 2006 states:

RTBM 5/22/06

### RESOLUTION NO. 441

**APPOINT/JOSEPH WOOLEY ESQ**
**HEARING OFFICERIDISCIPLINARY HEARING/P 0 EMPL** #1422

Councilwoman Manning offered the following resolution, which was seconded by Councilman Troy and was unanimously adopted:
RESOLVED, that <u>Joseph Wooley, Esq.</u>, with offices at 15-6 Granada Crescent, White Plains, NY <u>is hereby appointed to act as a hearing officer</u> in the disciplinary hearing of the police officer with Employee Number 1422 at a rate of $195.00 per hour, <u>in accordance with and pursuant to the provisions of the Rockland County Police Act</u>.
Ayes:  Councilpersons Manning, Troy, Morr
Supervisor Kleiner
Noes:  None
Absent:  Councilman O'Donnell
*(emphasis added)*

Resolution 600 of August 14, 2006 purportedly "amended" the above.   This was more than one month after the July 11, 2006 start of the Wetzel disciplinary trial, and <u>after</u> Mr. Klein had already rested Chief Nulty's case-in-chief.   Thus, this is an improper and invalid retroactive attempt at delegating authority, and an nullity.

16

Moreover, if the Town Board wished the power to delegate factfinding and punishment, it was required to do so by promulgated rules and regulation. The Police Act specifically requires this:

> "no member of such police department shall be fined, reprimanded, removed or dismissed until written charges shall have been examined, heard and investigated in such manner … as the [Town] board, by rules and regulations from time to time, may prescribe." *(emphasis added)*

See, Section 7 of Police Act

### J.  *Minimum 5 days notice, over Independence Day weekend*

There appears to be no good faith justification, regarding a case which had languished for almost 2 years, for the Town's agents to afford Sgt. Wetzel a mere five business days notice of the disciplinary trial, over Independence Day weekend.

> REPRISAL TIP:  *Minimal notice, particularly over the holiday weekend, is important to both hinder the ability of the subject of reprisal to prepare a defense, and also to hinder the civil servant from seeking judicial relief such as a temporary restraining order or injunction.*

Presumably, the henchman hearing officer had coordinated the selection of the trial date with Chief Nulty and Prosecutor Klein, to make sure that the date was convenient for the prosecutor and his witnesses. Moreover, the selected hearing date was obviously designed to be maximally disadvantageous to the defense—it was after the Independence Day holiday, and commenced immediately prior to, and perhaps overlapping with, previously ordered deposition dates in the Respondent's federal discrimination lawsuit against the charging party, Chief Nulty.

> REPRISAL TIP:  *Fully prepare your prosecution case, and then select with the hearing officer, ex parte, a date convenient to your witnesses and the hearing officer, but maximally disadvantageous to the disciplinary respondent.  Be sure the absolute minimum notice is provided to the defense.*

Of course, if this were a legitimate adjudicatory proceeding, this would constitute an improper one-sided "*ex parte*" communication. As will be seen below, the prosecutor repeatedly accused Sergeant Wetzel's attorney of attempting "ex parte" communication with the Town Board (a ridiculous accusation) whereas the prosecutor appears to have had *sub rosa* communications with both the henchman hearing officer and the Town Board (which was, incidentally, also his client, as "labor counsel").

> REPRISAL TIP:  *Be sure to aggressively accuse your adversary of precisely the misconduct which you are committing yourself as agent of the Reprising Official.  With this technique, you can endeavor to keep the civil servants and returning on the defensive.  Whenever possible, accuse the civil servant's attorney of unethical conduct, for similar effect.  If possible, invoice the municipal taxpayers for your bad faith accusations as prosecutor.*

17

Presumably, the henchman hearing officer had coordinated the selection of the trial date with Chief Nulty and his outside counsel prosecutor, to make sure that the state was convenient for the prosecutor and his witnesses. Of course, if this were a legitimate adjudicatory proceeding, this would constitute an improper one-sided "ex parte" communication.  As will be seen below, the prosecutor repeatedly accused Sergeant Wetzel's attorney of attempting "ex parte" communication with the Town Board (a ridiculous accusation) whereas the prosecutor appears to have had *sub rosa* communications with both the henchman hearing officer and the Town Board (which was, incidentally, also  his own client).

And as described further below, Chief Nulty's prosecutor even had the extraordinary arrogance, motivated by financial gain, to accuse Sgt. Wetzel's counsel of engaging in an *ex parte* communication when he directed a letter-motion to the Town Board (and copied Mr. Klein on such letter), and to then file a grievance, for which he Town billed the Town's taxpayers over $3,000.

### K.  *Non-notice regarding intent to prosecute the two sets of charges separately*

Prosecutor Klein never advised the disciplinary respondent, Sergeant Wetzel, or her attorneys (PBA counsel or Mr. Diederich) that only the September 7, 2004 set of disciplinary charges was being prosecuted against Sergeant Wetzel, and that the other set of disciplinary charges, those of September 3, 2004, were to be tried at some future date. Nor did the Town Board's appointment of Mr. Wooley provide any such directive or authority.

It was, and remains, a mystery to Sgt. Wetzel as to how Mr. Wooley was informed that only the September 7, 2007 charges were intended by Chief Nulty's attorneys for trial on July 11, 2006.   The only explanation is *ex parte* communication between Prosecutor Klein and Henchman Hearing Officer ("HHO") Wooley.

This created an abusive dilemma for the disciplinary respondent, especially as she objected to being forced to endure two separate trials.  With only five business days to prepare, and if HHO Wooley had agreed that separate trials are improper, the defense would then need to be prepared to meet all charges-- two sets totaling 21 separate disciplinary charges containing over 70 specifications—on the first day of trial. Accordingly, Sergeant Wetzel's attorney prepared a request for a bill of particulars where he devoted over 10 pages to the September 3, 2004 charges.

It was not until the actual day of hearing, July 11, 2006, that HHO Wooley ruled in favor of Prosecutor Klein allowing him to go forward only on the September 7, 2004 charges, and thus presumably permitting him to prosecute the September 3, 2004 charges at some time in the future.  (The charges are still outstanding as of January 9, 2008).

> REPRISAL TIP:  *If you have to separate sets of disciplinary charges, plan on trying these on two separate occasions, but do not inform the respondent or her attorney of such plans, because they will logically assume, based upon CSL § 75 practice, that all charges will be tried at one time.   The defense will spend a considerable amount of wasted effort preparing for charges which you do not intend to presently try.*

18

*FURTHER REPRISAL TIP:   Engage in ex parte communication with your hand-chosen and trusted hearing officer in advance.  Inform him that you are proceeding on only one set of charges.  Arrange for a mutually convenient trial date (but one expected to be inconvenient to the respondent).  Fill the henchman hearing officer in on all details necessary for the desired conviction.*

### L.  Communication of proposed settlement "around back" of Sgt. Wetzel's attorneys

On the very eve of trial, July 10, 2006, Town Attorney Teresa Kenny wrote to Sgt. Wetzel's PBA representative (a non-lawyer) proposing settlement which included the Town's right to use the settlement (wherein Sgt. Wetzel would admit guilt as to both July 4th and July 7th, 2004) in connection with her federal discrimination lawsuit.  This appears to have been an attempt by Ms. Kenny go "go around" Sgt. Wetzel's attorneys.  Though the Police Chief and Prosecutor Klein were copied on this settlement proposal, Sgt. Wetzel's attorneys were not.

No settlement with other officers charged in connection with the events of July 4 or July 7, 2004, contained language allowing use by the Town in a court litigation.  Sgt. Wetzel was singled out in this, because if her pending federal discrimination lawsuit.  The Town Attorney's proposal was thus an attempt to impose an unconstitutional condition upon the disciplinary proposal, linking it to the federal lawsuit opposing discrimination to impair her federal rights.

### No notice of penalty sought – another due process violation

The N.Y.S. § 75 Guidelines[7] point out that the employee should be provided with notice of the penalty sought.  This is consistent with basic due process requirements.  The Town proposed settlement of two days suspension "for the record" (meaning no actual penalty), but gave no indication of what it might seek at a hearing.  As reprisal for refusing to settle, Sgt. Wetzel encountered the harshest penalty recommendation which HHO Wooley and prosecutor could muster.

### M.  Refusal to provide reasonable adjournment

Almost immediately after receiving notice of the disciplinary trial, Sergeant Wetzel's attorney requested an adjournment because of the short notice, and also because he had previously-scheduled army reserve duty.[8]  The Police Chief's attorneys refused to consent to an adjournment of the trial, because Sergeant Wetzel's attorney refused to withdraw discovery requests made in the *Wetzel 1* federal discrimination lawsuit.

Essentially, Chief Nulty's attorneys sought to hinder Sergeant Wetzel's federal lawsuit by refusing to act reasonably in the disciplinary case if she did not waive discovery rights in her federal lawsuit.  There was no legitimate reason for declining to grant a reasonable adjournment, and any impartial hearing officer would have done so under the circumstances.

---

[7]  See, N.Y.S. Dept. of Civil Service, Manual of Procedure in Disciplinary Actions (2003).

[8]  Plaintiff's counsel informed HHO Wooley of his year tour of duty in central Iraq which ws completed 8 months or so earlier.

> REPRISAL TIP:  Granting a reasonable adjournment can only help the
> subject of reprisal.  Use of a henchman as the hearing officer will avoid
> this possibility.

### N.  Misrepresentation that Civil Service Law § 75 procedures would be used

Shortly after being notified of the trial date, Sergeant Wetzel's attorney was
informed that the general procedures of § 75 of the N.Y.S. Civil Service Law would be
followed.   However, this was not the case, for many reasons including but not limited to
the absence of an impartial adjudicator, and other basic procedural rights, such as
adequate notice of the charges placed against the civil servant, and the right to
exculpatory evidence, to witnesses, to an orderly proceeding, to adequate notice of
charges, and the basic right to present a defense to in impartial fact-finder and impartial
decision-maker.  These are described in more detail below.

> REPRISAL TIP:  It is important to give the appearance that the proceeding
> is fair, even though the proceeding is designed for reprisal, and conviction
> regardless of innocence.

### O.  Refusal to provide a Bill of Particulars, or to discuss pre-trial matters e.g. scheduling of witnesses, expected evidence, etc.

A basic element of due process is adequate notice of the charges.  New York law
is clear that a civil servant accused of administrative disciplinary charges is entitled to
demand a bill of particulars regarding charges which lack adequate specificity.  Because
of the intentionally short notice, Sergeant Wetzel's attorney was forced to draft a demand
for a bill of particulars on the same afternoon that he received the notice of trial.  Even
though Sergeant Wetzel's demand for a bill of particulars was timely made, no response
tendered, nor one required by the henchman hearing officer.

> REPRISAL TIP:  Another reason for not identifying the henchman hearing
> officer until the last possible moment is to hinder the right of the employee
> to request pretrial relief, such as a bill of particulars.  If the civil servant
> and her attorney are not informed of the identity of the hearing officer,
> they cannot make other reasonable requests either, such as requesting a
> public hearing, discussing evidentiary issues, or arranging for the orderly
> presentation of each party's case, including the scheduling of witnesses.

### P.  Lack of ability to obtain relevant evidence.

HHO Wooley indicated that if relevant evidence existed, "maybe [he] would
direct the Town to turn it over."  Tr. 62.   In addition, Sgt. Wetzel's counsel pointed out
the apparent lack of CPLR 2302 subpoena power in this unauthorized proceeding, to
which he responded at page  64 "My suggestion with you with that also is that you take
that up with a court."   Of course, that was quite impracticable with 4 business days
notice and no hearing officer previously identified.   HHO Wooley did not even provide a
fax number or street address in his initial correspondence.  If the hearing was to be
concluded on its first day, it would have been impossible for Sgt. Wetzel's counsel even

to subpoena relevant governmental documents (her employer is a government) as such would have required a "so ordered" subpoena under CPLR 2302.

Obviously, neither the Town nor the HHO had any intention of allowing Sgt. Wetzel to obtain exculpatory evidence from the Town with which to defend herself. *See*, below.

While the subject of "discovery" is similar to the subject of evidence production at trial, HHO Wooley insisted upon conflating the two, in order to prevent Sgt. Wetzel from obtaining needed evidence. He would not even permit her access to her own Memo Book, which the department had taken from her in 2004, and which was relevant to her activities of that evening (at transcript pages 68-69):

```
 5          MR. DIEDERICH:  How -- wait, sir,
 6      if only you have the power to cause the Town
 7      to produce for us documents and you indicate
 8      you even have subpoena power, so I would
 9      request you to subpoena them if you feel you
10      have to.  But if only you have that power
11      then I would like for you to tell them they
12      have to produce documents, such as my
13      client's memo book.
14          HEARING OFFICER WOOLEY:  Which
15      I'm not going to do.
16          MR. DIEDERICH:  Why?
17          HEARING OFFICER WOOLEY:  Because
18      you're not entitled to it.
19          MR. DIEDERICH:  Why?
20          HEARING OFFICER WOOLEY:  Now move
21      on.
22          MR. DIEDERICH:  As a matter of
23      due process, sir, my client is entitled to
24      be able to prepare a defense.  And if the
25      Town takes her property and her documents
[page 69]
 1          Proceedings
 2      and her papers and it takes those papers two
 3      years ago and then keeps them and won't give
 4      them up, when those things are needed for
 5      her to refresh her memory as to what
 6      happened two years ago, I cannot believe
 7      that that is not in violation of her basic
 8      right to be able to prepare a defense.
 9          HEARING OFFICER WOOLEY:
10      Mr. Diederich, I suggest you take it up with
11      the Supreme Court, the Appellate Division
12      and/or the Court of Appeals, which I am
13      relying on a representation by the Town
14      counsel that this was argued all the way up
15      those lines, okay, and several others and
16      denied.
```

21

There were many items which would have helped establish Sgt. Wetzel's defenses, but which the Prosecutor and HHO sought to deny her.  Just some examples, as her attorney argued early in the proceedings (at page 84):

```
7          … also her
8     entire memo book that was taken from her
9     regarding entries that she made documenting
10    what she did on July 7th, 2004, transcripts
11    of interrogations of other people made in
12    connection with these events, copies of
13    recordings, including radio and telephone
14    and FOB computer messages that occurred.
15    Things that would show that she was busy
16    doing her work as a supervisory sergeant on
17    that date.
```

Evidence in the Town's hands was crucial to the defense.  As her attorney argued regarding, for example, Charge I (at pages 86-87):

```
19         If you look at Charge I, the time
20    period involved seems to be between 6:44
21    p.m. and seven o'clock, actually 7:08.
22    That's the whole length of time of this
23    charge.  That's, I believe, 19, 20 minutes,
24    somewhere around that.  So this alleges that
25    in a period of 20 minutes or so, my client
[page 87]
2     failed to do supposed supervision of various
3     things.  But again there's no evidence that
4     my client wasn't involved in some other
5     important emergency at headquarters.  And
6     without discovery, how can she defend
7     against it?
```

The proceeding was Kafkaesque.  Essentially, all physical evidence was in the hands of the Town, but the only such evidence produced what that which the prosecution deemed relevant.

### Q.  Absence of promulgated Rules and Regulations

There were no rules or regulations promulgated by the Town Board regarding the prosecution of disciplinary cases under the Police Act.  Nor was there any delegation by the Town Board to Mr. Woolley to "act as hearing officer" regarding the disciplinary charges against Sergeant Wetzel.

There was a letter from the town attorney to the parties stating that the proceeding would be generally governed by § 75 of the N.Y.S. Civil Service Law.  However, the town attorney has no independent power to establish rules or regulations regarding police disciplinary cases.  That power rests with the Town Board alone.

> REPRISAL TIP:  it is best not to promulgate any formal rules or regulations.
> Ad hoc procedures, devised by the hearing officer or prosecutor during
> the preceding allow the greatest ability for abusing the subject of reprisal.

22

### R. *Absence of any authority for the delegation of power to make findings of fact or recommendations—or to preside over or adjudicate a hearing*

In the absence of a rule or regulation allowing for delegation of fact-finding to a hearing officer, as well as the absence of a written delegation, made the proceeding presided over by the henchman hearing officer a legal nullity.  Under the Police Act, and as Sergeant Wetzel was advised as her right in the discipline charges themselves, Sergeant Wetzel was entitled to trial before the town board itself.  This would be consistent with prior practice in the county.  *See, e.g.*, Matter of Rockland County PBA v. Town of Clarkstown, 149 A.D.2d 516, 539 N.Y.S.2d 993 (2d Dept. 1989).

> *REPRISAL TIP:  The henchman hearing officer is being paid to preside over a disciplinary trial.  He certainly will not undermine his own ability to preside, and be paid his fees, by ruling that he does not have authority to preside over the case.  It is important, therefore, that the Town Board not be presented with the civil servant's objection to lack of jurisdiction.  Otherwise, it might realize that it is required to conduct the hearing itself, to adjudicate the case.*

As acknowledged in the Section 75 guidebook referenced as guidance by HHO Wooley, the absence of a written delegation of authority to a hearing officer constitutes a jurisdictional defect.

### S. *Faced with a federal court challenge to the retaliation, the Reprising Official's attorneys mischaracterized or misrepresented the facts*

Federal court judges generally expect that the members of the federal Bar will represent facts truthfully and with candor to the Court.   In response to Sgt. Wetzel's effort to obtain a TRO and injunction against the disciplinary proceeding, the Town's outside counsel, Mr. Klein, made the following statement to the federal court on July 13, 2006, when he indicated, *inter alia*,

> "I can't make up what these facts are.  Ten people are charged.  Ten people are offered settlements.  Nine people accept the settlements, one [Lt. Wetzel] doesn't."

This, it turns out, was a completely false statement.  As of that date, it appears that only one person (another female police officer, Kathy Sampath, on July 4, 2004 charges completely unrelated to those placed against Sgt. Wetzel) may have settled.  See, below.

The teaching point for the Reprising Official is this:  If faced with a federal court challenge to the disciplinary proceeding as retaliatory, it is relatively simple to make misrepresentations to the federal court, because the employee will not likely have evidence at hand to counter the misrepresentations.  And once the federal court denies injunctive relief, it will not likely have reason to revisit the issues arising in the municipal administrative proceeding.

> *REPRISAL TIP:  While misleading a federal judge is somewhat risky, the bold attorney for a Reprising Official may find it financially worthwhile to take this risk, as he can be fairly confident that the federal courts will be*

*very reluctant to examine the details of a local government's administrative proceeding.*

*ADDITIONAL REPRISAL TIP: It is also important to know the local federal court, and local office of the EEOC, because if the local judges and/or EEOC are unsympathetic to employment discrimination and/or retaliation cases, it is less likely that they will devote the requisite effort to ensuring that the civil servant's federal rights are protected. In a gender case, this becomes even more of a problem if the judges are male, because they too may unconsciously have a gender bias.*

### T.  Conflict of interest whether the prosecutor will personally profit by obtaining a conviction

A deputy town attorney, not an outside counsel, should have been tasked with prosecuting any disciplinary case, and to do so fairly, as is a governmental prosecutor's ethical obligation. Here, on the other hand, the outside counsel is acting as prosecutor, has selected the hearing officer, and is legal advisor (as its labor counsel) to the Town Board, the ultimate adjudicator of the case.   It can be fairly assumed that the hearing officer and the Town Board, under such circumstances, will look to the prosecutor for advice and guidance, and also give him a conviction.   The prosecutor, as outside counsel will profit both financially, and in the eyes of his municipal benefactor, especially if he can also harm Lt. Wetzel, as that would help Chief Nulty in defending against her federal lawsuit, where he is an individual defendant.  Cost to the town (his other client) will be of no concern to the outside counsel/prosecutor, thought the taxpayers might take exception.

The Town Board will be also (unfairly) benefit by a conviction, as a conviction will hurt the employee's civil rights lawsuit against the Town, and the henchman hearing officer will profit by performing in a manner which will ensure him future employment by same municipality, and perhaps again at the recommendation of the prosecutor.

Only justice and the integrity of government suffers, and the victimized public servant.

HHO Wooley and Prosecutor Klein were unconcerned over Mr. Klein's conflict of interest in representing both the Town, the Police Chief (in the federal litigation) and the Police Chief (as disciplinary prosecutor).  The following is indicative:

| | |
|---|---|
| 17 | MR. DIEDERICH:  So that brings up |
| 18 | another issue.  You refer to Mr. Klein as |
| 19 | Town counsel.  Mr. Klein apparently is |
| 20 | representing both the Town and also |
| 21 | representing the police chief.  The police |
| 22 | chief is the charging party here. |
| 23 | MR. KLEIN:  I'm not representing |
| 24 | the Town, that's completely false. |
| 25 | MR. DIEDERICH:  Well, I have a |

[page 70]

| | |
|---|---|
| 2 | letter from his office indicating that Keane |
| 3 | & Beane represents the Town of Orangetown. |
| 4 | MR. KLEIN:  With respect to the |

24

5        disciplinary charges, I only represent the
6        Chief of Police, I've had no communications
7        with anyone on the Town Board regarding this
8        matter.  I don't represent them in this
9        matter.
10             MR. DIEDERICH:  The Town speaks
11       for the Town through its Town Board and if
12       Keane & Beane is labor counsel to the Town
13       of Orangetown -- by the way, is also
14       defending, the counsel, against my client's
15       federal lawsuit against, by the way, the
16       Town and the police chief.  So if Keane &
17       Beane is representing the Town for all of
18       those purposes and also representing the
19       police chief as basically a charging party,
20       then it's a blatant conflict of interest.
21             HEARING OFFICER WOOLEY:  Give me
22       a citation to that effect.
23             MR. DIEDERICH:  How about --
24             HEARING OFFICER WOOLEY:  Give me
25       a citation.
[page 71]
2             MR. DIEDERICH:  How about the
3        disciplinary rules?
4             HEARING OFFICER WOOLEY:  Give me
5        a citation.
6             MR. DIEDERICH:  It's blatant
7        conflict of interest.
8             MR. KLEIN:  Conflict of interest
9        is for me and my client to discuss, not him.

### U.  Unsworn and apparently uninvestigated charges

As pointed out on the first day of the disciplinary hearing, the disciplinary charges were not sworn, nor is there any indication that they were even investigated.  Implicit in a good faith prosecution is a good faith investigation of the charges, which did not occur here.  The Town should promulgate rules under the Police Act, and these should require assurance in the future that disciplinary actions have a proper factual basis and are undertaken in good faith.  *Tr.* 75.

### V.  Mr. Wooley refuses to answer voir dire questions

As stated above, HHO Wooley appears to have acknowledged that Mr. Klein recommended his appointment.  However, Mr. Wooley refused to provide any other indication of his credentials.  There is nothing in the record anywhere, nor in FOILed Town records, to indicate that he was competitively selected, or that he has any experience whatsoever in police matters.

Without any background or experience in policing and police matters, there is no reason give his evaluations or recommendations any credence whatsoever.  And based

25

upon his recommendations, it is obvious that a layman, or even a schoolchild, would have been more fair.

Sgt. Wetzel's attorney has learned from the reported <u>Temple</u> case[9] that Mr. Wooley has a reputation of <u>always</u> finding for his municipal employer.  His reputation appears to be that of a municipal whore.   It is no wonder that he refused to answer any *voir dire* questions regarding his appointment and potential non-impartiality.

### W. Disciplinary Trial, Day 1 -- the testimony of the only prosecution witness, Cpt. Zimmerman, subsequently revealed to be materially false and misleading

It is apparent that Chief Nulty's prosecutor (the Town's outside counsel) sought to start and finish the charade of a disciplinary trial on a single day, based upon the testimony of the man who was, on July 7, 2004, Sergeant Wetzel's squad leader, namely, Lt. (now Captain) Zimmerman.

At the start of Captain Zimmerman's testimony, he was perhaps most credible with hindsight response to Prosecutor Klein's question (at page 158):

```
15   Q.   Did you have any problems with what
16        Lieutenant Wetzel did?
17   A.   Me personally?
18   Q.   Yes.
19   A.   I believe I would have done more.
```

That statement was not an indictment of a subordinate, and suggest a potential need for mentoring, counseling or some corrective training.  He suggesting Sgt. Wetzel could and should have viewed the video monitors.   He viewed her as committing errors in judgment.

In this regard, Captain Zimmerman's testimony between pages 173 and 178 reveals assumptions about what Sgt. Wetzel should have done, but presents <u>no</u> evidence that she did not do these things.  For example, Captain Zimmerman says she should have inquired about Mr. Dowd's condition, but does not provide any information that she did not so inquire (and later testimony makes clear that she had extensive discussions about Mr. Dowd with arresting officer Holihan).

Unfortunately, it appears that Captain Zimmerman has been assigned the duty of becoming the Police Chief's henchman.  The testimony he provided on the first day of trial was damning.  It was also provably and materially false, although it took most of the 8 additional days of trial to uncover the actual facts.

### a.   Materially False and misleading prosecution evidence from Cpt. Zimmerman

What the defense was eventually able to show was that Captain Zimmerman's testimony was false and apparently perjurious, designed to provide a rationale for the Henchman hearing officer to convict Sergeant Wetzel on his false and misleading

---

[9] *Higham v. Temple*, 2006 WL 2714712 (S.D.N.Y., Sep 22, 2006).

testimony, which testimony was contradicted by the physical evidence which the Town itself produced.

Examples of the provably false testimony are as follows (at page 160):

```
10   BY MR. KLEIN:
11   Q.   And so you reviewed all videos?
12   A.   I believe I did, yes.
13   Q.   And what did you find upon your review of
14        the videos?
15   A.   As apparent on the tape, the suspect
16        appeared to be making phone calls without
17        anybody assisting him.  He had a good
18        portion of free reign in the booking room
19        for extended periods where he would move
20        from one seat, go to the phone and either
21        dial or answer.  There's no audio on the
22        tapes, I didn't line them up with the CDs.
23        But he can move fairly freely from one
24        portion of the booking area to the other,
25        he did pick up the phone several times.
```

Captain Zimmerman repeats this assessment again a short while later (in relation to Charge III ):

> "The fact that he was allowed to make so many phone calls, to answer the phone, to move freely around the booking room would indicate that the booking procedure was not being supervised."  Tr. 179.

And again (in relation to Charge VII) he testifies at Tr. 185:

> "In reviewing the videos, he strolled around for extended periods of time, going from one seat to another, answering the phone, making phone calls. *** And the prisoner is not supposed to be roaming freely around the booking room."

And once again (in relation to Charge IX) he testifies at Tr. 187:

> "The fact that this prisoner was allowed to roam freely, those were all issues that should have been dealt with by the supervisor in the building, and that refers to not dealing with those issues, individually, collectively, just as a whole on her shift."

And (in relation to the Charge X) he testifies at Tr. 188:

> "and the actions of the suspect inside our facility roaming around, lack of notification…."

In reality, as can be seen from <u>actually viewing</u> at the videotapes, during Sgt. Wetzel's shift Mr. Dowd <u>never</u> had "free reign in the booking room for extended periods…" during Sgt. Wetzel's shift.  On the contrary, Sgt. Wetzel may have been already departing her shift before Mr. Dowd ever begins walking unescorted outside the holding pen at some time around 10:56 pm or thereafter.   To hold Sgt. Wetzel for failure to monitor this activity at or after the very end of her shift, when as headquarters

27

commander she has no duty to constantly monitor the video cameras at all, is absolutely ridiculous.[10]  Thus, Captain Zimmerman's testimony is materially misleading if not perjurious.

Captain Zimmerman continues his misleading and perjurious testimony with his testimony about Nicole Colandrea's telephone call to the police headquarters.  He describes the call, in relation to Charge VI, as follows (at Tr. 182):

> "In this case complainant Nicole, I forget her last name, called the desk to say that she received three phone calls from our station that she considered to be harassing or aggravating in nature."  *(emphasis added)*

And again he testifies at Tr. 186:

> "A.   In this case the incident being that a person outside the Department called to say that they were being harassed from within the Department…. *** a prisoner was allowed to make harassing phone calls from our site."

And Captain Zimmerman again testifies at Tr. 188-89:

> "here we have somebody calling the station to report that they are being harassed from our facility, this is something that we should have taken very seriously, if nothing else for the fact that it started and ended in our building. The fact that we did absolutely nothing about it, I believe we let that family down and collectively it was conduct unbecoming an officer." *(emphasis added)*

However, a review of Nicole's actual conversation (attached), as well as her later testimony in this disciplinary case, revealed that she did not consider Mr. Dowd's calls to be telephone harassment (nor where they—indeed, Nicole never hung up on any of Mr. Dowd's calls), and Nicole did not wish to, and did not, file any complaint against Mr. Dowd on that day or at any time.  Moreover, if he had bothered to investigate the matter, he would have learned that Sgt. Wetzel had by this time already discussed this case with Orangetown Justice Phinney, who reviewed the facts with her, and not one involving "domestic violence."  Thus, Captain Zimmerman was painting a misleading picture. Nicole was never a "victim," except perhaps a victim of the embarrassment caused by a drunken domestic partner.

Captain Zimmerman did regard Sgt. Wetzel's inaction after Nicole's phone conversation with her as a "mistake in judgment."  *Tr.* 239.  Mistakes in judgment are not normally, nor properly, the subject of a disciplinary proceeding seeking the imposition of punishment.

### X.  *Disciplinary Trial, Day 1 -- HHO Wooley reveals himself to be a henchman*

Typical of his ruling throughout the disciplinary trial, HHO Wooley reveals himself to be a municipal henchman early on.

---

[10] Mr. Dowd was permitted telephone calls, so seeing him use the telephone would be of no concern to the upstairs supervisor.

### a. *Intentionally misrepresenting the facts to improperly attack the respondent*

For example, during cross-examination of Captain Zimmerman, HHO Wooley jumped on Captain Zimmerman's bandwagon, by suggesting that Dowd's telephone calls to his girlfriend were criminal (which the calls clearly were not):

> HEARING OFFICER WOOLEY:  Throw another caveat in there. Supposing the phone call came in saying that the crime was being committed from the police station, what would you have done? (Tr. 233-34)

Cpt. Zimmerman was still on cross-examination and HHO Wooley had already concluded guilt.

An even more egregious example of his partisan perspective involves video tape evidence.  Prosecutor Klein offered into evidence what was represented to be approximately six (6) hours of videotapes, which Lt. Wetzel's attorney objected to, stating that the prosecution has had "two years and three days to produce them for us." Tr. 190.  Prosecutor Klein then withdraw is offer of the tapes into evidence, after Sgt. Wetzel's counsel expressed the desire to review the tapes and then *voir dire* the Captain Zimmerman (whose testimony was based exclusively upon the videotapes and audiotapes).  Defense counsel nevertheless demanded inspection.   In a remarkable display of partiality and unreasonableness, HHO Wooley then denied the defense inspection of the tapes <u>unless</u> introduced into evidence. Tr. 191-192.  The testimony reads:

```
 8          MR. KLEIN:  I'm going to
 9     withdraw, I'm not going to offer them into
10     evidence, not at this time.
11          I'm fine, I have no further
12     questions.
13          MR. DIEDERICH:  I'd still like
14     production of them.
15          HEARING OFFICER WOOLEY:  That's
16     another story.  The answer to that is no.
17     If they were introduced -- moved into
18     evidence, then you would have a right to
19     have a copy of them.
20          MR. DIEDERICH:  With all due
21     respect, the Town obviously believes they're
22     relevant to the case and if they are
23     relevant to the case, they may be relevant
24     to the defense, and the defense should have
25     an opportunity to see them as a matter of
[page 193 ]
 2     basic due process.
 3          HEARING OFFICER WOOLEY:
```

29

4        Overruled.  Now, this is the time that you
5        get to cross-examine Captain Zimmerman.  If
6        you want to take a minute to talk to your client.

Essentially, HHO Wooley, as with the audiotape evidence, again denied the defense the actual evidence, here videotapes, upon which prosecution witness Zimmerman based his testimony.  The "best evidence rule" had been converted into the "worst evidence rule"—testimonial evidence of an extremely biased witness based solely upon his biased (or here, perjured) interpretation of the physical evidence.

To date, Lt. Wetzel has never had the opportunity to point this out to the Town Board.   Of course, HHO Wooley was certainly aware of his one-sided rulings and actions as a hearing officer henchman, but certainly did not admit this, or discuss exculpatory evidence, in his Report and Recommendations.  After all, his job was not to describe evidence of Lt. Wetzel's innocence.

### b.  Non-dismissal of a clearly defective charges.

Another example of HHO Wooley's partisanship involves his refusal to dismiss charges which were fatally defective on their face..

One was Charge VII refers to an entirely irrelevant subsection of the departmental orders, namely, General Orders 660 (2)(F).   Upon discovery that the wrong section of the General Orders was referenced in the charges, Prosecutor Klein refers to it a "typo" and seeks to informally amend the charge to recite the intended and different subsection, namely, GO 660 (2)(G).  HHO Wooley permits this. Tr. 184.

No impartial hearing officer would have permitted such a material amendment of charges during the trial, as such action would is a basic due process violation—a respondent is entitled to notice of the actual charges.

Another charge referred to a general order provision requiring informing supervisors of a lack of sufficient manpower or equipment (" deficiencies in personnel or equipment"), yet the Henchman hearing officer interpreted this provision to involve performance deficiencies in individual officers, rather than a logistics insufficiency.  As to all the other charges, it was a general lack of credible proof of the charges.

> REPRISAL TIP:  The hiring of a henchmen as a "hearing officer" will ensure that even utterly defective charges survive a motion to dismiss. Ignoring exonerating evidence is an important task of a henchman hearing officer.
> An bona fide and fair judge may have tossed the entire case upon recognizing prosecutorial misconduct.

### c.  Excluding Defense witnesses, but not the prosecution only witness

It is also indicative of HHO bias that Mr. Wooley, from the beginning of the trial, permitted Captain Zimmerman to remain present, even though he was the prosecution's principal witness, and one the defense intended to call.  Thus, even though HHO Wooley

excluded all other witnesses, including the Sgt. Wetzel's co-respondent, retired Sgt. Flannery, whom HHO Wooley indicated he would preclude from testifying if he stayed in the room (a patently unreasonable sanction in a disciplinary case), he permitted the prosecution witness to remain.   Tr. 112-115.

### d.   HHO Wooley allows introduction of cherry-picked evidence

Another example of HHO Wooley's partisan approach was his willingness to permit the introduction of prosecution-selected evidence, but not to provide the defense the ability to examine non-selected evidence.   The prosecution's case was analogous to showing videos of a coin toss and arguing that "the coin always shows tails (guilt)", by not producing all the video shots of the coin toss showing heads (innocence).

Specifically, as to the evidence introduced through Captain Zimmerman, although he is not an internal affairs investigator, he apparently took charge of selecting certain recorded communications purportedly showing that Headquarters Sergeant Wetzel did not communicate directly with Patrol Sergeant Flannery.  Yet the defense was provided with no inspection of all recorded communications between Sergeant Wetzel and Sergeant Flannery that evening.  Rather, only the selected portions which Captain Zimmerman had chosen were produced at the trial, and admitted by HHO Wooley.

Captain Zimmerman admitted that he only looked for tapes concerning Mr. Dowd, which undoubtedly did not include discussions between Sergeants Flannery and Wetzel, notwithstanding that the charges alleged their failure to directly communicate. This did not concern HHO Wooley.   Captain Zimmerman testified at transcript pages 150-151:

```
 3   Q.  In other words, could you explain to us how
 4       that tape was made; in other words, did
 5       somebody go to other recordings and then
 6       copy selected portions, I presume?
 7  A.   This may be complicated.  What happens is
 8       when you put the disk in and you download
 9       the data, it will list every call that's on
10       the disk, every channel, pretty much in
11       date and time order.  What you have to do
12       is listen to them to see if they are
13       relevant.  If they are, you put an asterisk
14       in front of it and it drags it from one
15       portion to the other, which is going to be
16       your burn list.
17             So those are the calls that I
18       found that were relevant to this case.  As
19       far as how many other calls were there, I
20       wouldn't even begin to guess.  There could
21       be a thousand, there could be none.  The
22       machine is just going to record -- it's
23       dormant until there's conversation and it's
24       voice activated.
25   Q.  And who was the person who determined what
     [page  151]
```

```
2        was relevant to this case as far as
3        selecting tape?
4   A.   For the most part when I did the tape, if
5        it pertained to the arrest of Frank Dowd,
6        whether starting from the first call to the
7        last call, whether it be the police
8        channel, the phone lines, then I made a
9        copy of it.
```

*(emphasis added)*

> REPRISAL TIP:  *Provide only the portions of evidence that will
> advance your deceit, and hide or destroy all other evidence.  The
> subject of reprisal will have little if any ability to defend, where
> only pro-prosecution evidence is made available to the defense.
> Make sure your trusted captain and chief prosecution witness is
> the person who selects only evidence which is favorable to the
> prosecution.*

### e.   HHO Wooley denies Sgt. Wetzel alternative means of establishing her diligence—the testimony of Sgt (retired) Flannery

HHO Wooley not only denied Sgt. Wetzel access to physical evidence (e.g., FOB cards, videotape evidence and audiotape evidence), but also denied her the right to exculpatory witnesses.  For example, a key witness was Sgt. Wetzel's fellow sergeant, Sgt. Flannery.  An alternative method for Sergeant Wetzel to establish that she regularly communicated with Sergeant Flannery would be Sergeant Flannery's testimony.  However, during the trial it appears that Sergeant Flannery was intentionally intimidated by the threat of prosecution of the disciplinary charges against him, and the (legally baseless) threat that his retirement pension could be affected.  The prosecutor, Mr. Klein, refused to withdraw the charges against Sergeant Flannery thereby continuing the Town's intimidation of this witness.  HHO Wooley, though agent for the Town, did nothing to correct this denial of basic due process.

Because HHO Wooley did nothing, and based upon the Town's threats, Sergeant Flannery declined to testify for the defense.  Thus, Chief Nulty and his attorney actively sought, and achieved with the aid of HHO Wooley, the denial of Sergeant Wetzel's right to testimony vital to her defense.

> REPRISAL TIP:  *If a witness crucial to the defense exists, intimidate such
> witness into refusing to give testimony.  Although this would be a crime if
> it were a judicial proceeding, because this is a sham proceeding, the
> defense will have no effective remedy regarding the abuse.*

### f.   HHO Wooley ignores the fully exculpatory evidence

As described above, the most egregious aspect of Captain Zimmerman's testimony was his testimony that Sergeant Wetzel essentially allowed Mr. Dowd free rein to roam around the booking room unsupervised for extended periods of time during her shift on July 7, 2004.  Captain Zimmerman based this testimony upon his careful viewing of what was represented as "8 hours of videotape," which videotapes had not, at

that time, been made available to the defense, and which were not played at all on the police chiefs direct case.

It was not until near the end of the trial, when Captain Zimmerman was put on as a defense witness, that Captain Zimmerman was forced to acknowledge that the only time that Mr. Dowd walked around the booking room or made a telephone call unattended appeared to be 10:55 p.m. (2255 hrs), in other words, the last few minutes of the 3 pm -11 pm shift.  If the incoming Sergeant had already relieved her (as is a common and accepted practice among incoming and outgoing supervisors), Sergeant Wetzel would have already left for the evening.

Witnesses present at the hearing can testify that HHO Wooley was not even interested in looking at the monitor when this evidence was played at the disciplinary trial.   Why bother?   He knew his job was to convict.

> *REPRISAL TIP:  If you have a witness willing to provide false evidence, this is a very effective tool of reprisal, especially if you can make it difficult or impossible to refute the perjury.*

### g.   *"Selective prosecution"*

Sgt. Wetzel's answer contained the affirmative defense of "selective prosecution." Of course, this could have encompassed reprisal.  But not so under HHO Wooley's views, and partisan view.   Another aspect of selective prosecution was the question of whether Mr. Dowd (and the booking officer supervisor) where engaged in precisely the same conduct for which Sgt. Wetzel was charged, but after under the supervisors of the next shift.  (The evidence reveals Mr. Dowd's calls continuing into the next shift.)   HHO Wooley refused any inquiry, even though this would have revealed selective prosecution, because when Prosecutor Klein objects (pg 216 21-23) "it doesn't matter what anyone else did."  HHO Wooley rules "I agree."

### Y.  *Gamesmanship interfering with Sgt. Wetzel's ability to put on a defense*

Chief Nulty's outside counsel prosecutor sought to make the disciplinary proceeding abusive toward the defense, whether by personally attacking Sergeant Wetzel's attorney, forcing Sergeant Wetzel to bear the cost of "subpoenaing" witnesses (even her coworkers), or obstructing the orderly presentation of evidence.  This "gamesmanship" hindering the presentation of the defense case is described herein.

Typical of Mr. Klein's gamesmanship was his refusal to rest the prosecution's case on July 11, 2006, even though he completed his case on that first day of trial, indicating that he might have further witnesses.  Thereafter, when Sergeant Wetzel's attorney wrote him inquiring of his plans for the start of the next court date, August 4th, as Sgt. Wetzel would be required to begin her defense case at that time, Mr. Klein stated that he might have one or two brief witnesses.  This was a deceptive ruse on his part, and an attempted ambush, because the witness he then attempted to call was Sgt. Wetzel herself.

Essentially, in this quasi-criminal proceeding, the prosecutor sought to make Sergeant Wetzel a witness against herself.  Of course, Sergeant Wetzel would likely be

expected to eventually testify.  Yet this tactic served its purpose of delaying the start of the defense case, with defense witnesses waiting.

> *REPRISAL TIP:  Professional courtesy and the orderly presentation of a case has no place because the goal is to abuse and burden the defense.  Gamesmanship and the inconveniencing of people called as defense witnesses should be practiced wherever possible.*

### Z.  Denying reasonable meal breaks—in a "rush to judgment"?

HHO Wooley did not permit a break in the proceedings on the first day until 4:00 p.m., despite repeated defense requests for a meal break.  He left the decision of a break to the stenographer (Mr. Klein's selected reporter).  Tr. 148, 164.  This appeared designed to burden the defense.  At 4 pm, an unreasonably short meal break was allowed:

```
 8           MR. DIEDERICH:  I would suggest
 9      it's four o'clock, that we break for dinner
10       because we've been here since the notice
11       time of 9:30 this morning without a break,
12       other than a few minute breaks.
13           HEARING OFFICER WOOLEY:  4:30.
15           (Break in the proceeding.)
```

### AA.     What purpose in prosecuting this competent police woman?

No credible explanation exists for subjecting Lt. Wetzel to disciplinary charges.  The only credible explanation is reprisal.  As the prosecution's only witness, Captain Zimmerman, testified:

```
18   Q.   *** Would it be fair to say you've
19       had a long-term working relationship with
20       Lieutenant Wetzel?
21   A.   Yes.
22   Q.   And you supervised her for many years?
23   A.   Yes.
24   Q.   Is she a competent officer?
25   A.   As a general rule I'd say yes.
```
[page 195]
```
 2   Q.   Competent sergeant when she was a sergeant?
 3   A.   I would say yes.
 4   Q.   Competent lieutenant when she was a
 5       lieutenant?
 6   A.   I would say yes.
```

She is a competent lieutenant.  She is respected by her men and they perform well under her command.  These disciplinary charges reflect pure abuse of governmental power for wrongful purposes, and at substantial taxpayer expense.

Captain Zimmerman testified that he was Sgt. Wetzel's supervisor, yet he did not inquire of her about the events of July 7, 2004. Why not? If she did wrong or made mistakes, why not correct her? Tr. 202-204. And he did not know what she was or not doing that evening, supervising headquarter alone in Lt. Zimmerman's absence. His follow-up corrective action was only "more observation." *Tr.* 240.

And Zimmerman admits that the was no working speaker in the communication room on July 7, 2004, which, if working, would have been used to advise Plaintiff of Officer Holihan's arrival with Mr. Dowd. Tr. 252.

### BB.    Refusal to allow Sgt. Wetzel's attorney to seek redress from, or make motion to, the Town Board

A henchman hearing officer, hired to convict, has an obvious self-interest in upholding his own authority to preside over the unlawful and unauthorized proceedings, as well as to uphold the disciplinary charges against challenges of legal insufficiency or failure of proof.

Because the Town Board, perhaps upon the advice of its outside counsel (prosecutor Klein), is the governmental body controlling the proceedings against its civil servant, Lt. Wetzel, it is the proper entity for considering and remedying any improper or unauthorized actions. This it has not done, either intentionally so, or because its agents prevent relevant information from reaching it.

The various actions of prosecutor Klein and Henchman Hearing Officer Wooley in attempting to prevent and preventing Sergeant Wetzel from addressing the above and related issues to the Town Board deprived her of her right to seek redress from her own local government—a right guaranteed by both the First Amendment and § 15 of the N.Y.S. Civil Rights Law. *See, Wetzel 2.* In this regard, Sgt. Wetzel's attorney submitted a lengthy letter-motion during the disciplinary trial, after HHO Wooley stated that he would not find that he lacked jurisdiction (or grant Sgt. Wetzel's other request). Obviously, Sgt. Wetzel was entitled to request the appointing authority to review its appointment, on the grounds of lack of legal authority, lack of impartiality or to make any reasonable request regarding matters within the Town Board's control relating to the procedure the Town Board had directed. This is her First Amendment right to petition her own government for the redress of wrong (a right which the Town's outside counsel has challenged, at least where the petition is presented by an attorney – *See, Wetzel 2* appeal).

Nevertheless, even before Sgt. Wetzel's attorney wrote the Town Board, its outside counsel (Prosecutor Klein) directed the Town Board  "not to accept or read anything written from [Sgt. Wetzel's counsel] that concerns this disciplinary hearing." *See*, L. Klein letter dated September 7, 2006. The fact that Prosecutor Klein was giving the Town Board direction is revealing. It suggests that he, not it, is controlling the disciplinary process.

> *REPRISAL TIP: The Reprising Official must carefully keep control over the Reprisal Plan, and not allow potentially intervening officials, such as a Town Board, to become involved. The Reprising Official and his attorneys must also*

*protect and insulate the Town Board, because evidence of reprisal in its hands could become a political liability.*

If the town had considered the letter motion from Sergeant Wetzel's counsel, it could have stopped the abusive proceedings, and directed trial, if any, before itself. Because it had no power to delegate fact-finding, it was the sole entity with the power under the Police Act to try the case.

### CC.      HHO Wooley faults Sgt. Wetzel for not becoming an officious intermeddler

The Henchman hearing officer devoted considerable time in his Report in writing how Sergeant Wetzel failed to "investigate" how Frank Dowd injured his chin during his arrest on July 7, 2004. Mr. Wooley does not explain why Sergeant Wetzel would have such responsibility, as she was not the patrol sergeant, nor did she supervise the patrol sergeant (Sergeant Flannery was both the patrol sergeant, and the senior officer on duty that evening).

If HHO Wooley knew anything about policing (and he might, on this issue), he would realize that a police officer who becomes an officious intermeddler in making accusations against a fellow police officer is not viewed favorably. In fact, the patrol sergeant did prepare a use of force report, and a subsequent internal affairs investigation was conducted by the detective Lt. John McAndrew, which report exonerated the police officers involved in arresting Mr. Dowd. Sgt. Wetzel was not directly involved in any of this, and should not have been charged with a disciplinary infraction where she had no duty to act.

### DD.      HHO Wooley's Report & Recommendations is the work of a henchman

It was no surprise that Henchman hearing officer Wooley's report and recommendation found without Wetzel "guilty as charged" upon 10 of 11 charges. Tellingly, he made no comment whatsoever regarding the overstated and false testimony of Captain Zimmerman, nor the similarly false testimony of Chief Nulty. As expected of a "hanging judge," he portrayed all facts and circumstances in favor of the prosecution, and drew all inferences against the defense. And he sprinkled his 59 page report with gratuitous jabs at Sergeant Wetzel's attorney, even though counsel was not on trial.

It is also no surprise that Henchman hearing officer Wooley failed to comment upon the failures of the prosecution's proof such as, for example, the assertion that Mr. Dowd had free reign walking around the booking room for extended periods of time, which Sergeant Wetzel should have noticed had, for example, she been watching the video monitors, where in actuality any walking which Mr. Dowd did without supervision was likely after Sergeant Wetzel had ended her shift.

Similarly, Henchman hearing officer Wooley faults Sergeant Wetzel for not informing Sergeant Flannery about the arrest of a drunken Mr. Dowd at 42 Sunset Rd, Blauvelt, New York, where the audiotape evidence clearly indicates that Sergeant Wetzel was outside of the ready room, likely conducting a mandatory building check, when these events took place. Nor does he comment upon the false assertion in the charges that four

vehicles were "dispatched" to Sunset Rd., when in actuality only one vehicle was dispatched.

Henchman hearing officer Wooley has no trouble whatsoever vilifying Mr. Dowd's girlfriend, Nicole, including impugning both her character and her testimony, and suggesting that she was out to "make a quick buck" by complaining about the unlawful eavesdropping and use of her personal telephone conversations with Mr. Dowd. *See*, Wooley Report, p. 49.

Henchman hearing officer Wooley made no comment whatsoever regarding the utter lack of justification for examining tape-recorded conversations of Mr. Dowd and his girlfriend called where Mr. Dowd's complaint of excessive force related to what occurred on the street, and had nothing to do with telephone conversations. These disciplinary charges resulted from a fishing expedition intruding upon private telephone conversations between two citizens of the town.

> REPRISAL TIP: *Creation of a large report will help ensure that the Town Board does not read anything other than the conclusions. Do not include physical evidence such as audio or videotape evidence, or make sure such evidence is as inaccessible as possible.*

### EE. *Denial of opportunity to provide input to the Town Board decision makers*

With no promulgated rules or regulations governing the disciplinary proceedings, there was no established procedure for providing input either to the Henchman hearing officer or, more importantly, to the decision-making Town Board. Rather, this was an *ad hoc* process dictated by both disciplinary prosecutor Klein and the Henchman hearing officer, as described below.

#### A.   Initial HHO Wooley guidance

During the disciplinary hearing, Henchman hearing officer Wooley described for the parties the process he would use for receiving post-trial briefs at the conclusion of the disciplinary hearing. Briefly, he directed that the prosecutor provide the defense with a copy of the transcript, and briefs would be due two weeks thereafter.

Aside from the fact that the prosecutor was obtaining the trial transcripts on an ongoing basis, including the defense copy, by refusing to provide a copy to the defense, as well as the fact that two weeks might be an unreasonably short period of time due to the size of the transcript and complexity of the case, the concept of simultaneous submission of post-trial briefs is commonplace and acceptable. Thus, this was counsel's expectation.

#### B.   Close-of-hearing sand-bagging

Appearing suspiciously coordinated, at the close of the trial, and in an apparent haste to adjourn, Wooley at Mr. Klein's suggestion invites a discussion over whether the parties preferred post-trial briefs or a closing argument, and that he preferred a brief, at which time Sergeant Wetzel's attorney offered that his closing argument would

essentially be that Sgt. Wetzel is innocent and the charges the result of reprisal.  This was obviously rhetorical, and HHO Wooley could not genuinely have construed that statement to be an election between closing argument and post-trial brief.  However, in the spirit of a henchman, Wooley did construe this as an election and there no further discussion on the record.[11]

---

[11] Disciplinary Transcript pages 2220-2224:

```
15           MR. DIEDERICH:  Then I would like
16      to have the transcripts here at Town Hall.
17      This is a Town proceeding and for me to
18      have to travel to White Plains will be very
19      burdensome.
20           MR. KLEIN:  You go to White
21      Plains all the time, you file complaints
22      left and right.
23           HEARING OFFICER WOOLEY:  I have
24      ordered the transcripts to be turned over,
25      how they get to you is between you and
                          2221
 2      Mr. Klein at this point.
 3           With that this hearing is --
 4           MR. KLEIN:  There's one question
 5      I have.  This will be a deviation from any
 6      hearing that I have done, ordinarily you do
 7      have either a closing statement or a brief.
 8      And I think because you're making a
 9      recommendation to the Town Board, it might
10      be in the Town Board's best interest to not
11      only have your decision but to have briefs
12      from the parties or closing statements.
13           HEARING OFFICER WOOLEY:  Choose
14      one.
15           MR. KLEIN:  I'll choose a brief.
16           HEARING OFFICER WOOLEY:
17      Mr. Diederich, choose one.
18           MR. DIEDERICH:  I would like to
19      see the report and recommendation of the
20      hearing officer yourself and know when --
21      be advised when that is going to be
22      submitted to the Town Board so that I could
23      then make any comments to the Town Board
24      based upon your report and recommendation.
25           HEARING OFFICER WOOLEY:  My
                          2222
 2      question is do you want to do a closing
 3      statement or a brief or neither, I don't
 4      care.  If you don't want to do either,
 5      that's perfectly fine also.
 6           MR. DIEDERICH:  My closing
 7      statement is the Town, A, didn't prove the
 8      case.  And B, this whole thing is
 9      retaliatory based upon her fighting
10      discrimination in this town.
11           HEARING OFFICER WOOLEY:  Is that
12      the extent of your closing argument?
13           MR. DIEDERICH:  And I'd like an
14      opportunity to review and comment upon the
15      hearing officer's report of recommendation
16      prior to it being submitted to the board.
```

38

Not long thereafter, Sergeant Wetzel's attorney requested HHO Wooley to advise of a date for simultaneous submission of post-trial briefs.  Henchman hearing officer Wooley did not respond.  Mr. Klein, however, did respond, and on behalf of Chief Nulty suggested that Sergeant Wetzel's counsel had made an election to proceed by (one sentence) closing argument.

Interestingly, although Mr. Klein had in his possession all trial transcripts shortly after the last day of the trial, November 1, 2006, he did not submit a post-trial brief two weeks thereafter.  Rather, Mr. Klein submitted his 49 page post-trial brief <u>approximately 6 months</u> thereafter, in May 2007.  In other words, Sgt. Wetzel's attorney received a few moments time to give a one sentence closing statement, while the prosecution received 6 months to prepare a 49 page brief.

Of course, it would have been foolish for Sergeant Wetzel's attorney to have prepared and submitted a brief without guidance from henchman hearing officer Wooley, as he undoubtedly, by virtue of being a henchman, would likely have rejected the document for one reason or another, as may be reasonably implied by his failure to respond to Sgt. Wetzel's correspondence.

---

**17**     **I'd like at least two weeks notice.**
**18**          **HEARING OFFICER WOOLEY:**
**19**     **Mr. Klein, feel free to submit a brief.  I**
**20**     **will tell you on the record there will be**
**21**     **no reply.**
**22**          **The way this is usually done and**
**23**     **the way I do it is both sides submit their**
**24**     **briefs.  Mr. Diederich has chosen to do**
**25**     **what he purports to be a closing argument.**
                                  2223
**2**     **You have opted to do a brief.  There will**
**3**     **be no reply briefs in this matter.**
**4**          **MR. DIEDERICH:  Then I would like**
**5**     **to know what the submission date is going**
**6**     **to be so that I would have the opportunity**
**7**     **to submit a brief that's contemporaneous**
**8**     **with Mr. Klein.**
9          HEARING OFFICER WOOLEY:  I
10     understand or I'm lead to believe that you
11     do this on a regular basis, in which
12     point --
13          MR. DIEDERICH:  I've never had a
14     hearing like this.
15          MR. KLEIN:  Never had a hearing.
16          HEARING OFFICER WOOLEY:  You
17     would know that what I will do is I will
18     submit to both of you my findings of fact
19     and recommendations, okay, at the same time
20     as submitting it to the Town Board.  I
21     would have thought that you would have
22     known that.
23          This hearing is now closed.
24          (Whereupon, the Hearing was
25          concluded at 5:24 p.m.)

In any event, HHO Wooley would not likely have considered anything counsel would have written, other than perhaps to try to deflect valid arguments.

My letter faxed to Mr. Wooley, and copied to Mr. Klein, sent February 9, 2007 was as follows:

> Dear Mr. Wooley:
>
> Please advise whether you will be accepting post-trial briefs regarding the disciplinary charges dated September 7, 2004 against my client, Lt. Wetzel, and if so, the date for such submission from the parties (I suggest one month from today).
>
> Secondly, as to your eventual report and recommendation, I request that you furnish this in a manner whereby I can review and comment upon your report and recommendation prior to its submission to the Town Board.
>
> Thank you.
>
> > Sincerely yours,
> > /s/
> > Michael D. Diederich, Jr. /'
>
> cc: Lance H. Klein, Esq.

On May 2, 2007, Sgt. Wetzel's counsel again asked Mr. Wooley for a response to counsel's February 9, 2006 letter. No response was forthcoming.

Nine days later, Mr. Klein submitted his 49 page "Closing Statement" to HHO Wooley. Mr. Wooley gave no indication that he would accept anything from Sgt. Wetzel's counsel, and presumably he would not based upon his prior non-responses and his requirement of simultaneous submission of briefs.

HHO Wooley's report was issued approximately one month later, on or about June 12, 2007, without any input from Sgt. Wetzel's counsel, and without indicating to whom his report was being sent.

Thereafter, Sgt. Wetzel's counsel requested the Town to provide information about this, and the Town Clerk was requested to relate Sgt. Wetzel's request that her counsel be permitted to provide input to the Town Board regarding the Wooley Report and Recommendation.

Counsel pointed out his view that Mr. Wooley was a hired henchman hired to convict regardless of the evidence or lack thereof, and, respectfully, it was incumbent upon a fair-minded board to consider this position and permit a presentation of Sgt. Wetzel's side of the case.

C. HHO Wooley's and Prosecution's unilateral submission to Town Board

Sergeant Wetzel's counsel was not advised when Mr. Wooley's Report and Recommendation would be submitted to the Town Board, and Mr. Wooley apparently provided Mr. Klein with the original physical evidence and transcripts. Thus, Sergeant Wetzel's attorney was not provided with information as to how the Town Board would be

considering the matter, what precisely would be considered,  and when or where this would occur.  Presumably all materials addressed to the Town Board would be sent to the Town Clerk.

It is unclear whether prosecutor Klein's 49 page "Closing Statement" was submitted to the Town Board.  Presumably it was.  For this additional reason, Sergeant Wetzel should have had an opportunity to provide her defense.   The Wooley Report, as well as the Prosecutor's "Closing Statement," are essentially accusations against Lt. Wetzel to which she should have an opportunity to rebut under principles of due process.  This is especially necessary where, as here, the trial is essentially a fact-finding and adjudicatory hoax—a sham proceeding—as the trial was rigged.

D. Sgt. Wetzel's request to provide input to the Town Board

Sergeant Wetzel had hoped that perhaps the Town Board would be more inclined to be fair than Henchman hearing officer Wooley.  For this reason, counsel wrote a letter to the town clerk request information as to whether and when the town board would be considering the Wetzel disciplinary matter, how whether Sergeant Wetzel would be permitted an opportunity for input into the decision-making.  Counsel noted that Mr. Wooley refused to provide an opportunity for input to him, and that no opportunity was afforded to comment upon Mr. Wooley's reports and recommendation.


**FF.**    ***The Town Board denies the defense a reasonable opportunity to submit input, and therefore deprives itself of a reasonable opportunity to look for, and examine, exculpatory evidence and the prosecution's lack of proof***

It is common sense that without input from the defense, the Town Board would find it difficult, if not impossible, to adequately comprehend Sergeant Wetzel's defense against the charges.  Certainly her counsel's one sentence statement at the conclusion of the trial would not suffice, nor was it intended to.

Moreover, the Town Board should have recognized the Wooley document for what it was, namely, a hatchet job.  It should have provided Lt. Wetzel and her attorney in opportunity to provide an argument in defending against the charges.

As discussed below, a few days before its December 10, 2007 regularly scheduled Town Board meeting, and one business day after Sergeant Wetzel had submitted her opposition to the Town's motion to dismiss in *Wetzel 3*,  Town Attorney Theresa Kenny advised Sergeant Wetzel's counsel that he would be given "five minutes" time to address the board on December 10, 2007.  See, Kenny letter.  After Sergeant Wetzel's counsel protested that five minutes was a ridiculously short amount of time to present a defense, the town attorney followed this notice up with direction that's Sergeant Wetzel's counsel could not "argue the evidence" or make a "closing statement."

At the town Board meeting, Sergeant Wetzel's counsel abided by this directive, and used the time provided at the public input portion of the Town Board meeting (where he was previously informed he would be permitted to speak) to describe the background to the disciplinary prosecution and the patently retaliatory nature of the disciplinary

41

charges. At precisely the five-minute mark, a timer rang and the town supervisor told Sergeant Wetzel's attorney to cease speaking. He submitted his letter to the Town Clerk.

Prosecutor Klein began his five minutes of allotted of time, and immediately began arguing the evidence of the case, raising counsel's objection, as Sergeant Wetzel had been informed that argument was prohibited.

At that time, the conversation was adjourned into executive session, with Sergeant Wetzel and her counsel present, at which time Mr. Klein further argued, and the town board unjustifiably agreed, that Sergeant Wetzel had been afforded an adequate opportunity to provide a defense.

### GG. The Town Board, it appears, did not even have relevant exculpatory evidence available to it—for example, prosecutor Klein kept the videotapes

An intentional tactic employed by prosecutor Klein and HHO Wooley was to make sure that current to the extent possible, relevant audiotape and videotape evidence was made difficult to manage and review. This would hinder review by anyone not attending the actual trial, including the Town Board and a reviewing court.

For example, the videotaped evidence could have easily been placed into a DVD format so that a reviewer could do this on a personal computer. Instead, chief Nulty and his counsel chose prehistoric VCR video format.

Likewise, the hearing officer refused to permit the brief conversation between Nicole Colandrea and Sergeant Wetzel to be taken down by the stenographer, even though this was the prosecution's central piece of evidence. Thus, to review this central piece of dialogue, a person must listen to the audiotape, rather than simply review a transcript. This was unfair to the defense.

Because of the prosecution's decision to place all audiotapes on one CD, the listener must wade through the several Dowd--Colandrea conversations in order to listen to the one brief, and innocuous, Colandrea-Wetzel conversation (transcription attached).

Because no input from the defense was permitted, the defense was unable to point out to the reviewing Town Board vital things to examine in the physical evidence, such

- as Nicole's actual conversation with Sgt. Wetzel, and

- the fact that Mr. Dowd did not "walk around unsupervised" in the booking room until after Sgt. Wetzel had likely departed because her shift had ended, and

- the misleading and perjurious testimony of both Captain Zimmerman and Chief Nulty (suborned by the outside counsel/prosecutor) with regard to the above facts—facts which are clear when the actual physical evidence is examined.

### HH.    The Town Board unfairly selected a politically convenient date to conclude the disciplinary case

It appears that the Town Board intentionally permitted adjudication of this case to drag on for over a year after the conclusion of the trial, and until after Election Day 2007, for political purposes.  This is an improper basis for delaying a civil servant's case, especially when its timing meant guilt and punishment being imposed over the Christmas holiday season (just as the trial had been imposed just after the July 4th holiday.  Abusive scheduling appears at work.

### II.    Town Board  members not re-elected to office (in part due to unrelated public interest litigation of Sgt. Wetzel's attorney) should have recused themselves, as should the entire Town Board

As the Town Board is fully aware, Lt. Wetzel's attorney has advocated for the public interest in taxpayer litigation around the county, and one of his cases, *Morgan v. Orangetown*, involved suing the Town Board over retroactive pension benefits.  For this additional reason, the timing of the Town Board's action on this disciplinary matter is quite suspect, as this matter should have been addressed long before the November 2007 election.  We again presume it was delayed for political reasons.

Of greatest concern is that two board members (Morr and O'Donell) who were defeated at the polls largely as a result of *Morgan v Orangetown* and the public outcry regarding this taxpayer abuse will hold Lt. Wetzel responsible for the advocacy (in an unrelated case) of her attorney.  In fact, those two board members behaved in an openly hostile towards Lieutenant Wetzel's counsel in the executive session on the night it convicted Lieutenant Wetzel.  Morr, to his credit, did recuse himself from decision, and he also remained present.  O'Donnell did not.  He should have recused himself, particularly as both appeared openly prejudiced regarding Lieutenant Wetzel disciplinary case, which again had nothing to do with the *Morgan* litigation.

We must also point out that the remaining Town Board members (perhaps with the exception of its new members) undoubtedly have become prejudiced against Lt. Wetzel by virtue of the actions they have taken, and not taken, against her, some of which has resulted in her suing the Town.  Under these circumstances, the present Town Board cannot be considered as a fair and impartial adjudicator, and so it too should recuse itself.

### JJ. The Town Board apparently permits the police chief to schedule a position of punishment in a manner most abusive to Sergeant Wetzel

As further indication of reprisal and an intent to inflict maximum abuse upon Sergeant Wetzel, the Town Board apparently delegated to the prosecution (Chief Nulty) control over the manner in which punishment was imposed.  He then imposed the punishment in a manner most abusive towards Sergeant Wetzel.

### A. Chief Nulty delays imposing the punishment until 2008, making the punishment more financially severe than if immediately imposed

The Town Board did not specify when a suspension would begin.  It should have.  Or it should have rules.  Suspension should have begun promptly, or begun after any appeal had been concluded.

However, rather than imposing punishment immediately, Chief Nulty decided that the punishment—a 10 day suspension—would be imposed immediately after the New Year, commencing on January 2, 2008.  Because a new police contract is expected, essentially Chief Nulty imposed a more costly penalty upon Sergeant Wetzel than if the penalty were imposed in 2007.

### B. Chief Nulty imposes punishment even before Sergeant Wetzel's 30-day time to appeal had expired

Although the Town Board did not specify when imposition of punishment would occur, nor did it delegate to Chief Nulty the power to decide when punishment would be imposed. Under the Police Act, a police officer has the right to appeal to a court of law within 30 days of a finding of guilt and discipline or charges.  Sergeant Wetzel reasonably presumed that she would not suffer punishment for her right to appeal had expired and the appeal adjudicated.  This is an especially reasonable presumption regarding a suspension, because once time is lost via a suspension, it can never be regained.   If the Town had promulgated Rules and Regulations under the Police Act, the uncertainty could have been avoided.

Without Town Board direction, Chief Nulty should not have directed imposition of punishment even before Sergeant Wetzel's 30 day time to appeal had expired.

### C. Chief Nulty transforms the Town Board's 10 day suspension into 12 days

Although police officers in the past have been given suspensions served exclusively, or almost exclusively, on their days off, Chief Nulty has taken the extraordinary, unprecedented, and unauthorized step of breaking the "10 day suspension" directed by the Town Board into two discrete suspension periods, with two days in between. Chief informed Sergeant Wetzel that she was suspended between January 2 and January 6, 2008, and again January 9 through January 12, 2008.  Less, she was ostensibly not suspended on her  "regular days off", namely January 7 and January 8, 2008.  This effectively created a 12 day suspension period, as Sergeant Wetzel was not suspended on days and days for which it was unlikely she would be able to work (or want to work in view of her suspension). This unprecedented two  part suspension is further evidence of discriminatory animus and reprisal from Chief Nulty and the town's outside counsel.

> REPRISAL TIP:  it is best to demonstrate that the Reprisal Plan will be implemented as harshly towards the employee as possible.  If men receive suspensions which overlap days off, you should ensure that a female subject of reprisal which are only on a regular days of work.  This guarantees that she understands that she is the subject of reprisal.

    D.  <u>Lt. Wetzel must turn in her badge, and weapon, to her subordinate to commence her suspension</u>

By requiring Lt. Wetzel to turn in her weapon and badge to her own subordinate, the Police Chief sought to purposefully humiliate Lt. Wetzel before her own squad, undermine her leadership, and decrease respect for her among her subordinates. Chief Nulty apparently has no concern whatsoever for the damage which his reprisal will do to morale, discipline and respect for the chain of command.

## IV.   *Not only Reprisal, but Innocence too*

Even if Lt. Wetzel were guilty of all charges, the prosecution of this case would nevertheless constitute unlawful retaliation. He favored male sergeants would not have been prosecuted under the same set of facts, especially a sergeant subsequently promoted to lieutenant, and doing his job well.

However, the trial of this case demonstrated not only its retaliatory nature, but also false and perjured testimony by the prosecution, and of Sergeant Wetzel's innocence. A brief discussion is set forth below, because a complete discussion is beyond the scope of this Reprisal Manual. The reader is also directed to the above discussion regarding the materially false and perjurious testimony of the prosecution's chief witness, Captain Zimmerman.

> *REPRISAL TIP: It is best to retaliate against employee who is at least guilty of substantial charges, as otherwise embarrassment to the Reprising Official and his cronies, such as that described below, will result.*

The discussion of innocence is divided into the two separate proms of the disciplinary charges, first, the arrest of Mr. Dowd at Sunset Road in Blauvelt, and second, the telephone calls which occurred at police headquarters in Orangeburg.

### A.  *Sunset Road events of July 7, 2004*

"Prosecutor" Klein and HHO Wooley attempt to convince the reader that all the evidence which prosecutor Klein presented demonstrated that Sergeant Wetzel failed to supervise Sergeant Flannery and his patrol squad during a time span of the few minutes on July 7, 2004. A few basic facts counter their arguments:

    1.   It was not Sergeant Wetzel's job to supervise Sergeant Flannery or his patrol squad. Sergeant Flannery was the senior officer in charge that evening, and in charge of the shift. It is not the duty of the headquarters supervisor to also micromanage or otherwise supervise the squad in the field.

    2.   The audiotapes clearly reveal that Sergeant Wetzel had just returned to the radio room as Mr. Dowd was being transported to the hospital. As headquarters supervisor, she had the mandatory duty of conducting a building check, which it appears she had been doing. There is absolutely no indication that she was informed by her headquarters staff (Officers Youngman and Drain) of the events at Sunset Road. Moreover, there is no evidence that the offense at Sunset Road

involved anything more than a drunk and disorderly man, Mr. Dowd, tripping and thereby cutting his chin.

3.  As to lack of communication between Sergeant Wetzel and Sergeant Flannery, the charging party (the prosecution) produced only a few self-serving audio tapes of its own selection.  Sergeant Wetzel was not provided with the opportunity to examine, or produce, all audiotapes or videotapes concerning the events of that evening, which most certainly would have shown ongoing communication between her and Sergeant Flannery, and the diligent performance of police duties.   By refusing Lt. Wetzel such evidence (of which the Town is an exclusive control), she was denied the basic right to defend herself.

> REPRISAL TIP:  Produce only evidence supporting your desired allegation (e.g., produce telephone conversations over a 15 minute time period which to not include Sergeant Flannery, but omit to produce all the conversation which otherwise occurred) and refuse to permit discovery of any evidence which would reveal the contrary.

4.  Further as to communication between Sergeant Wetzel and Flannery, Sergeant Flannery could have testified to this but for his refusal to testify at all (and his PBA counsel's direction that he not testify) based upon Chief Nulty's and Prosecutor Klein's continuing and affirmative threat of pursuing a disciplinary trial against this retired officer.   The disciplinary charges contain more proven inaccuracies than they do facts.  Only one police vehicle was dispatched to Sunset Road (not four).  Officer Ryder, who allegedly requested an ambulance, was not even on duty that evening.  Because Sergeant Flannery did not testify, and because all audiotapes of police calls were not produced, there is no reason to believe that Sergeant Flannery was not fully aware of his subordinates whereabouts (his duty, as Patrol Sergeant, not the Headquarters Sergeant's duty).

5.  Finally, nothing untoward occurred as a result of any of the allegations against Sergeant Wetzel (or Sergeant Flannery).  An obnoxious drunk was arrested, treated at night hospital for a laceration, and then detained at police headquarters as he sobered up.  I made a few calls to his residence (unlawfully eavesdropped upon by Chief Nulty's staff), spoke obnoxiously to his girlfriend, but she continued speaking with him, apparently trying to find out why he was set, and she never hung up the phone (thus, this cannot be considered harassment).   They resumed life again as domestic partners after his release from custody, and are together today.  There was absolutely no credible evidence that the woman was a "victim" of "domestic violence" At the disciplinary trial, she flatly denied such, and she further testified that she did not telephone the police station to make any sort of complaint.

> *REPRISAL TIP:  It is poetic to be able to accuse a female police officer of failing to aid a "victim of domestic violence."  This, the female citizen was characterized as a victim of domestic violence by Chief Nulty and his prosecutor, even though she was not.*

**B. *Police headquarters events of July 7, 2004***

Prosecutor Klein and HHO Wooley attempt to convince the reader that Sergeant Wetzel failed to perform her duties and headquarters.  If you basic facts counter their arguments:

1.  It was a busy night at police headquarters, and Sergeant Wetzel was handling the shift alone.  The squad leader, Lt. Zimmerman, was not working that evening, and there was no replacement.

2.  Sergeant Wetzel was not informed of the arrival of Officer Holihan and Mr. Dowd at the station, and therefore she could not meet them "immediately upon arrival."  There is no evidence to the contrary.

3.  Sergeant Wetzel could use the booking room from the video monitors in the radio room, which I did, and observed nothing unusual.   In addition, other officers, including a senior sergeant, were in the booking room that evening.

4.  Based upon 27 years of experience, and being able to casually view of the monitors which showed nothing unusual taking place in the booking room, there was no reasonable reason for Sergeant Wetzel to anticipate that forwarding a phone call to the booking room would not result in a being answered by a police officer.  The fact that it was not, and that Mr. Dowd picked up the telephone and conversed with Nicole, is hindsight.  It is not a sufficient basis for disciplinary charges.

5.  To any impartial witness to the testimony, the essence of the accusation against Sergeant Wetzel was that, as Captain Zimmerman repeated approximately 7 times in his testimony, and Chief Nulty repeated several times, the allegation that Sergeant Wetzel allowed us to Dowd to have free reign to roam about the booking room unsupervised.  However, these accusations were shown to be completely unfounded by a careful review of the videotape.  The videotape evidence reveals Mr. Dowd moving about the booking room, apparently unsupervised, and only one brief occasion, at 10:55 p.m. (as indicated by the time indicated on the videotapes) or perhaps 11:00 p.m. or thereafter (as the booking room clock indicated that it was after 11:00 pm).

6.  Thus, if the incoming Sergeant had already arrived, Sergeant Wetzel may have already been handing over the shift and departing the premises (as is entirely permissible), and even if present, it was not the duty of the headquarters sergeant to continually monitor video cameras such as cameras 9 and 10 viewing the booking room.  Moreover, there was no working audio piping in from the booking room, and therefore there was no way for Sergeant Wetzel to hear conversations (e.g., Mr. Dowd's conversations with his girlfriend) taking place in the booking room.

7.  Almost the entire case against Sergeant Wetzel is based on the charging party's distorted view of the girlfriend's call to the police department.  The transcript of that call clearly shows that the woman was not attempting to make a complaint against her boyfriend, but rather was seeking information regarding his condition.  This interpretation is corroborated by the woman's (Nicole's) own

testimony at the disciplinary hearing.  Thus, at most this was a difference in judgment and how to interpret the telephone call, and in retrospect, Sergeant Wetzel's interpretation of the call was the correct one.

8.  Finally, if Chief Nulty and his staff genuinely believed that Nicole was a victim of domestic violence and telephone calls constituting aggravated harassment, and it was absolute dereliction on their part not to further investigate this, and speak directly with this oppressed victim.  They did not.

> REPRISAL TIP:  It would have been highly damaging to the prospects for reprisal to find out from the "victim of domestic violence", Nicole,  that she was not a victim at all, and that Sergeant Wetzel's actions were perfectly appropriate.

### C.  No "Fair and Impartial" adjudication of the facts

Prosecutor Klein, in his letter to HHO Wooley dated September 12, 2006, states that due process "does not require [the hearing officer] to treat the parties equally and fairly.'" *(emphasis added)*   Of course, impartiality requires fair and equal treatment.  Thus, Mr. Klein is once again reminding his chosen adjudicator to proceed in partisan fashion.

Mr. Wooley was hired to convict.  Naturally then, he construed all factual issues, and all inferences, against Sgt. Wetzel.

Any fair and impartial adjudicator would have seen this case for what it is—pure reprisal against a competent and diligent female police supervisor.   This was the Town's first disciplinary trial under the Police Act—against its first female police supervisor, for alleged lack of supervising.

> REPRISAL TIP:  If the courts do not provide supervision over outrageous abuse of this sort, the police officers whose duty it is to uphold the law will find that, as to their own employment as civil servants, lawlessness prevails, and merit protection is meaningless.  This will be especially true if you are a woman or a minority.

## V.    The Tactic of Harassing and Burdening the Employee's Lawyer, her Colleagues, and her Witnesses

Besides directing abuse at Sgt. Wetzel directly, as described above, Chief Nulty and his attorneys also did their best to dissuade others from coming to the aid of Sgt. Wetzel, through such tactics as inconveniencing and intimidating witnesses, and threatening the professional license of her attorney.

### A.  Intimidation and Inconveniencing of Police Colleagues

There is a reason that Sgt. Wetzel alone was brought to trial, namely, everyone else is justifiably intimidated—indeed, terrorize—by the Stalinist disciplinary process which the Reprising Official and his municipal have created.

After all, if a 27 year veteran with an unblemished record can face termination on charge based upon fanaticized facts (whether intentionally or incompetently

manufactured by the Nulty administration and the Town's outside counsel), it is obvious that no other officer has merit protection.

### 1.  Sgt. (now retired) Flannery's intimidation

It appears he was deceived into believing that disciplinary testimony on behalf of Lt. Wetzel could result in a disciplinary trial against him, and that his retirement might then be placed at risk.

> REPRISAL TIP:  If there is a witness who possesses exculpatory evidence regarding the target of reprisal, take measures to prevent him from providing such evidence. One effective tool is to make him a disciplinary co-respondent.  And if he retires, continue baseless threats (such as by refusing to drop charges 2 years after the events, and delivering proposed settlement papers during the Wetzel trial) so as to intimidate this essential witness and his PBA attorney.

### 2.  Other police officer "given a clear  message"

Other police officer given the clear message "play the game our way or face trouble.  One clear message was financial.  As described next, when Sgt. Wetzel called a fellow police officer to testify as a witness, such officer was denied his hourly wage, even though such testimony was given in connection with his public employment.

### 3.  PO (now sergeant) Holihan intimidation

Police Officer Thomas Holihan was responsible for booking Mr. Dowd, and may (the Chief would argue should) have been present when Mr. Dowd conducted his telephone conversations with Nicole.   He was an experienced police officer at the time, with several years experience with the NYPD.

Officer Holihan's disciplinary charges were "settled" almost 2 year after the July 7, 2004 events, during the 2006 Wetzel disciplinary trial.  He was on the sergeants' promotional list at the time.  We believe his penalty was for a five day or less suspension, with the disciplinary record removed from his personnel records.  (Apparently a common practice, "sterilizing" an officer's records to make them appear unblemished.)  Officer Holihan subsequently was promoted to the rank of sergeant.

Also, as described below, he was paid only Sgt. Wetzel's subpoena fee, not his ordinary wage, in an abusive manner, as discussed next.

### 4.  Penalty of lost pay if testifying for Lt. Wetzel

Without informing Sgt. Wetzel's attorney, Chief Nulty and his attorneys decided that any witnesses called to testify for Sgt. Wetzel would not be paid their wages for this time.   This was not only unprecedented (as police officers are always paid when required to give testimony in connection with their employment—and subpoena fees tendered to them are turned over to the municipal employer), but also irrational, as this ostensibly official proceeding was conducted for ostensibly governmental reasons, and thus

participation was not for the personal benefit of Sgt. Wetzel or her witnesses.  Thus, for participation, they should be paid.  See, *Wetzel 4.*

As a further example of the intentional abuse, Officer Holihan had be requested by the defense to testify.  The prosecution did not inform Sgt. Wetzel that Officer Holihan was directed to the premises and essentially held incommunicado until defense counsel inquired about whether he had arrived and was present.  When placed on the stand by the defense, Officer Holihan directed some ire at the Sgt. Wetzel's attorney for his having been present for several hours, for which, he was told by Chief Nulty's administration, he would not be paid.

Thus, with the ad hoc procedures concocted by Chief Nulty and his lawyers, Sgt. Wetzel was required to pay a subpoena fees to obtain the testimony of her co-workers, and the co-workers would be paid only such fee, and not their (considerably higher) police officer wages.   Thus, both the respondent and her witnesses are financially punished for putting on a disciplinary defense.

> *REPRISAL TIP:   It is an effective tool of retaliation to make co-workers resent the subject of reprisal.*
>
> *FURTHER REPRISAL TIP:   Force the respondent employee to pay subpoena fees, and deprive co-worker witness of his or her ordinary wage entitlement.  The respondent is thus forced to expend money for subpoena fees to put on the defense, and coworkers called as defense witnesses are denied their ordinary wage for assisting the  subject of reprisal.*

And as mentioned in Part II, above, Sgt. Wetzel was similarly denied her ordinary wage for attending her own disciplinary trial.

### B.  *Intimidation and Inconveniencing of non-employee witnesses*

Nicole is an "innocent victim" to the reprisal against Lt. Wetzel.  Her boyfriend got drunk, disorderly and injured.  He called her.  She called the police station to ascertain his circumstances.  Thereafter, and unbeknownst to her, she became intentionally mischaracterized by Chief Nulty and his lawyers as a "victim of domestic violence," and her very personal telephone conversations published "to the world" by Chief Nulty's prosecutor in the unauthorized disciplinary trial before HHO Wooley.

HHO Wooley allowed her to be victimized by the disciplinary proceedings, by denying her request that her personal telephone conversations be suppressed, and the audiotape evidence of her conversations with Frank Dowd eliminated from the proceeding.  If HHO Wooley had granted this request, the only record of the conversations would be in the minds of the few people to attended the Wetzel trial.  HHO Wooley denied this request, thereby creating a permanent public publication of the personal conversations, some of the most obnoxious portions thereof quoted by Mr. Klein in his publicly accessible Closing Statement.

HHO Wooley has further victimized Nicole by accusing her, in his Report, of looking to "make a few bucks off of this."  Wooley Report at p. 49.  Mr. Wooley failed to mention that Nicole commenced a federal action under the Federal Wiretap Act (now

being handled by attorney William Gerard), and that Mr. Wooley is a personally named defendant.

At the disciplinary trial, Nicole, with infant child, made repeated visits to the hearing location at Town Hall to give testimony, but was repeatedly turned away by HHO Wooley, for unjustified reasons.

She had to defend herself, and it appears her personal integrity, against the questioning of Mr. Klein—questioning which appeared intended to seek to embarrass Nicole, and which certainly was embarrassing for her domestic partner, Mr. Dowd. Thus, these citizens became victim of Chief Nulty's Reprisal Plan.

> REPRISAL TIP:  The fact that innocent citizens in the community may become victim of a Reprisal Plan should be no deterrence to undertaking the reprisal.

### C. The Town and its Police Chief maliciously seek to burden, harass, intimidate and disparage Sgt. Wetzel's counsel, by lodging a professional grievance

During the disciplinary trial, the HHO and the outside counsel Prosecutor saw the opportunity to further harass the defense when the defense obtained the cooperation of another victim of the Town's illegality, Mr. Dowd's girlfriend Nicole.

Keane & Beane's Lance Klein, accused Lt. Wetzel's attorney of professional misconduct and lodged a professional grievance alleged unethical conduct against him. They also billed the Town over $3,000 for preparing this grievance—maliciously intended to burden and harass him for representing his client, and to disparage his good name and reputation.  Mr. Klein announced the filing of this grievance publicly, and certainly informed the Police Chief and the Town Board.  Such public disclosure by Mr. Klein was improper.

In January 2008, attorney Diederich received notice from the Committee on Professional Standards that the professional grievance had been dismissed.   Unlike Keane & Beane, he will not seek payment from his client for his client the time and effort necessary to defend against the malicious and unfounded grievance.

## VI. The Disparate imposition of punishment—men who shoot colleagues receive a slap on wrist, while the Chief asks for 62 days forfeiture of salary against his female lieutenant, merely for opposing his illegality

In this disciplinary case, the HHO was the hanging judge, and gave recommended the absolute maximum punishment short of termination (which even Chief Nulty's counsel did not dare request).   With the July 4, 2004 charges still looming over her head, Chief Nulty can draw such blood at the next go around, if he decides he wants the ultimate reprisal of termination of public employment.

It is interesting to contrast Chief Nulty's (and his attorneys') concept of appropriate punishment against a female who opposes unlawful discrimination with the punishments meted out for such things as lying to superiors or accidentally shooting or almost shooting fellow officers.

51

REPRISAL TIP:  It is absolutely vital that the subject of reprisal recognize that she will be treated most harshly absent submission to the Reprising Official's will, and that she is powerless to resist.  Make clear that you can fire her, and that her only remedy then will be seeking judicial relief which may take years and years, and be resolved only after her police career has been long since destroyed.

ADDITIONAL REPRISAL TIP:   Make sure all subordinates are aware of the Reprising Officials complete and absolute power of reprisal.  Inform them that there is absolutely nothing they can do to counter this absolute power, and that he can terminate their jobs, and destroy their civil service careers, at will and without effective recourse.  Tell them that the Reprising Official will be long retired, and they will be long in a non-police career, before even the possibility of a jury trial.

### A.   *Chief Nulty argues for a penalty amounting to forfeiture of 3 months' pay*

In the "Closing Statement" submitted by Chief Nulty's attorneys, he states that forfeiture of 62 days of pay is the appropriate penalty, "[g]iven the gravity of the offenses, as well as Respondent's refusal to acknowledge that she did anything wrong."   Under the PBA contract, such a penalty would equate to being punished approximately 3 months work without pay.  Chief Nulty did not seek termination only because, as stated in the Closing Statement, "Since … Respondent has no prior disciplinary record, it is appropriate that the Chief is seeking forfeiture of salary rather than termination."

### B.   *Chief Nulty allows "slaps on the wrist" for his favored men regarding July 4 and July 7, 2004 events*

In stark contrast to the exceedingly harsh penalty sought by Chief Nulty against Lt. Wetzel is the punishment which he has meted out to his favored men, even those committing serious infractions.

### D.   *Making a "mountain made out of a mole hill"*

In seeking formal discipline for what was, a most, minor mistakes in judgment if mistakes at all, the Police Chief and his counsel have intentionally created the "proverbial mountain over a mole hill" for ulterior motives of discrimination and reprisal.  There was no remedial or corrective goal intended.  Only reprisal and harassment.  This was employee management by tyranny.

The Police Chief's wrongful goals also provided the opportunity for the financial enrichment of the Town's outside counsel, who were more than happy to oblige, and to select a lawyer friend (the hearing officer) who could assist in this charade.  These lawyers had their own obvious self interests—Mr. Klein in "winning" both the disciplinary case and the federal litigations, and Mr. Wooley in assuring himself future employment with this Town or otherwise at the recommendation of Mr. Klein and his firm.

## VII.   Denying the civil servant her right to assert the defense of reprisal intentionally denies her State civil service law protection, further undermining merit protection

The civil service is designed to protect good civil servants.  In return for receiving less compensation than that provided in the private sector, they are supposed to receive job security for a job properly done.

The New York Legislature has recognized the potential for abuse against civil servants in the form of retaliatory disciplinary action.   Consequently, it enacted Civil Service Law § 76-b to provide protection against reprisal.

Here, the HHO denied Sgt. Wetzel the right to defend upon such grounds.  Astonishingly, he viewed such defense as procedurally improper because, in his view, the Town had not been provided with adequate notice of the claim of retaliation.  Of course, Sgt. Wetzel's initial federal lawsuit claimed retaliation, as did her amended lawsuit, as did her second federal lawsuit seeking a TRO, as did her charges of discrimination and reprisal made to the EEOC, as did her PBA attorney's formal answer to the disciplinary charges which included the explicit Affirmative Defense that the disciplinary charges were the result of "selective enforcement" by the police chief.   Thus, for HHO Wooley to disallow the introduction of evidence on the defense of reprisal was patently absurd.  It further evidences his role as a henchman.

> REPRISAL TIP:  It is important to hinder any attempts by the subject of reprisal to prove that reprisal is taking place.

## VIII.   Reprisal beyond the Wetzel case

### A.  Lt. Wetzel's uniquely qualities will be reprisal easier against less exemplary civil servants

Lt. Wetzel is a police a lieutenant with superior supervisory skill and, it appears, the respect of her subordinates.  Thus, the Reprising Official must be more creative in retaliating against someone with her qualities than an "ordinary" employee.

Moreover, because of her acknowledged competent work as a lieutenant, and ability to make the department look good for Chief Nulty, it does not appear that he wishes her employment terminated.  He merely wishes her to be "in her place," uncritical of his gender bias and the Town's political cronyism.

### B.  Reprisal against less exemplary civil servants is easier

As to less exemplary employees, the Reprisal Plan can be much more direct, and vigorous.  For example, if Sgt Wetzel were a rookie, rather than an experienced cop, it is apparent from Henchman hearing officer Wooley's Report and Recommendation that he would have recommended termination of employment.  The Henchman hearing officer would (and did) refuse to consider that the male arresting officer who was "booking" Mr. Dowd received only a slap on the wrist, or the selective inclusion of evidence by the

police chief's henchmen designed to paint one picture, while omitting (and perhaps destroying) any and all exculpatory evidence.

With the Henchman hearing officer findings and recommendations, and the inability to defend himself or herself, a rookie cop, for example, could easily be fired as part of a Reprisal Plan, with little or no remedy available to rectify the situation. A reviewing court would ordinarily look only at the Henchman hearing officer's determination of facts, especially on matters of credibility. It will not retry the case. The reprisal will then succeed.

## IX.     Conclusion

Hopefully, the reader has found this to be an informative and interesting guide to the many ways in which civil servants can be abused and retaliated against. Whether this guide should be used depends on whether the courts will provide civil servants with the legal protection they are entitled to, or whether the courts will allow local government free reign to ignore the law, including fundamental constitutional rights. As the attorney for the victim of reprisal, Lt. Wetzel, it is my hope that this Manual can be used by advocates for upstanding civil servants to oppose abuses such as those described herein.

Draft document prepared by the
Law Office of Michael Diederich, Jr.

Attachment "1" –
Nicole Colandrea / Lorraine Wetzel telephone conversation of July 7, 2004

**Wetze**l:              Orangetown Police

**Nicole**:              Hi… um… My name is Nicole my boyfriend was arrested earlier this evening…um… he just call… um he was arrested and they told me that they would let me know if he was released because he was very very drunk and he is very abusive when he is drunk. So I just received…um… one, two three phone calls from him in a row

**Wetzel:**              Well, who is your boyfriend

**Nicole:**              Frank Dowd

**Wetzel:**              You received three phone calls from him?

**Nicole:**              Yes just now from the Orangetown Police Department cause I have caller ID…

**Wetzel:**              Yes

**Nicole:** …and he keeps calling and I'm wondering did they let him out?

**Wetzel:**              No, he is down in our holding cell

**Nicole:**              Oh he is in he holding cell, very good. Ok so he'll be there all evening?

**Wetzel:**              That I can't tell you

**Nicole:**              Oh alright, cause you know, like, I'm not going to be able to sleep cause he's still very drunk, cause when he's not drunk he does not call me names, he's calling me three times in a  row still calling me abusive names and…

**Wetzel:**              Do you want to sign a charge?

**Nicole:**  Well I'm just trying to figure out if, you know, he's out, if he's…

**Wetzel:**              He's in the holding cell

**Nicole:** Yeah

**Wetzel:**              Let me put you down to the arresting officer

**Nicole:**   Alright, thank you

**Wetzel:**              Ok

55

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

LORRAINE WETZEL,

Plaintiff,

-against-

TOWN OF ORANGETOWN, et al

Defendants.

-----------------------------------------------------------------

COMPLAINT

("*Wetzel 6*")

08 CIV 0196

"*ECF Case*"

MICHAEL D. DIEDERICH, JR.
*Attorney for Plaintiff    (MD 2097)*
361 Route 210
Stony Point, N.Y. 10980
845-942-0795
Mike@DiederichLaw.com

To: Teresa Kenny, Town Attorney
Town of Orangetown
26 Orangeburg Road
Orangeburg, NY 10962
845-359-5100